## THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| S.A.P. et al, <br><br>       Plaintiffs, <br><br>       v. <br><br> CHAD F. WOLF, in his official capacity as Acting Secretary of Homeland Security; KENNETH T. CUCCINELLI, in his official capacity as Acting Director of U.S. Citizenship and Immigration Services; WILLIAM P. BARR, in his official capacity as Attorney General; and JAMES MCHENRY, in his official capacity as Director of the Executive Office for Immigration Review, <br><br>       Defendants. | Case No.: 19-cv-3549 |

## PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION
## AND SUPPORTING MEMORANDUM

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................................................... 1

BACKGROUND .................................................................................................................................... 3

    A.    Asylum and Withholding of Removal Protections in the United States ........................... 3

    B.    The Creation of the 1996 Expedited Removal System ....................................................... 4

    C.    2019 Changes to the Expedited Removal System for Certain Noncitizens ....................... 6

    D.    The 2019 Decision and *Dicta* in *L-E-A- II* ............................................................................ 7

    E.    The New PSG Guidance ...................................................................................................... 9

    F.    Plaintiffs ............................................................................................................................. 10

LEGAL STANDARD ........................................................................................................................... 12

ARGUMENT ........................................................................................................................................ 14

I.      PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS ................................................. 14

    A.    The Instruction to Reject PSGs Based on "Ordinary" Families Is Unlawful ................. 14

           1.    The Effort to Deny Protection to "Ordinary" Families Is Based on an Unreasonable Interpretation of the INA That Arbitrarily Departs from Past BIA and Circuit Court Precedent ................................................................ 14

           2.    The INA Prohibits a Presumption Against Family-Based PSGs ........................ 21

    B.    The Instruction to Disregard Contrary Court of Appeals Precedent Violates the APA ..................................................................................................................................... 22

II.     PLAINTIFFS ARE SUFFERING IRREPARABLE HARM ........................................................ 25

III.    THE BALANCE OF HARMS AND THE PUBLIC INTEREST BOTH FAVOR INJUNCTIVE RELIEF ................................................................................................................. 26

IV.   THE COURT SHOULD GRANT SYSTEM-WIDE RELIEF AND ENJOIN THE NEW PSG GUIDANCE .......................................................................................................................... 28

CONCLUSION ..................................................................................................................................... 32

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Matter of A-B-,*
      27 I & N Dec. 316 (A.G. 2018) ................................................................................. 2, 20

*Matter of Acosta,*
      19 I & N Dec. 211 (BIA 1985) ..................................................................................... 20

*Al–Ghorbani v. Holder,*
      585 F.3d 980 (6th Cir. 2009) ........................................................................................ 15

*Anderson v. Heckler,*
      756 F.2d 1011 (4th Cir. 1985) ...................................................................................... 23

*Ayele v. Holder,*
      564 F.3d 862 (7th Cir. 2009) ........................................................................................ 15

*Barr v. East Bay Sanctuary Covenant,*
      ___ S. Ct. ____, 2019 WL 4292781 (Sept. 11, 2019) .................................................... 6

*Batalla Vidal v. Nielsen,*
      279 F. Supp. 3d 401 (E.D.N.Y. 2018) .......................................................................... 31

*Bernal-Rendon v. Gonzales,*
      419 F.3d 877 (8th Cir. 2005) ........................................................................................ 15

*Brown v. Plata,*
      563 U.S. 493 (2011) ...................................................................................................... 28

*Matter of C-A-,*
      23 I. & N. Dec. 951 (BIA 2006) ................................................................................... 17

*Califano v. Yamasaki,*
      442 U.S. 682 (1979) ...................................................................................................... 28

*California v. Azar,*
      911 F.3d 558 (9th Cir. 2018) ........................................................................................ 30

*Castillo-Arias v. Att'y Gen.,*
      446 F.3d 1190 (11th Cir. 2006) .................................................................................... 16

*Chevron USA, Inc. v. Natural Resources Defense Council, Inc.,*
      467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984) ........................................ *passim*

*Matter of Cienfuegos,*
      17 I & N Dec. 184 (BIA 1979) ..................................................................................... 23

*Cooper v. Aaron*,
  358 U.S. 1 (1958) .................................................................................................. 22

*Crespin-Valladares v. Holder*,
  632 F.3d 117 (4th Cir. 2011) ........................................................................... 15, 24

*Matter of Cruz De Ortiz*,
  25 I & N Dec. 601 (BIA 2011) ............................................................................. 23

*Damus v. Nielsen*,
  313 F.Supp.3d ........................................................................................................ 27

*District of Columbia v. Dep't of Labor*,
  819 F.3d 444 (D.C. Cir. 2016) .............................................................................. 13

*Doe v. Rumsfeld*,
  341 F. Supp. 2d 1 (D.D.C. 2004) .......................................................................... 29

*E. Bay Sanctuary Covenant v. Trump*,
  932 F.3d 742 (9th Cir. 2018) ................................................................................ 30

*East Bay Sanctuary Covenant v. Barr*,
  385 F. Supp. 3d 922 (N.D. Cal. 2019) .................................................................... 6

*Encino Motorcars, LLC v. Navarro*,
  136 S. Ct. 2117 (2016) .................................................................................... 18, 25

*Fox v. Clinton*,
  684 F.3d 67 (D.C. Cir. 2012) ........................................................................... 12, 13

*Grace v. Whitaker*,
  344 F. Supp. 3d 96 (2018) *appeal filed* ......................................................... *passim*

*Guilford Coll. v. McAleenan*,
  389 F. Supp. 3d 377 (M.D.N.C. 2019) .................................................................. 30

*Matter of H-*,
  21 I. & N. Dec. 337 (BIA 1996) (en banc) ........................................................... 17

*Hall St. Assocs., L.L.C. v. Mattel, Inc.*,
  552 U.S. 576 (2008) .............................................................................................. 19

*INS v. Cardoza-Fonseca*,
  480 U.S. 421 (1987) ..................................................................................... 4, 6, 16

*Matter of Kasinga*,
  21 I. & N. Dec. 357 (BIA 1996) (en banc) ........................................................... 17

*Matter of L-E-A-*,
  27 I. & N. Dec. 581 (A.G. 2019) ..................................................................... *passim*

*Leiva-Perez v. Holder*,
  640 F.3d 962 (9th Cir. 2011) ........................................................................ 25

*Lone Mountain Processing, Inc. v. Sec'y of Labor*,
  709 F.3d 1161 (D.C. Cir. 2013).................................................................... 18

*Lopez v. Heckler*,
  725 F.2d 1489 (9th Cir.), *vac'd on other grounds*, 469 U.S. 1082 (1984) .................................... 22, 23

*M.G.U. v. Nielsen*,
  No. 18-1458, 2018 WL 3474189 (D.D.C. July 18, 2018) .................................... 27

*Matter of M-E-V-G-*,
  26 I. & N. Dec. 227 (BIA 2014) .................................................... 17, 18, 21, 24

*Marbury v. Madison*,
  5 U.S. 137 (1803) ......................................................................................... 22

*Montclair v. Ramsdell*,
  107 U.S. 147 (1883) ..................................................................................... 20

*Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*,
  545 U.S. 967 (2005) ..................................................................................... 16

*Nat'l Min. Ass'n v. Army Corps of Eng'rs*,
  145 F.3d 1399 (D.C. Cir. 1998)..................................................................... 29

*Nken v. Holder*,
  556 U.S. 418 (2009) ..................................................................................... 27

*O'Donnell Const. Co. v. District of Columbia*,
  963 F.2d 420 (D.C. Cir. 1992)....................................................................... 27

*Padilla v. Kentucky*,
  559 U.S. 356 (2010) ..................................................................................... 25

*Pirir-Boc v. Holder*,
  750 F.3d 1077 (9th Cir. 2014) ...................................................................... 21

*R.I.L-R. v. Johnson*,
  80 F.Supp.3d 164 (D.D.C. 2015).................................................................... 27

*Rios v. Lynch*,
  807 F.3d 1123 (9th Cir. 2015) ................................................................. 15, 24

*Rivera-Barrientos v. Holder*,
  666 F.3d 641 (10th Cir. 2012) ...................................................................... 15

*S.E.R.L. v. Att'y Gen.*,
  894 F.3d 535 (3d Cir. 2018) ......................................................................... 15

*In Re S-P-*,
  21 I. & N. Dec. 486 (B.I.A. 1998) ........................................................................ 17

*Sottera, Inc. v. FDA*,
  627 F.3d 891 (D.C. Cir. 2010) ............................................................................. 12

*Torres v. Mukasey*,
  551 F.3d 616 (7th Cir. 2008) ............................................................................... 15

*Troy Corp. v. Browder*,
  120 F.3d 277 (D.C. Cir. 1997) ............................................................................. 13

*U.S. Ass'n of Reptile Keepers v. Jewell*,
  106 F. Supp. 3d 125 (D.D.C. 2015) (Moss, J.) .................................................... 29

*U.S. v. Perchman*,
  42 U.S. 51 (1833) ................................................................................................. 20

*Matter of V-T-S-*,
  21 I. & N. Dec. 792 (BIA 1997) (en banc) .......................................................... 17

*Vanegas-Ramirez v. Holder*,
  768 F.3d 226 (2d Cir. 2014) ................................................................................ 15

*Villalta-Martinez v. Sessions*,
  882 F.3d 20 (1st Cir. 2018) .................................................................................. 15

*Vumi v. Gonzales*,
  502 F.3d 150 (2d Cir. 2007) ................................................................................ 15

*Matter of W-G-R-*,
  26 I. & N. Dec. 208 (BIA 2014) .......................................................................... 17

**Statutes**

5 U.S.C. § 706(2)(a) ................................................................................................. 12

8 U.S.C. § 1101(a)(42)(A) .................................................................................... 3, 19

8 U.S.C. § 1158(b)(1)(B)(i) ....................................................................................... 3

8 U.S.C. § 1158(b)(l)(A) ........................................................................................... 3

8 U.S.C. § 1182(a)(9)(A)(i) ....................................................................................... 5

8 U.S.C. § 1225(b)(1) ........................................................................................... 4, 10

8 U.S.C. § 1225(b)(l)(B)(ii) ....................................................................................... 6

8 U.S.C. § 1225(b)(l)(B)(iii)(II) ................................................................................ 4

8 U.S.C. § 1225(b)(l)(B)(iii)(III) ............................................................................... 5

8 U.S.C. § 1231(b)(3) .......................................................................................................... 4

8 U.S.C. § 1252(e)(3) ..................................................................................................... 29, 30

8 USC § 1229 ..................................................................................................................... 6

Illegal Immigration Reform and Immigrant Responsibility Act of 1996 .................................... 20

Refugee Act of 1980, Pub. 96-212, 94 Stat. 102 ............................................................. *passim*

**Other Authorities**

8 C.F.R. § 208.30(d) ........................................................................................................ 4

8 C.F.R. § 208.30(e)(4) .................................................................................................... 4

8 C.F.R. § 208.30(e)(5)(iii) ............................................................................................... 7

8 C.F.R. § 208.30 (f) ........................................................................................................ 6

8 C.F.R. § 208.30(g)(1) .................................................................................................... 5

8 C.F.R. § 1208.16(b)(2) .................................................................................................. 6

Fed. R. Civ. P. 4(i) ........................................................................................................... 1

G.A. Res. 217A ................................................................................................................ 17

*Guidance for Processing Reasonable Fear, Credible Fear, Asylum, and Refugee Claims
in Accordance with Matter of L-E-A-,* ("USCIS Guidance") ............................................ *passim*

https://www.uscis.gov/legal-resources/policy-memoranda .......................................................... 9

Molly O'Toole, *Border Patrol agents, rather than asylum officers, interviewing families
for 'credible fear',* Los Angeles Times, Sep. 19, 2019 ........................................................ 2

*Refugees and Stateless Persons.,* U.N. Doc. A/CONF.2/108/Rev.1, https://
www.refworld.org/docid/40a8a7394.html (July 25, 1951) ................................................ 17

**INTRODUCTION**

In September 2019, Defendants enacted new written policies designed to dismantle longstanding protections for asylum seekers who, like Plaintiffs, were targeted for persecution in their home countries because they are members of a particular family. Unless this Court issues an immediate injunction against these new policies, Defendants will deport Plaintiffs and countless other noncitizens with meritorious claims for asylum and withholding of removal to their countries of origin, where they face serious risk of physical violence and death.

Defendants' new policies deprive noncitizens in expedited removal proceedings of a meaningful opportunity to obtain protection from persecution on account of their membership in a family-based particular social group ("PSG"). Defendants implemented their new policies by issuing two written guidance documents to asylum officers in September 2019 (the "New PSG Guidance"). The New PSG Guidance purports to implement *Matter of L-E-A-*, 27 I. & N. Dec. 581 (A.G. 2019) ("*L-E-A- II*"), a legal opinion by the Attorney General regarding family-based social groups as a protected ground. That opinion suggested—in *dicta*—that families cannot meet the social distinction requirement for PSGs unless they "carr[y] greater societal import" than "ordinary" families and are "recognizable by society at large." *Id.* at 595. This *dicta* broke from decades of past precedent recognizing that ordinary families constitute PSGs under the Immigration and Nationality Act ("INA").

The Attorney General's *dicta* represents an unlawful change to our existing asylum laws that would: (i) preclude members of "ordinary" families from seeking protection from persecution based on their family membership, (ii) arbitrarily limit asylum protections to members of well-known or famous families, and (iii) subvert the will of Congress which, through the INA, sought to offer protection to "particular" social groups not "extraordinary"

social groups.

The New PSG Guidance unreasonably and unlawfully interprets the INA term "particular social group" to exclude most families, which is at odds with the statutory text, context, and legislative history, and contrary to a substantial body of circuit and Board of Immigration Appeals ("BIA" or "Board") precedent. The New PSG Guidance also violates the plain language of the INA and imposes an unlawful presumption against family-based PSGs, arbitrarily departing from decades of agency guidance requiring an individualized, fact-based, case-by-case social group analysis. And the New PSG Guidance fails to adequately acknowledge, much less reasonably explain, its departure from settled law. Because it is arbitrary, capricious, and contrary to law, the Court should vacate the New PSG Guidance under the Administrative Procedure Act ("APA").

The New PSG Guidance also violates the APA by explicitly prohibiting asylum officers from applying decades of federal courts of appeals and BIA precedent recognizing that ordinary families constitute quintessential PSGs.

This Court recently issued a preliminary injunction against Defendants, prohibiting them from applying a very similar guidance memorandum following an earlier decision by the Attorney General, *Matter of A-B-*, 27 I. & N. Dec. 316 (A.G. 2018), and holding that directing asylum officers to ignore controlling court of appeals precedent is "clearly unlawful." *Grace v. Whitaker*, 344 F. Supp. 3d 96, 137-38 (2018), *appeal filed*.[1]

This Court should take similar action to issue a preliminary injunction and prevent application of the unlawful New PSG Guidance here. Relying on these new policies, asylum officers have unlawfully denied Plaintiffs' claims for asylum and withholding of removal and

---

[1] The *Grace* litigation involves a similar procedural history and challenge to a similar directive by Defendants that upends decades of precedent interpreting and applying key aspects of asylum law.

ordered them removed to countries where they face serious risk of violent persecution and death. First, the Court should preserve the status quo by enjoining the Defendants from deporting Plaintiffs pending adjudication of their claims. Second, the Court should enjoin the Defendants from implementing the New PSG Guidance to protect thousands of similarly situated asylum seekers from irreparable harm while this case is pending adjudication.

## BACKGROUND

### A. Asylum and Withholding of Removal Protections in the United States

Congress enacted the current asylum system in 1980 in order to bring U.S. law into conformity with our obligations under the United Nations Convention Relating to the Status of Refugees and 1967 United Nations Protocol Relating to the Status of Refugees. *See* Refugee Act of 1980, Pub. 96-212, 94 Stat. 102. To be eligible for asylum, a noncitizen must establish that she is "a refugee within the meaning of [8 U.S.C.] section 1101(a)(42)(A)[.]" 8 U.S.C. § 1158(b)(l)(A); *see also* 8 U.S.C. § 1158(b)(1)(B)(i). A refugee is defined as:

> any person who is outside any country of such person's nationality or, in the case of a person having no nationality, is outside any country in which such person last habitually resided, and who is unable or unwilling to return to, and is unable or unwilling to avail himself or herself of the protection of, that country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, **membership in a particular social group**, or political opinion[.]

8 U.S.C. § 1101(a)(42)(A) (emphasis added).

Consistent with international law, the definition of "refugee" does not require a showing of certain harm. Instead, individuals can establish eligibility for asylum based on a "well-founded fear of persecution," which the Supreme Court has defined as at least a 1 in 10 chance of persecution. *See INS v. Cardoza-Fonseca*, 480 U.S. 421, 430, 440 (1987).

A noncitizen who is ineligible for asylum may apply for other forms of relief, including withholding of removal, in cases in which the applicant can show "that it is more

likely than not that he or she would be persecuted on account of" a protected ground if removed from the United States. 8 C.F.R. § 1208.16(b)(2); *see also* 8 U.S.C. § 1231(b)(3).

### B. The Creation of the 1996 Expedited Removal System

Prior to 1996, noncitizens seeking protection from deportation or exclusion from the United States were generally entitled to a full hearing in immigration court, appellate review before the BIA, and judicial review in federal court, even if they were outside the United States seeking entry. But in 1996, Congress created a new removal mechanism called "expedited removal" for certain noncitizens seeking admission to the United States. *See* 8 U.S.C. § 1225(b)(1).

Through expedited removal, the government can summarily remove noncitizens after a preliminary inspection by an immigration officer, so long as the noncitizens do not express a fear of persecution in their country of origin. If noncitizens indicate fear of returning to their home country, they are entitled to receive a "credible fear interview" with an asylum officer, a non-adversarial process intended "to elicit all relevant and useful information bearing on whether the applicant has a credible fear of persecution or torture." 8 C.F.R. § 208.30(d). The asylum officer must "consider whether the [applicant's] case presents novel or unique issues that merit consideration in a full hearing before an immigration judge." 8 C.F.R. § 208.30(e)(4). If the asylum officer makes a negative credible fear determination, the officer must issue a written decision documenting "the officer's analysis of why, in light of [the] facts, the [applicant] has not established a credible fear of persecution." 8 U.S.C. § 1225(b)(l)(B)(iii)(II).

ln the expedited removal system, abbreviated credible fear proceedings often occur within days of arrival, with little to no preparation or assistance by counsel, little to no knowledge of asylum law by the applicant, no opportunity to examine witnesses or gather

evidence, and while the individual is detained. It is thus unrealistic for applicants in the expedited removal system to present a fully developed asylum claim.

A noncitizen who receives a negative credible fear determination is entitled to request a prompt review of that determination by an immigration judge. 8 U.S.C. § 1225(b)(l)(B)(iii)(III); *see also* 8 C.F.R. § 208.30(g)(1). However, immigration judge review of a negative credible fear decision does not entitle a noncitizen to many rights available in full removal proceedings under section 240 of the INA. And once an immigration judge makes a negative credible fear review decision, it is administratively final. Noncitizens who receive a negative credible fear determination by an asylum officer or immigration judge receive expedited removal orders and, upon removal, are subject to a five-year bar on admission to the United States. 8 U.S.C. § 1182(a)(9)(A)(i).

Given the truncated removal process and serious consequences of expedited removal, Congress was careful to include crucial protections to avoid sending asylum seekers back to harm. One such protection was to establish a low threshold at the credible fear stage to ensure that asylum seekers could develop valid asylum claims properly in a full trial-type hearing before an immigration judge. Congress thus viewed the credible fear process as an essential safeguard to prevent summary removals of bona fide asylum seekers.

To obtain asylum in full immigration removal proceedings, a noncitizen need only establish a 1 in 10 chance that he or she will be persecuted on account of one of the five protected grounds for asylum. *See Cardoza-Fonseca*, 480 U.S. at 440. By contrast, "[t]o prevail at a credible fear interview, the [applicant] need only show a 'significant possibility' of a one in ten chance of persecution, *i.e.*, a fraction of ten percent." *Grace,* 344 F. Supp. 3d at 127 (citing 8 U.S.C. § 1225(b)(l)(B)(v)). The reason for the low threshold at the credible fear

stage is understandable. An asylum claim is highly fact-specific and often will take significant time, resources, and expertise to develop, including expert testimony and extensive evidence about country conditions. It may also involve complex legal questions.

If an asylum officer finds that a noncitizen has a "credible fear," the individual is no longer subject to expedited removal proceedings and is entitled to a regular full hearing under 8 USC § 1229a before an immigration judge. At that hearing, the asylum seeker has the opportunity to develop a full record before the immigration judge, and the asylum seeker may appeal an adverse decision to the BIA and federal court of appeals. 8 C.F.R. § 208.30(f); *see also* 8 U.S.C. § 1225(b)(l)(B)(ii).

### C. 2019 Changes to the Expedited Removal System for Certain Noncitizens

Notwithstanding Congress' stated intent to protect bona fide asylum seekers from summary removal, on July 16, 2019, the Department of Justice ("DOJ") and the Department of Homeland Security ("DHS") published a joint interim final rule, entitled "Asylum Eligibility and Procedural Modifications." 84 Fed. Reg. 33,829 (July 16, 2019) (codified at 8 C.F.R. pts. 208, 1003, 1208).[2] The Rule imposes "a new mandatory bar for asylum eligibility for [noncitizens] who enter or attempt to enter the United States across the southern border after failing to apply for protection from persecution or torture in at least one third country through which they transited *en route* to the United States." *Id*. at 33,830.

These noncitizens are still subject to expedited removal proceedings and, while they are presumed to be ineligible to seek asylum, the government must still screen them for potential eligibility for withholding of removal and protection under the Convention against Torture. Noncitizens subject to this new regulation are evaluated by the asylum officer

---

[2] *See East Bay Sanctuary Covenant v. Barr*, 385 F. Supp. 3d 922, 935 (N.D. Cal. 2019), injunction stayed *sub. nom Barr v. East Bay Sanctuary Covenant*, ___ S. Ct. ____, 2019 WL 4292781 (Sept. 11, 2019).

under a higher "reasonable fear" standard described in 8 C.F.R. § 208.30(e)(5)(iii), rather than the intentionally low "credible fear" standard discussed above. If an asylum officer finds that a noncitizen has a "reasonable fear," the individual is entitled to a regular full hearing under 8 USC § 1229a before an immigration judge.

Regardless of which standard is applied, Defendants' newly enacted policies have the same effect: they unlawfully deny relief to noncitizens with meritorious claims by imposing new legal standards for family-based PSG claims that are inconsistent with U.S. law and treaty obligations.

### D. The 2019 Decision and *Dicta* in *L-E-A- II*

On July 29, 2019, Attorney General Barr issued *Matter of L-E-A*, 27 I. & N. Dec. 581 (A.G. 2019), which reversed part of a 2017 BIA decision discussing whether a Mexican man who fled extreme violence at the hands of a drug cartel had established a cognizable family-based PSG. In the earlier decision, the BIA held that "members of an immediate family may constitute a particular social group"—a determination that was conceded by the DHS in that case—but proceeded to deny Mr. L-E-A's claims, finding that his feared persecution from the cartel had an insufficient nexus to his family membership.

Although the BIA had already denied Mr. L-E-A's claims on nexus grounds, Defendant Barr's predecessor, Acting Attorney General Whitaker, employed a procedural mechanism to "certify" the BIA's prior decision to the Attorney General for review. Despite affirming the BIA's denial based on lack of nexus in the prior decision, Defendant Barr used this procedure as a vehicle to criticize the BIA and IJ below for accepting DHS's concession that Mr. L-E-A's family qualified as a PSG without undertaking an independent factual analysis.

In addressing this issue, Defendant Barr relied on a narrow and uncontroversial legal

principle: to determine whether an applicant for asylum or withholding is a member of a family-based "particular social group," for purposes of the INA, courts must assess all three PSG criteria identified in prior cases—immutability, particularity, and social distinction—on a case-by-case basis. *See* 27 I. & N. Dec. at 582, 584. In this respect, *L-E-A- II* broke no new ground; it simply reaffirmed settled law requiring adjudicators analyzing proposed PSGs to conduct "a fact-specific inquiry based on the evidence in a particular case." *See* 27 I. & N. Dec. at 584.

Despite the Attorney General's stated adherence to the principle of case-by-case adjudication, he nonetheless made several statements in *dicta* suggesting that family-based groups *ordinarily* will not meet the social distinction requirement for PSGs. For example, he stated that "unless an immediate family carries greater societal import, it is unlikely that a proposed family-based group will be 'distinct' in the way required by the INA for purposes of asylum." *Id.* at 595.The Attorney General further surmised that "[t]he fact that 'nuclear families' or some other widely recognized family unit generally carry societal importance says nothing about whether a *specific* nuclear family would be 'recognizable by society at large.'" *Id.* at 594 (citation omitted).

The Attorney General's statements represent a radical departure from past precedent by imposing new criteria to meet the social distinction requirement under which an applicant's family must "carr[y] greater societal import" than "ordinary" families and be "recognizable by society at large." This new legal standard precludes members of "ordinary" nuclear families from seeking protection from persecution based on their family membership and would arbitrarily limit asylum protections to members of well-known or famous families. There is nothing in the statutory term "particular social group" which indicates that Congress intended this protected characteristic to extend only to groups of people that are well-known.

### E.  The New PSG Guidance

On September 24, 2019, U.S. Citizenship and Immigration Services ("USCIS") issued a written Refugee, Asylum, and International Operations Directorate Officer Training Asylum Division Officer Training Course ("Credible Fear Lesson Plan"), entitled *Credible Fear of Persecution and Torture Determinations. See* Complaint, Ex. A.

The Credible Fear Lesson Plan instructs asylum officers to implement the *dicta* of *L-E-A- II* as follows:

> The relevant question in this analysis is not whether the degree and type of relationship that defines a potential family-based particular social group is immutable, particular and socially distinct. Rather, "[i]f an applicant claims persecution based on membership in his father's immediate family, then the adjudicator must ask whether that specific family is 'set apart, or distinct, from other persons within the society in some significant way.' It is not sufficient to observe that the applicant's society (or societies in general) place great significance on the concept of the family." *Matter of L-E-A-*, 27 I&N Dec. at 594 (citing *M-E-V-G-*, 26 I&N Dec. at 238). *Matter of L-E-A-* instructs that "[t]he fact that 'nuclear families' or some other widely recognized family unit generally carry societal importance says nothing about whether a specific nuclear family would be 'recognizable by society at large'" *Id.* Therefore, officers must analyze the specific group of people identified as a family group in making this assessment. Previous guidance that instructed officers to assess whether the society in question recognizes the type of relationship shared by the group as significant or distinct is no longer valid under Matter of L-E-A-.

*See* Credible Fear Lesson Plan at 23.

On or around September 30, 2019,[3] USCIS issued an unsigned, undated Policy Memorandum titled *Guidance for Processing Reasonable Fear, Credible Fear, Asylum, and Refugee Claims in Accordance with Matter of L-E-A-*, ("USCIS Guidance"). Complaint, Ex. B. The USCIS Guidance likewise instructs asylum officers to apply the *dicta* of *L-E-A- II* when conducting credible and reasonable fear interviews. It specifically directs that "in the ordinary case, a nuclear family will not, without more, constitute a 'particular social group'

---

[3] While this document is undated, the publicly available USCIS Memoranda website lists its publication date as September 30, 2019. *See* https://www.uscis.gov/legal-resources/policy-memoranda.

because most nuclear families are not inherently socially distinct." USCIS Guidance at 3-4.

The USCIS Guidance also announces a new policy not mentioned in *L-E-A- II* by mandating that, in making credible and reasonable fear determinations, USCIS asylum officers must ignore all federal court of appeals cases recognizing that "ordinary" families unambiguously qualify as PSGs under the INA:

> While a court order in *Grace v. Whitaker*, 344 F. Supp. 3d 96 (D.D.C. 2018), currently requires officers to apply the law of the circuit most favorable to an [applicant] undergoing credible fear screening, the Attorney General's decision in *Matter of L-E-A- [II]* is controlling law in every circuit, and must be applied going forward in every circuit, unless and until a circuit court holds to the contrary. The Attorney General in L-E-A- held that previous courts of appeals decisions that held that nuclear families categorically constituted particular social groups were interpretations of "particular social group," an ambiguous statutory term that the Attorney General has discretion to reasonably interpret. The Attorney General has reasonably interpreted that term to require social distinction and particularity, and has predicted that many family-based groups may not meet those requirements.

USCIS Guidance at 2, n.1.

*L-E-A- II* and the Credible Fear Lesson Plan and USCIS Guidance (defined above as "New PSG Guidance") establish written policies concerning credible and reasonable fear interviews and implementing the expedited removal provisions at 8 U.S.C. § 1225(b)(I).

### F.  Plaintiffs

Plaintiffs are predominantly women and children, seeking safety from violence and threats in other countries, including threats of violence, kidnapping, and death. *See* Ex. 1 (Plaintiff Declarations). For example, Plaintiffs R.C.E.A. and her children, Plaintiffs L.J.O.E., J.A.M.E. and C.J.M.E. fled Honduras after gang members beat her husband and killed the family dog in front of her and two of her children after her husband refused to pay a war tax. Ex. 1, Declaration of R.C.E.A. ("R.C.E.A. Decl.") ¶¶ 1-3. The gang members threatened to kill the whole family if they went to the police. *Id.* at ¶ 3.

Plaintiff Y.C.D. fled Honduras after a gang member, who raped his mother, told his mother that if she was not going to be his, he would kill her and then find her son, Plaintiff Y.C.D., and kill him too. Ex. 1, Declaration of E.D.A. ("E.D.A. Decl.") ¶ 2. Plaintiffs L.R.Q. and her son E.M.M.R. fled Guatemala after gang members began threatening E.M.M.R. because his older brother, L.R.Q.'s oldest son, refused to join their gang. Ex. 1, Declaration of L.R.Q. ("L.R.Q. Decl.") ¶ 2. *See also* Ex. 1, Declaration of S.G.F. ("S.G.F. Decl.") (fled Honduras with her three children after they began receiving death threats from a gang after her husband fled the country out of fear of retaliation from the gang for filing a police report against the gang for robbing his brother); Ex. 1, Declaration of K.G.J. ("K.G.J. Decl.") (fled Guatemala with her son after gang members told her she had three days to tell them where her partner, who refused to join the gang, was or they would kidnap her son, Plaintiff J.G.J.; those same gang members came looking for her after the three days had passed but she had already fled the country); Ex. 1, Declaration of M.A.C. ("M.A.C. Decl.") (fled Honduras with her son after gang members threatened to kill her and kidnap her sons if she did not work for them after her husband was violently beat for refusing to pay the gang money or join the gang); Ex. 1, Declaration of M.O.R.S. ("M.O.R.S. Decl.") (minor child fled Mexico after gang members threaten to "disappear him" after his mother stopped paying money to a gang that had been extorting her for years); Ex. 1, Declaration of J.S.R. ("J.S.R. Decl.") (fled Honduras with her child after gang members discovered her brother was a police officer and told him they were going to go after his family; those gang members subsequently identified her as a family member of her brother); Ex. 1, Declaration of A.G.T. ("A.G.T. Decl.") (fled Brazil with her son after being shot at (i) multiple times by gang members who killed her brother and (ii) by a loan shark who was owed money by her husband); Ex. 1, Declaration of D.A.M. ("D.A.M. Decl.") (fled Mexico with her

daughter after being followed by cartel members who want to kill her because of her husband, who disappeared two years ago); Ex. 1, Declaration of D.A.L. ("D.A.L. Decl.") (fled El Salvador after gang members, who committed a murder in front of her home, threatened to murder D.A.L. and her family; those same gang members followed through on their threat and murdered her half-brother. Prior to D.A.L. witnessing the murder, the gang members subjected her and her family to threats and extortion and shot at a different half-brother); Ex. 1, Declaration of P.A.O. ("P.A.O. Decl.") (fled Guatemala after a political party threatened to kill him because his father supported a different political party).

## LEGAL STANDARD

On a motion for a preliminary injunction, a court must consider "whether (1) the plaintiff has a substantial likelihood of success on the merits; (2) the plaintiff would suffer irreparable injury were an injunction not granted; (3) an injunction would substantially injure other interested parties; and (4) the grant of an injunction would further the public interest." *Sottera, Inc. v. FDA*, 627 F.3d 891, 893 (D.C. Cir. 2010) (internal quotation marks and citations omitted). All four factors favor an injunction in this case.

Under 5 U.S.C. § 706(2)(a), agency action must not be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." To survive an arbitrary and capricious challenge, an agency action must be "the product of reasoned decision making." *Fox v. Clinton*, 684 F.3d 67, 74–75 (D.C. Cir. 2012). The reasoned decision making requirement applies to judicial review of agency adjudicatory actions. *Id*. at 75. A court must not uphold an adjudicatory action when the agency's judgment "was neither adequately explained in its decision nor supported by agency precedent." *Id*. (citing *Siegel v. SEC*, 592 F.3d 147, 164 (D.C. Cir. 2010)).

In reviewing an agency's interpretation of a statute it is charged with administering, a

court must apply the framework of *Chevron USA, Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984). Under this two-step test, the court must first ask "whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Id.* at 842–43.

If a court finds that the statute is silent or ambiguous with respect to a particular issue, then Congress has not spoken clearly on the subject and a court is required to proceed to the second step of the *Chevron* framework. *Id.* at 843. Under *Chevron* step two, a court's task is to determine if the agency's approach is "based on a permissible construction of the statute." *Id*. To make that determination, a court again employs the traditional tools of statutory interpretation, including reviewing the text, structure, and purpose of the statute. *See Troy Corp. v. Browder*, 120 F.3d 277, 285 (D.C. Cir. 1997) (noting that an agency's interpretation must "be reasonable and consistent with the statutory purpose"). Ultimately, "[n]o matter how it is framed, the question a court faces when confronted with an agency's interpretation of a statute it administers is always, simply, whether the agency has stayed within the bounds of its statutory authority." *District of Columbia v. Dep't of Labor*, 819 F.3d 444, 449 (D.C. Cir. 2016) (citation omitted).

**ARGUMENT**

## I.   PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS.

### A.   The Instruction to Reject PSGs Based on "Ordinary" Families Is Unlawful

The New PSG Guidance effects an irrational and unlawful change in our asylum laws that reverses decades of circuit court and BIA authority interpreting the phrase "particular social group" as encompassing ordinary families. Moreover, there is nothing in the language of the statute that indicates that "particular social group" should be limited to groups that are in some way extraordinary. This New PSG Guidance (i) violates the APA because it is arbitrary, capricious, and contrary to law; and (ii) violates the INA by imposing an unlawful presumption against family-based PSGs.

### 1.   The Effort to Deny Protection to "Ordinary" Families Is Based on an Unreasonable Interpretation of the INA That Arbitrarily Departs from Past BIA and Circuit Court Precedent

The New PSG Guidance violates the APA because its instruction to asylum officers—that the "ordinary" family cannot be a "particular social group" within the meaning of the INA—represents a radical change in law that is arbitrary, capricious, is not the product of reasoned decision making, and "was neither adequately explained . . . nor supported by agency precedent." *Grace,* 344 F. Supp. at 120 (internal citation omitted). Through the New PSG Guidance, the government has unlawfully attempted to make *dicta* from *L-E-A- II* the law of the land, preventing asylum seekers from getting a full asylum hearing before an immigration judge,

The New PSG Guidance seeks to reverse decades of circuit court and BIA precedent holding that "ordinary" families qualify as PSGs under the plain language of the INA. The USCIS Guidance asserts that the Attorney General is free to reverse decades of court and BIA precedent, and is entitled to *Chevron* deference in doing so, because the term "particular social

group" is ambiguous. USCIS Guidance at 2, n.1. But while courts have recognized that the outer contours of this term may be ambiguous, they have *uniformly* held that it *unambiguously* encompasses ordinary nuclear families.

In fact, the *dicta* in *L-E-A II* is at odds with the conclusion of *every* circuit that has ever interpreted this language. *See Villalta-Martinez v. Sessions*, 882 F.3d 20, 26 (1st Cir. 2018) ("[I]t is well established that the nuclear family constitutes a recognizable social group . . ."); *Vanegas-Ramirez v. Holder*, 768 F.3d 226, 237 (2d Cir. 2014) (petitioner's "membership in his family may, in fact, constitute a 'social-group basis of persecution' against him"); *Vumi v. Gonzales*, 502 F.3d 150, 155 (2d Cir. 2007) (remanding a family-based claim because "[t]he BIA has long recognized that 'kinship ties' may form a cognizable shared characteristic for a particular social group"); *S.E.R.L. v. Att'y Gen.*, 894 F.3d 535, 556 (3d Cir. 2018) ("Kinship, marital status, and domestic relationships can each be a defining characteristic of a particular social group. . . ."); *Crespin-Valladares v. Holder*, 632 F.3d 117, 125 (4th Cir. 2011) ("the family provides a prototypical example of a particular social group") (internal quotations omitted); *Al–Ghorbani v. Holder*, 585 F.3d 980, 995 (6th Cir. 2009) ("[A] family is a 'particular social group' if it is recognizable as a distinctive subgroup of society."); *Torres v. Mukasey*, 551 F.3d 616, 629 (7th Cir. 2008) ("Our prior opinions make it clear that we consider family to be a cognizable social group . . . ."); *Ayele v. Holder*, 564 F.3d 862, 869 (7th Cir. 2009) ("Our circuit recognizes a family as a cognizable social group under the INA."); *Bernal-Rendon v. Gonzales*, 419 F.3d 877, 881 (8th Cir. 2005) ("[P]etitioners correctly contend that a nuclear family can constitute a social group."); *Rios v. Lynch*, 807 F.3d 1123, 1128 (9th Cir. 2015) (families are "quintessential" particular social groups); *Rivera-Barrientos v. Holder*, 666 F.3d 641, 648 (10th Cir. 2012) (approvingly citing the Board's prior characterization of particular social groups as including

those bound by kinship ties formulation); *Castillo-Arias v. Att'y Gen.*, 446 F.3d 1190, 1193 (11th Cir. 2006) (same).

Thus, despite the fact that the term "particular social group" may lend itself to some ambiguity, these prior circuit court decisions foreclose the new interpretation in *L-E-A- II* as a matter of law. *See Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 983 (2005) ("[A] judicial precedent holding that the statute unambiguously forecloses the agency's interpretation, and therefore contains no gap for the agency to fill, displaces a conflicting agency construction.").

Independent of overwhelming past precedent, the New PSG Guidance's directive that an "ordinary" family cannot be a "particular social group" within the meaning of the INA is not a reasonable interpretation of that broad statutory term. Congress adopted the facially broad term "particular social group" into the INA through the Refugee Act of 1980. The "motivation for the enactment of the Refugee Act" was the "United Nations Protocol Relating to the Status of Refugees ["Protocol"]," *INS v. Cardoza-Fonseca*, 480 U.S. 421, 424 (1987), "to which the United States had been bound since 1968," *id.* at 432–33. Thus, "[i]n interpreting the Refugee Act in accordance with the meaning intended by the Protocol, the language in the Act should be read consistently with the United Nations' interpretation of the refugee standards." *Grace*, 344 F. Supp. at 124.

The term "particular social group" is a term of art first used in the 1951 Refugee Convention.[4] Since that time, the family unit has been closely associated with the idea of a social group as those terms were used in post-war international human rights law instruments. Both the conference that unanimously adopted the 1951 Refugee Convention[5] and the Universal

---

[4] *See* Art. 1(A)(2), July 28, 1951, 19 U.S.T. 6259, 189 U.N.T.S. 137 (Refugee Convention).
[5] United Nations Conference of Plenipotentiaries on the Status of Refugees and Stateless Persons, *Final Act of the*

Declaration of Human Rights,[6] which was passed just two years earlier, explicitly recognize the principle that "the family" is "the natural and fundamental group unit of society."[7]

The BIA has long recognized that Congress' intent in enacting the Refugee Act was to align domestic refugee law with the United States' obligations under the Protocol, to give statutory meaning to "our national commitment to human rights and humanitarian concerns," and "to afford a generous standard for protection in cases of doubt." *In Re S-P-*, 21 I. & N. Dec. 486, 492 (BIA 1998) (quoting S. Rep. No. 256, 96th Cong., 2d Sess. 1, 4, reprinted in 1980 U.S.C.C.A.N. 141, 144).

For decades, BIA precedent has uniformly recognized that families are paradigmatic particular social groups under the INA. *See Matter of C-A-*, 23 I. & N. Dec. 951, 955 (BIA 2006) ("[s]ocial groups based on . . . family relationship are generally easily recognizable and understood by others to constitute social groups"); *Matter of V-T-S-*, 21 I. & N. Dec. 792, 798 (BIA 1997) (en banc) (analogizing the group "Filipino[s] of mixed Filipino-Chinese ancestry" to "kinship ties" when concluding it constituted a particular social group); *Matter of Kasinga*, 21 I. & N. Dec. 357, 365-66 (BIA 1996) (en banc) ("identifiable shared ties of kinship warrant characterization as a social group"); *Matter of H-*, 21 I. & N. Dec. 337, 342 (BIA 1996) (en banc) (noting that "clan membership . . . is inextricably linked to family ties" and therefore grounds for finding a particular social group); *see also Matter of M-E-V-G-*, 26 I. & N. Dec. 227, 240 (BIA 2014) (noting that the particular social group found in a prior case was "inextricably linked to family ties"); *Matter of W-G-R-*, 26 I. & N. Dec. 208, 216 (BIA 2014) (same).

---

*United Nations Conference of Plenipotentiaries on the Status of Refugees and Stateless Persons*., U.N. Doc. A/CONF.2/108/Rev.1, https:// www.refworld.org/docid/40a8a7394.html (July 25, 1951).

[6] G.A. Res. 217A, U.N. GOAR, 3d Sess., 1st plen. Mtg., U.N. Doc. A/810 (Dec. 12, 1948).

[7] *See also Final Act of the United Nations Conference of Plenipotentiaries on the Status of Refugees and Stateless Persons*, U.N. Doc. A/CONF.2/108/Rev.1 (articulating principle that "the family" is "the natural and fundamental group unit of society"). This language was adopted concurrently with the 1951 Refugee Convention, where the term "particular social group" was first used. Thus, the intent behind the original use of that term, later imported into the INA, was in fact to encompass and protect families.

The Board has also previously interpreted the "social distinction" component of the "particular social group" analysis to be focused "on the extent to which the group is understood to exist as a recognized component of the society in question." *Matter of M-E-V-G-*, 26 I. & N. Dec. 227, 239 (BIA 2014). The Board explained in *M-E-V-G-* that a "successful case"—*i.e.*, one in which the proposed group meets the standard—is one in which a group "is set apart within society in some significant way." *Id.* at 244.

The Attorney General's *dicta* in *L-E-A- II* is an abrupt departure from this well-settled law. It imposes a new requirement, beyond those in *Matter of M-E-V-G-*, that PSGs not only be socially distinct but also be of "greater societal import" than "ordinary" groups. *See* 27 I. & N. Dec. at 595. And it produces an irrational result that arbitrarily denies protections to members of "ordinary" nuclear families, while providing the same protections to members of well-known or famous families. *Cf., e.g.*, *Judulang*, 565 U.S. at 55 (rule disfavoring certain noncitizens that "bears no relation" to "the purposes of the immigration laws or the appropriate operation of the immigration system" is arbitrary and capricious).

Moreover, while the Attorney General recognized that he was departing from circuit court precedent addressing family-based PSGs generally, he did not acknowledge or explain his departure from precedent specifically addressing the "social distinction" component of the "particular social group" analysis, including *Matter of M-E-V-G-*. The absence of this recognition and a reasoned explanation further renders that departure unreasonable. *See Encino Motorcars, LLC v. Navarro,* 136 S. Ct. 2117, 2126 (2016) (an agency changing its interpretation of a statute must "at least 'display awareness that it is changing position' and 'show that there are good reasons for the new policy'") (quoting *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009)); *Lone Mountain Processing, Inc. v. Sec'y of Labor*,

709 F.3d 1161, 1164 (D.C. Cir. 2013) ("an agency changing its course must supply a reasoned analysis indicating that prior policies and standards are being deliberately changed, not casually ignored").

The *dicta* of *L-E-A- II*, which the government has now attempted to make the law of the land through the New PSG Guidance, is also poorly reasoned and illogical. The Attorney General attempted to justify his reinterpretation of the INA by misapplying the *ejusdem generis* canon of construction, claiming that this canon requires the term "particular social group" be read "in conjunction with the terms preceding it, which cabins its reach." *Matter of L-E-A-*, 27 I. & N. Dec. at 592. But the terms surrounding "particular social group"—"political opinion," "religion," "race," and "nationality" (8 U.S.C. § 1101(a)(42)(A))—are all extremely broad. Few persons exist who do not belong to a race, practice a religion, have a nationality, or hold a political opinion. Correctly applied, then, the *ejusdem generis* canon indicates that the term "particular social group" casts a very wide net. *See Hall St. Assocs., L.L.C. v. Mattel, Inc.*, 552 U.S. 576, 587 (2008). Certainly there is no indication in the other surrounding terms that individuals who possess the other protected characteristics, or that the characteristics themselves, must be something other than "ordinary."

The Attorney General also suggested that a broad interpretation of "particular social group" would "render virtually every [applicant] a member of a [particular social group]" and thus eligible for relief. 27 I. & N. Dec. at 593. But that conflates the particular social group analysis with the *separate* requirement that an applicant show that he was persecuted *because of* membership in a particular social group (the "nexus" requirement). Thus, the Attorney General's basic reasoning is illogical. Just as not everyone who possesses a race qualifies for asylum, not everyone who belongs to a particular social group qualifies for asylum. As Attorney General

Sessions noted in *A-B-*, nexus is "'where the rubber meets the road.'" 27 I. & N. Dec. at 338 (citation omitted).

The Attorney General further opined that "particular social group" should not be interpreted to encompass ordinary families because "family" is not one of the grounds for protection explicitly listed in the INA. *See L-E-A- II,* 27 I. & N. Dec. at 583. The INA term "particular social group," however, is intentionally broad and does not explicitly list any recognized groups. Congress' decision to use the broad international law term "particular social group," long understood to encompass families, rendered it unnecessary for Congress to also specifically list "family" as a protected group. And, in 1985, *Matter of Acosta*, the seminal Board decision interpreting that term for the first time, the Board specified that "kinship ties" are a "characteristic that defines a particular social group," 19 I. & N. Dec. 211, 233 (BIA 1985). This further confirms that, when Congress passed the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 and did not change the definition of refugee, it intended particular social group to encompass families.

In any event, the Attorney General's claim that specific types of PSGs must be named in the INA to qualify for protection thereunder would render the "particular social group" language meaningless since no particular social groups are named explicitly in the INA. Such an interpretation would be contrary to longstanding principles of statutory interpretation. *See Montclair v. Ramsdell,* 107 U.S. 147, 152 (1883) (interpreter must "give effect, if possible, to every clause and word of a statute"); *U.S. v. Perchman*, 42 U.S. 51, 69-70 (1833) ("It is one of the admitted rules of construction, that interpretation which . . . render an act null, are to be avoided").

The Attorney General's *dicta* suggesting that "ordinary" families generally are not

particular social groups is both an unreasonable reading of the INA—as evidenced by the dozens

of circuit court and Board decisions to the contrary—and poorly reasoned. The implementation

of this *dicta* in the New PSG Guidance is thus arbitrary, deprives asylum seekers of an

impartial adjudication of their claims based on the specific facts of their cases, and represents

an improper departure from prior policy.

### 2.   The INA Prohibits a Presumption Against Family-Based PSGs

The New PSG Guidance also violates the INA because it instructs asylum officers to

apply a presumption against claims premised on family-based PSGs. The USCIS Guidance

explicitly informs asylum officers that "in the ordinary case, a nuclear family will not, without

more, constitute a 'particular social group' because most nuclear families are not inherently

socially distinct." USCIS Guidance at 3-4. But, as repeatedly interpreted by the BIA and

courts, the INA requires an individualized approach to asylum adjudication. *See, e.g.*, *Matter of*

*M-E-V-G-*, 26 I. & N. Dec. at 242 ("[S]ocial group determination[s] must be made on a case-by-

case basis[.]"); *id*. at 251 (citing *Matter of Acosta*, 19 I. & N. Dec. at 233); *Pirir-Boc v. Holder*,

750 F.3d 1077, 1084 (9th Cir. 2014) ("[T]he BIA may not reject a group solely because it had

previously found a similar group in a different society" not to meet the legal standard).

In *Grace*, this Court struck down a similar directive creating a presumption against

asylum claims premised on social groups related to victims of gang and domestic violence. As

the Court held, such a "general rule is arbitrary and capricious because there is no legal basis

for an effective categorical ban on" certain categories of PSGs" and "runs contrary to the

individualized analysis required by the INA." *Id*. at 126. As the Court further explained:

> A general rule that effectively bars. . . claims related to certain kinds of violence
> is inconsistent with Congress' intent to bring "United States refugee law into
> conformance with the [Protocol]." *Cardoza-Fonseca*, 480 U.S. at 436-37, 107
> S.Ct. 1207. The new general rule is thus contrary to the Refugee Act and the
> INA. In interpreting "particular social group" in a way that results in a general

rule, in violation of the requirements of the statute, the Attorney General has failed to "stay[ ] within the bounds" of his statutory authority. *District of Columbia v. Dep't of Labor*, 819 F.3d at 449.

*Id.* at 126.

In this case, asylum officers have been applying the new PSG Guidance to effectively bar family-based PSGs, directly informing asylum seekers that "they cannot rely on family anymore to find a nexus to a protected ground." *See* Ex. 2, Declaration of Bridget Cambria, dated November 21, 2019, ¶ 13. Such a bar violates the INA, and this Court should strike down the New PSG Guidance for these reasons.

### B.     The Instruction to Disregard Contrary Court of Appeals Precedent Violates the APA

The New PSG Guidance is also unlawful because it instructs asylum officers to disregard any court of appeals precedent that contradicts the *dicta* of *L-E-A- II*. That wholesale rejection of federal court precedent contradicts basic separation-of-powers principles, and represents an irrational and radical departure from longstanding agency practice in violation of the APA.

The USCIS Guidance informs asylum officers that "the Attorney General's decision in *Matter of L-E-A- [II]* is controlling law in every circuit, and must be applied going forward in every circuit, unless and until a circuit court holds to the contrary." USCIS Guidance at 2, n.1. But is essential to our constitutional system that Executive Branch officials are bound by the decisions of Article III courts. *See Marbury v. Madison*, 5 U.S. 137, 177 (1803); *see also Cooper v. Aaron,* 358 U.S. 1, 17-19 (1958). Thus USCIS, like all executive agencies and officials, "is required to apply federal law as interpreted by the federal courts." *Lopez v. Heckler*, 725 F.2d 1489, 1503 (9th Cir.), *vac'd on other grounds*, 469 U.S. 1082 (1984). "[T]he executive branch defying the courts," *id*. at 1497, represents "shocking disrespect" for a co-equal branch,

*Anderson v. Heckler*, 756 F.2d 1011, 1013 (4th Cir. 1985). The government has long acknowledged these principles in the immigration context. *See, e.g.*, *Matter of Cruz De Ortiz*, 25 I. & N. Dec. 601, 603 n.1 (BIA 2011) (noting "we are bound" by circuit holding); *Matter of Cienfuegos*, 17 I. & N. Dec. 184, 186 (BIA 1979) (same). The USCIS Guidance, however, dispenses with this principle, instructing asylum officers to disregard any circuit court decision that is not consistent with *Matter of L-E-A II*, which (as discussed above in Section I.A.2) would include every circuit court decision applying the phrase "particular social group" to families.

This Court recently issued a preliminary injunction against Defendants prohibiting them from applying a similar directive in *Grace*, holding that directing asylum officers to ignore controlling court of appeals precedent is "clearly unlawful." 344 F. Supp. 3d at 137-38. As this Court explained, "an agency's interpretation of a provision may override a prior court's interpretation if the agency is entitled to *Chevron* deference and the agency's interpretation is reasonable. If the agency is not entitled to deference or if the agency's interpretation is unreasonable, a court's prior decision interpreting the same statutory provision controls." *Id*. at 137. Here, as discussed in detail above in Section I.A, the Attorney General's *dicta* in *Matter of L-E-A- II* is not entitled to deference for several reasons.

First, the simple fact that the Attorney General's discussion of family-based PSGs is *dicta* precludes *Chevron* deference with respect to those statements as a matter of law. *See Grace*, 344 F. Supp. 3d at 138 ("the only legal effect of [the Attorney General decision] is to overrule [a particular BIA decision]. Any other [] *dicta* would not be entitled to deference."). The USCIS Guidance explicitly asserts that deference is warranted because the Attorney General "has predicted that many family-based groups may not meet [the social distinction] requirements" for PSGs. But while *Chevron* deference may apply to an agency's precedential interpretation of

ambiguous statutory language, it does not apply to a *gratuitous prediction* about how statutory language may apply to an unknown set of facts.

Second, the Board and courts of appeals have uniformly held that while the outer contours of the term "particular social group" may be ambiguous, the term unambiguously encompasses the ordinary nuclear family. *See, e.g. Crespin-Valladares v. Holder*, 632 F.3d 117, 125 (4th Cir. 2011) ("the family provides a prototypical example of a particular social group") (internal quotations omitted); *Rios v. Lynch*, 807 F.3d 1123, 1128 (9th Cir. 2015) (families are "quintessential" particular social groups); *Gebremichael v. I.N.S.*, 10 F.3d 28, 36 (1st Cir. 1993) ("There can, in fact, be no plainer example of a social group based on common, identifiable and immutable characteristics than that of the nuclear family."). This precedent forecloses the new interpretation in *L-E-A- II* as a matter of law. *See Brand X*, 545 U.S. at 983.

Third, the Attorney General's newly proposed interpretation of the phrase "particular social group" is unreasonable in light of the legislative history and text of the INA and violates the INA's prohibition against establishing general presumptions against certain categories of asylum seekers.

Fourth, while the Attorney General recognized that he was departing from circuit court precedent addressing family-based PSGs generally, he did not acknowledge his departure from precedent specifically addressing the "social distinction" component of the "particular social group" analysis, including *Matter of M-E-V-G-*. In suggesting this aspect of the decision is nonetheless entitled to deference, the USCIS Guidance attempts to paper over these changes by stating that "[t]he Attorney General has reasonably interpreted th[e] term particular social group" to require social distinction and particularity" for family-based PSGs. The USCIS Guidance, however, fails to acknowledge, much less explain, the basis for imposing a new

requirement that that families must "carr[y] greater societal import" than ordinary families and be "recognizable by society at large" in order to be socially distinct enough to qualify as PSGs. The failure to explain this departure from past Board precedent further renders that departure unreasonable. *See Encino Motorcars,* 136 S. Ct. at 2126 (an agency changing its interpretation of a statute must "at least 'display awareness that it is changing position' and 'show that there are good reasons for the new policy'") (quoting *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009)).

The directive of the New PSG Guidance represents an irrational and radical departure from longstanding agency practice, based on unreasonable interpretation of the INA and without any well-reasoned explanation. The New PSG Guidance is not entitled to *Chevron* deference, and this Court should enjoin its directive that asylum officers disregard controlling court of appeals precedent.

## II.  PLAINTIFFS ARE SUFFERING IRREPARABLE HARM

There is no question that the Plaintiffs, asylum seekers who fear brutal persecution in their home countries, will suffer irreparable harm if removed to their home countries based on the unlawful New PSG Guidance. The Supreme Court has long recognized that removal is a "particularly severe" injury, inflicting substantial harm on a deportee. *Padilla v. Kentucky*, 559 U.S. 356, 365 (2010) (quoting *Fong Yeu Ting v. United States*, 149 U.S. 698, 740 (1893)). Special care accordingly must be taken in asylum cases lest the court permit persecution to occur. *See Leiva-Perez v. Holder*, 640 F.3d 962, 969 (9th Cir. 2011).

As detailed in their declarations, based on extensive past harms and threats they have already suffered, Plaintiffs fear beatings, kidnapping, shootings, and even death in their home countries. *See* Ex. 1, R.C.E.A. Decl. ¶ 6; E.D.A. Decl. ¶ 3; L.R.Q. Decl. ¶ 3; S.G.F. Decl. ¶ 3; K.G.J. Decl. ¶ 3; M.A.C. Decl. ¶ 3; M.O.R.S. Decl. ¶ 3; J.S.R. Decl. ¶ 2; A.G.T. Decl. ¶ 3;

D.A.M. Decl. ¶ 6; D.A.L. Decl. ¶¶ 7, 32; P.A.O. Decl. ¶ 4. For example, R.C.E.A. and her children are living in terror at the prospect of being removed to their home country, after receiving threatening Facebook messages from a stranger saying they knew where they were. Ex. 1, R.C.E.A. Decl. ¶ 6. R.C.E.A. understands that if she gets removed, the gang members will carry out their threat against her and her children if she ever returns. *Id*. Indeed, all of the Plaintiffs are at risk of being killed or seriously harmed if removed to countries where they have previously been threatened or harmed.

Plaintiffs are not alone. Throughout the country, legal service providers have reported that the denial of family-based claims in credible and reasonable fear proceedings has increased dramatically as a result of the New PSG Guidance, with asylum officers directly informing counsel that "they cannot rely on family anymore to find a nexus to a protected ground." *See* Ex 2., ¶¶ 13, 2; Ex. 3, Declaration of Andrea Meza, dated November 21, 2019, ¶ 5 ("a significantly higher number of individuals. . . have received a negative credible or reasonable fear decision despite presenting facts that would have previously formed the basis of a cognizable family-based claim. Those who have been most significantly affected have been minor children"); Ex. 4, Declaration of Shalyn Fluharty, dated November 22, 2019, ¶ 7 ("Previously, 1-2% of our clients were issued negative credible fear findings. Currently, approximately 25-30 families represented by our project are served with a negative credible fear finding each day. The overwhelming majority of these families have family-based claims, that would have been granted prior to the implementation of Matter of L-E-A-.").

## III. THE BALANCE OF HARMS AND THE PUBLIC INTEREST BOTH FAVOR INJUNCTIVE RELIEF.

Plaintiffs ask this Court to enjoin Defendants' unlawful policies to prevent irreparable harm to vulnerable asylum seekers to whom Defendants have issued unlawful negative credible

and reasonable fear determinations. The issuance of an injunction will not substantially injure the government and would further the public interest.

It is in both the public interest and the government's interest—and consistent with the government's obligations under the Refugee Convention and other treaties—to ensure that the government does not remove asylum seekers like the Plaintiffs to (or force them to remain in) a place where they fear grave persecution or death in violation of the immigration laws. *See Nken v. Holder*, 556 U.S. 418, 436 (2009) ("Of course there is a public interest in preventing [applicants] from being wrongfully removed, particularly to countries where they are likely to face substantial harm.").

Moreover, the public interest is served when the government complies with its obligations under the INA and the APA. The "public also has an interest in ensuring that its government respects the rights of immigrants[.]" *M.G.U. v. Nielsen*, 325 F. Supp. 3d 111, 124 (D.D.C. 2018) (issuing a preliminary injunction and enjoining immigration authorities from removing Plaintiffs pursuant to expedited removal orders)*; see also O'Donnell Const. Co. v. District of Columbia*, 963 F.2d 420, 429 (D.C. Cir. 1992) (stating that the "issuance of a preliminary injunction would serve the public's interest in maintaining a system of laws" where the government must comply with its legal obligations); *Damus v. Nielsen*, 313 F. Supp. 3d 317, 342 (D.D.C. 2018) ("The public interest is served when administrative agencies comply with their obligations under the APA.") (citation and quotation marks omitted); *R.I.L-R. v. Johnson*, 80 F. Supp. 3d 164, 191 (D.D.C. 2015) (explaining that the public interest is served by an injunction that "ends an unlawful practice" and ensures compliance with the APA) (citation and quotation marks omitted). Far from undermining the public interest, treating asylum seekers with basic fairness and dignity is among our nation's best traditions. *See*, *e.g.*, Refugee Act of

1980, Pub. L. No. 96- 212, § 101(a), 94 Stat. 102 ("[I]t is the historic policy of the United States to respond to the urgent needs of persons subject to persecution in their homelands, including . . . admission to this country of refugees of special humanitarian concern to the United States, and transitional assistance to refugees in the United States.").

In short, the balance of harms and the public interest decisively favor enjoining Defendants' unlawful policies and affording asylum seekers a meaningful opportunity to establish their fear of persecution in accordance with correct legal standards.

### IV.  THE COURT SHOULD GRANT SYSTEM-WIDE RELIEF AND ENJOIN THE NEW PSG GUIDANCE.

"[T]he scope of a district court's equitable powers . . . is broad, for breadth and flexibility are inherent in equitable remedies." *Brown v. Plata*, 563 U.S. 493, 538 (2011) (quotation omitted). The Court should enjoin or stay the removal of the Plaintiffs, and also provide system-wide relief by enjoining Defendants from applying the New PSG Guidance to all noncitizens.

A system-wide injunction is appropriate here given the nature of Plaintiffs' claims, which attack the overall validity of the New PSG Guidance, and the fact that the New PSG Guidance is being applied broadly. "[T]he scope of injunctive relief is dictated by the extent of the violation established, not by the geographical extent of the plaintiff." *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979). Because Plaintiffs "are clearly making a facial challenge" to the New PSG Guidance—one that argues that it is "infirm regardless of how [it is] applied"—system-wide relief is appropriate. *Doe 2 v. Mattis*, 344 F. Supp. 3d 16, 25 (D.D.C. 2018).

System-wide preliminary injunctive relief is also appropriate here because the remedy, at final judgment, for the issuance of the unlawful New PSG Guidance would be vacatur—which is inherently system-wide. As the D.C. Circuit explained in *National Mining Association*,

"[w]hen a reviewing court determines that agency regulations are unlawful, the ordinary result is that the rules are vacated—not that the application to the individual petitioners is proscribed." *Nat'l Min. Ass'n v. U.S. Army Corps of Engineers*, 145 F.3d 1399, 1409 (D.C. Cir. 1998). Because Plaintiffs would obtain vacatur if their claims are successful on the merits, system-wide preliminary relief is warranted if the Court agrees that they have a likelihood of success on the merits.

System-wide relief is also necessary to protect non-parties who face harms identical to those suffered by the Plaintiffs. As this Court has suggested, "evidence of irreparable harm to persons other than Plaintiffs" may merit extending injunctive relief. *U.S. Ass'n of Reptile Keepers v. Jewell*, 106 F. Supp. 3d 125, 129 (D.D.C. 2015) (Moss, J.). Indeed, the D.C. Circuit has specifically rejected the assertion that injunctive relief must be limited to the parties, reasoning that "a single plaintiff, so long as he is injured by the rule, may obtain 'programmatic' relief that affects the rights of parties not before the court." *Nat'l Min. Ass'n v. Army Corps of Eng'rs*, 145 F.3d 1399, 1409 (D.C. Cir. 1998); *see also Doe v. Rumsfeld*, 341 F. Supp. 2d 1, 17 (D.D.C. 2004) ("The Fourth, Fifth, Ninth, and D.C. Circuits have held that an injunction can benefit parties other than the parties to the litigation."). Denying system-wide relief would instead give the government untrammeled authority to continue enforcing unlawful system-wide rules even in the face of a meritorious "challenge[] on [the] validity of the system." 8 U.S.C. § 1252(e)(3).

That would be particularly inappropriate given that Section 1252(e)(3) requires all challenges to a generally-applicable guidance document, like the New PSG Guidance, to be brought within sixty days "in an action instituted in the United States District Court for the District of Columbia." 8 U.S.C. § 1252(e)(3). In other words, this is the *only* forum where the

New PSG Guidance can be challenged, and so the court *must* determine whether it is lawful *on a system-wide basis*. Moreover, there is a sixty-day statute of limitations under Section 1252(e)(3)(B). If the Court were to grant relief to the Plaintiffs alone, other injured parties may be unable to receive any relief at all—even if their claims for relief were identical to the Plaintiffs.

In other words, if a court may only enter preliminary injunctive relief—or permanent relief—as to the named plaintiffs in a Section 1252(e)(3) challenge, the only parties that can obtain such relief are parties to whom the challenged rules were applied in the first sixty days. That bizarre and unjust result demonstrates that system-wide relief is not only appropriate, but necessary under the statutory scheme. Congress itself has directed that challenges under Section 1252(e)(3) be made, and remedied, on a system-wide basis. Moreover, because any future challenges to the New PSG Guidance could be time-barred, a system-wide injunction here does not risk conflicting injunctions, or threaten "detrimental consequences to the development of law and deprive appellate courts of a wider range of perspectives." *California v. Azar*, 911 F.3d 558, 583 (9th Cir. 2018).

Finally, enjoining the New PSG Guidance as to some asylum applicants, but not others, frustrates the constitutional interest in a uniform federal immigration policy. "In immigration matters," courts "have consistently recognized the authority of district courts to enjoin unlawful policies on a universal basis." *E. Bay Sanctuary Covenant v. Trump*, 932 F.3d 742, 779 (9th Cir. 2018). "Such relief is commonplace in APA cases, promotes uniformity in immigration enforcement, and is necessary to provide the plaintiffs here with complete redress." *Id.* (quoting *Regents of the Univ. of Cal.,* 908 F.3d at 512); *see also Guilford Coll.*, 389 F. Supp. 3d 377, at 397 ("[L]imiting the geographic scope of an injunction on an

immigration enforcement policy would run afoul of the constitutional and statutory requirements for uniform immigration law and policy.") (quotation omitted); *Batalla Vidal v. Nielsen*, 279 F. Supp. 3d 401, 438 (E.D.N.Y. 2018) ("[T]here is a strong federal interest in the uniformity of federal immigration law."). There is no reason why an immigrant's ability to access asylum should depend on whether they happened to be detained in a location where they had access to sufficient legal services to become aware of and join in this suit.

In order to prevent irreparable harm to Plaintiffs and serve the public interest in proper application of our asylum laws, Plaintiffs respectfully request that this Court enjoin Defendants, their agents, and any persons acting in concert with them from applying the New PSG Guidance and any and all other guidance issued by DHS and DOJ implementing the *dicta* from *Matter of L-E-A II* in credible or reasonable fear proceedings.

As to Plaintiffs who have not been removed, Plaintiffs request that the Court enjoin their removal, vacate any credible or reasonable fear determinations and removal orders issued to them, and order that Defendants provide new credible or reasonable fear procedures or full removal proceedings in which they apply the correct legal standards.

For any Plaintiffs who have been removed from the United States, Plaintiffs request that the Court order Defendants to parole them back into the United States, vacate any credible or reasonable fear determinations and removal orders issued to them, and provide new credible fear procedures or full removal proceedings, applying the correct legal standards.

## CONCLUSION

For the foregoing reasons, Plaintiffs' motion should be GRANTED.

Dated: November 26, 2019

Respectfully submitted,

Tracy A. Roman (#443718)
Amanda Shafer Berman (#497860)
Jared A. Levine*
Carina Federico (#1002569)
Mara R. Lieber*
CROWELL & MORING LLP
1001 Pennsylvania Ave., N.W.
Washington, D.C. 20004
(202) 624-2500
troman@crowell.com

Victoria Neilson*
Bradley Jenkins*
Michelle Mendez*
Rebecca Scholtz*
CATHOLIC LEGAL IMMIGRATION
NETWORK, INC.
8757 Georgia Ave., Suite 850
Silver Spring, MD 20910
(301)565-4820
bjenkins@cliniclegal.org

*Counsel for Plaintiffs*

*Application for admission pro hac vice
forthcoming*

32

**CERTIFICATE OF SERVICE**

I hereby certify that on November 26, 2019, I caused true and correct copies of Plaintiffs'

Motion for Preliminary Injunction to be served pursuant to Fed. R. Civ. P. 4(i) along with the

accompanying exhibits on the Defendants in the above-captioned action, and also to the U.S.

Attorney General, and the U.S. Attorney for the District of Columbia (c/o the Civil Process

Clerk), at the following addresses:

CHAD F. WOLF, Acting Secretary of Homeland Security
c/o the Office of the General Counsel
245 Murray Lane SW
Mail Stop 0485
Washington, DC 20528-0485

U.S. DEPARTMENT OF HOMELAND SECURITY
c/o the Office of the General Counsel
245 Murray Lane SW
Mail Stop 0485
Washington, DC 20528-0485

KENNETH T. CUCCINELLI II, Acting Director of U.S. Citizenship and Immigration Services
c/o the Office of the General Counsel
245 Murray Lane SW
Mail Stop 0485
Washington, DC 20528-0485

U.S. CITIZENSHIP & IMMIGRATION SERVICES
c/o the Office of the General Counsel
245 Murray Lane SW
Mail Stop 0485
Washington, DC 20528-0485

JAMES McHENRY
Executive Office of Immigration Review
U.S. Department of Justice
950 Pennsylvania Ave., NW
Washington, DC 20530

WILLIAM BARR
Attorney General of the United States
U.S. Department of Justice
950 Pennsylvania Ave., NW
Washington, DC 20530

JESSIE K. LIU
U.S. Attorney for the District of Columbia
c/o Civil Process Clerk
U.S. Attorney's Office for the District of Columbia
555 4th Street NW
Washington, DC 20530

Dated: November 26, 2019

Respectfully submitted,

Amanda Shafer Berman