## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

S.A.P., a minor (by and through his father);

R.C.E.A., and her minor children, C.J.M.E., J.A.M.E. and L.J.O.E. (by and through their mother);

A.G.T. and her minor son, A.B.T. (by and through his mother);

K.G.J., and her minor son, J.G.J. (by and through his mother);

M.A.C., and her minor son, I.G.C. (by and through his mother);

L.R.Q. and her minor son, E.M.M.R. (by and through his mother;

Y.C.D., a minor (by and through his mother);

J.S.R., and her minor son, J.N.R.S. (by and through his mother);

S.G.F., and her minor children, L.O.G., T.O.G. and W.E.O.G. (by and through their mother);

J.I.H.R., a minor (by and through his mother);

D.A.M., and her minor daughter A.I.A. (by and through her mother);

D.A.L.; and

I.G.V. and her minor daughter M.S.G. (by and through her mother),

      Plaintiffs,

      v.

WILLIAM BARR, Attorney General of the United States, in his official capacity;

Case: 19-cv-3549

**AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

CHAD WOLF, Acting Secretary for the Department of
Homeland Security, in his official capacity;

KEN CUCCINELLI,
Acting Director of United States Citizenship and
Immigration Services, in his official capacity;

JAMES MCHENRY, Director of the Executive Office for
Immigration Review, in his official capacity,

                    Defendants.

**AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF**

Plaintiffs S.A.P. et al. file this Amended Complaint pursuant to Fed. R. Civ. P. 15(a)(1)(A). This Amended Complaint differs from the Complaint previously filed only in that it includes an additional family group of two Plaintiffs, whose names and identifying information were provided to the Defendants, along with the names and identifying information for all of the other Plaintiffs, shortly after the filing of the initial Complaint.

## INTRODUCTION

1.     In September 2019, Defendants enacted new written policies designed to dismantle longstanding protections for asylum seekers who, like Plaintiffs, were targeted for persecution in their home countries because they are members of a particular family.

2.     These new policies deprive noncitizens in expedited removal proceedings of a meaningful opportunity to obtain asylum or withholding of removal based on their membership in a family-based particular social group ("PSG").

3.     The new policies purport to implement *Matter of L-E-A-*, 27 I. & N. Dec. 581 (A.G. 2019) ("*L-E-A- II*"), a legal opinion by the Attorney General which—in *dicta*—articulated new, erroneous, and unlawful standards for adjudicating asylum claims when applicants fear persecution because of their family membership.

4.     The *dicta* in *L-E-A- II* broke from decades of past precedent by suggesting that families cannot meet the social distinction requirement for PSGs unless they "carr[y] greater societal import" than ordinary families and are "recognizable by society at large." *Id.* at 595.

5.     The Attorney General's statements represent an unlawful change to our existing asylum laws that would preclude members of "ordinary" families from seeking protection from persecution based on their family membership, arbitrarily limiting asylum protections to members of well-known or famous families.

6.     Relying on these new policies, asylum officers have unlawfully denied Plaintiffs'

claims for asylum and withholding of removal and ordered them removed to countries where they face violent persecution.

7.      This action seeks to enjoin these new policies to prevent Plaintiffs and countless other noncitizens with meritorious claims for asylum and withholding of removal from being deported to their country of origin, where they face serious risk of physical violence and death.

8.      Pursuant to the Immigration and Nationality Act ("INA"), the United States has long offered protection to those who seek refuge from persecution directed at characteristics that are fundamental to a person's identity or conscience—characteristics including their race, religion, nationality, political opinion, or, as this case examines, their membership in a PSG.

9.      By extending refugee protection to noncitizens possessing a well-founded fear of persecution on account of their membership in a PSG, Congress sought to implement the international human rights obligations adopted in the wake of the horrors of the Second World War.

10.     Before appearing in the INA, the 1951 Refugee Convention introduced "particular social group" as a term of art. Both the conference that unanimously adopted the 1951 Refugee Convention and the Universal Declaration of Human Rights, which was passed just two years earlier, explicitly recognize the principle that "the family" is "the natural and fundamental group unit of society." *See Final Act of the United Nations Conference of Plenipotentiaries on the Status of Refugees and Stateless Persons*, U.N. Doc. A/CONF.2/108/Rev.1 (articulating principle that "the family" is "the natural and fundamental group unit of society").

11.     Administrative interpretations of the INA and Refugee Act of 1980 ("Refugee Act") have historically shared this observation. *See Matter of Acosta*, 19 I. & N. Dec. 211 (BIA 1985) (citing "kinship ties" an innate characteristic comprising a PSG); *Matter of C-A-*, 23 I. &

N. Dec. 951, 955 (BIA 2006) ("[s]ocial groups based on. . . family relationship are generally easily recognizable and understood by others to constitute social groups"); *Matter of H-*, 21 I. & N. Dec. 337, 342 (BIA 1996) (en banc); *Matter of M-E-V-G-*, 26 I. & N. Dec. 227, 240 (BIA 2014).

12.    Federal courts of appeals, in their review of these administrative interpretations, have repeatedly recognized the ordinary nuclear family as "the quintessential particular social group." *Rios v. Lynch*, 807 F.3d 1123, 1128 (9th Cir. 2015); *see also Crespin-Valladares v. Holder*, 632 F.3d 117, 125 (4th Cir. 2011) ("the family provides a prototypical example of a particular social group"); *Villalta-Martinez v. Sessions*, 882 F.3d 20, 26 (1st Cir. 2018) ("[I]t is well established that the nuclear family constitutes a recognizable social group . . .").

13.    Contrary to this clear precedent, the Attorney General's decision in *L-E-A- II* contains *dicta* suggesting a new legal standard and interpretation of the INA, which effectively precludes noncitizens from asserting family-based PSGs in all but the most extraordinary circumstances.

14.    In September 2019, Defendants implemented two new written guidance documents (the "New PSG Guidance") directing asylum officers to apply this new legal standard in evaluating the claims of noncitizens in expedited removal proceedings. The implementation of this new policy guidance effects an unlawful change in law.

15.    First, the New PSG Guidance violates the plain language of the INA and imposes an unlawful presumption against family-based PSGs, arbitrarily departing from decades of agency guidance requiring an individualized, fact-based, case-by-case social group analysis. The New PSG Guidance also unreasonably and unlawfully interprets the INA term "particular social group" to exclude most families, which is at odds with the statutory text,

context, and legislative history, and contrary to a substantial body of federal courts of appeals and Board of Immigration Appeals ("BIA" or "Board") precedent. And the New PSG Guidance fails to adequately acknowledge, much less reasonably explain, its departure from settled law. Because it is arbitrary, capricious, and contrary to law, the New PSG Guidance should be vacated under the Administrative Procedure Act ("APA").

16.     Second, the New PSG Guidance violates APA by explicitly prohibiting asylum officers from applying decades of controlling precedent from the courts of appeals and the BIA recognizing that ordinary families constitute quintessential PSGs. This Court recently issued a preliminary injunction against Defendants prohibiting them from applying a very similar guidance memorandum and holding that directing asylum officers to ignore favorable court of appeals precedent is "clearly unlawful." *Grace v. Whitaker*, 344 F. Supp. 3d 96, 137-38 (2018), *appeal filed sub nom. Grace v. Barr*, No. 19-5013 (D.C. Cir. filed Jan. 30, 2019).[1]

17.     Plaintiffs are noncitizens who have been placed into expedited removal and who have credibly testified to having suffered horrific violence in their home countries or fearing such harm in the future.

18.     Plaintiffs credibly testified that the reason they, and not some other person, experienced persecution and fear future persecution is because they share an identifiable family connection with a member of their family.

19.     As a result of Defendants' new written policy directives, asylum officers denied Plaintiffs' claims for asylum and/or withholding of removal without a full hearing.

20.     Plaintiffs seek a declaration that the New PSG Guidance violates the INA and the APA; an order enjoining the application of the New PSG Guidance to credible and reasonable fear

---

[1] The *Grace* litigation involves a similar procedural history and challenge to similar directive by Defendants that upends decades of precedent interpreting and applying key aspects of asylum law.

interviews; and an order that Plaintiffs' expedited removal orders be vacated and that they be provided with new credible or reasonable fear interviews under the proper legal standard or, in the alternative, full immigration court removal proceedings pursuant to 8 U.S.C. § 1229a.

## JURISDICTION AND VENUE

21.     This case arises under the United States Constitution; the APA, 5 U.S.C. § 701 et seq.; and the INA, 8 U.S.C. § 1101 et seq. and its implementing regulations.

22.     The Court has jurisdiction under 8 U.S.C. § 1252(e)(3). Section 1252(e)(3) is a provision of the INA that provides jurisdiction in the United States District Court for the District of Columbia over systemic challenges "to [the] validity of the [expedited removal] system," including regulations and "written" policies regarding expedited removal. The Court also has jurisdiction under 28 U.S.C. § 1331.

23.     Venue is proper in this District because 8 U.S.C. § 1252(e)(3)(A) requires that all § 1252(e)(3) actions be brought in the United States District Court for the District of Columbia. In addition, venue is proper under 28 U.S.C. § 1391(e)(I) because a substantial part of the events or omissions giving rise to this action occurred in this District.

## PARTIES

24.     Plaintiff S.A.P., a minor child, is an asylum seeker from Guatemala who participated in a reasonable fear interview at the Karnes County Residential Center in Karnes City, Texas on October 23, 2019. At the interview, S.A.P.'s father testified that men associated with a powerful political figure threatened to kill S.A.P. because of S.A.P.'s relationship to his father. Specifically, while S.A.P.'s parents were walking in the street, masked men told them that

because S.A.P.'s father had refused to join a political campaign, they would kill S.A.P.'s father "or someone from [his] family." After S.A.P. and his family left the village, men associated with the same political figure continued to look for his family. On October 29, 2019, an asylum officer served Plaintiff S.A.P. with a Form I-869A Record of Negative Credible/Reasonable Fear Finding and Request For Review by Immigration Judge for Aliens Barred From Asylum Pursuant to 8 CFR 208.13(c)(4) which stated USCIS's finding that "[t]here is no reasonable possibility that the harm you experienced and/or the harm you fear is on account of your race, religion, nationality, political opinion, or membership in a particular social group." On the same day, Plaintiff S.A.P.'s father was found to have established a reasonable fear of persecution on account of his political opinion. In a checklist accompanying Plaintiff S.A.P.'s negative finding by USCIS, the asylum officer wrote "the applicant was not able to show that his family was distinct enough within his community to support [sic] the threats against him were on account of a protected ground."

25.     Plaintiff R.C.E.A. and her minor children, Plaintiffs C.J.M.E., J.A.M.E., and L.J.O.E., are asylum seekers from Honduras who participated in reasonable fear interviews at the Berks County Residential Center in Leesport, PA on October 22, 2019, November 5, 2019 and November 8, 2019. At the interviews, Plaintiff REA testified that gang members threatened her and her children because of their familial relationship with her husband. Specifically, R.C.E.A.'s husband owned a business and gang members threatened to harm and kill him and his family if he did not pay war taxes. The gang members then beat R.C.E.A's husband while she and her children were present and also shot and killed the family dog. On November 13, 2019, an asylum officer served Plaintiff R.C.E.A and her children with a Form I-869A Record of Negative Credible/Reasonable Fear Finding and Request For Review by Immigration Judge for Aliens

Barred From Asylum Pursuant to 8 CFR 208.13(c)(4) which stated the finding by the U.S. Citizenship and Immigration Services ("USCIS") that "[t]here is no reasonable possibility that the harm you experienced and/or the harm you fear is on account of your race, religion, nationality, political opinion, or membership in a particular social group." In a checklist accompanying Plaintiff R.C.E.A's negative finding by USCIS, the asylum officer wrote "Applicant fears that she will be harmed on account of her membership in a proposed particular social group of immediate family members of her husband, [CMM]. The record does not establish that members of this group are set apart, or distinct, from other persons within the society in a significant way such that it forms a cognizable particular social group. See Matter of L-E-A-, 27 I. & N. Dec. 581, 594 (2019). Applicant [sic] testimony indicates that what distinguishes her family is the fact that they are one of two families that own businesses in their community. The evidence gleaned from the applicant's testimony regarding social distinction discusses facts that, while supporting the notion that the applicant's family was perceived as a family unit, do not support the conclusion that the applicant's family was perceived by her society as distinct from other family units in a significant way."

26.     Plaintiff A.G.T. and her minor child, Plaintiff A.B.T., are asylum seekers from Brazil who participated in a reasonable fear interview at the South Texas Family Residential Center on October 18, 2019. At the interview, Plaintiff A.G.T. testified that gang members shot at her and her son A.B.T. because of their familial relationship with her brother and her husband. Specifically, gang members came into her home and shot at her, her son and her mother because her brother was in a rival gang. That same gang has shot at A.G.T. and her family multiple times. Additionally, A.G.T. was shot at by a loan shark because her husband had borrowed money from the loan shark. On November 7, 2019 an asylum officer served Plaintiff A.G.T. and her child

with a Form I-869A Record of Negative Credible/Reasonable Fear Finding and Request For Review by Immigration Judge for Aliens Barred From Asylum Pursuant to 8 CFR 208.13(c)(4) which stated USCIS's finding that "[t]here is no reasonable possibility that the harm you experienced and/or the harm you fear is on account of your race, religion, nationality, political opinion, or membership in a particular social group." In a checklist accompanying Plaintiff A.G.T.'s negative finding by USCIS, the asylum officer wrote "[t]he applicant testified that she was shot at by a rival gang of her brother's in Brazil. The applicant also testified that her home was shot at by a loan shark because her husband borrowed money and did not pay him back. The applicant also testified that another of her brothers was killed by the rival gang. The applicant's [sic] testified that her family was targeted because her brother was involved with a gang and because her husband borrowed money from a loan shark."

27.     Plaintiff K.G.J. and her minor child, Plaintiff J.G.J., are asylum seekers from Guatemala who participated in reasonable fear interviews at the South Texas Family Residential Center on October 3, 2019, October 9, 2019 and October 11, 2019. At the interviews, Plaintiff K.G.J. testified that gang members threatened her and her child, J.G.J., because of their relationship with her partner. Specifically, gang members told her partner they would kill her if her partner did not work for the gang. Her partner subsequently fled the country and the gang members then told K.G.J. they would kidnap J.G.J. if K.G.J. did not tell the gang where her partner was. On October 18, 2019, an asylum officer served Plaintiff K.G.J. and her child with a Form I-869A Record of Negative Credible/Reasonable Fear Finding and Request For Review by Immigration Judge for Aliens Barred From Asylum Pursuant to 8 CFR 208.13(c)(4) which stated USCIS's finding that "[t]here is no reasonable possibility that the harm you experienced and/or the harm you fear is on account of your race, religion, nationality, political opinion, or

membership in a particular social group." In a checklist accompanying Plaintiff J.G.J.'s negative finding by USCIS, the asylum officer wrote "[t]he applicant was threatened because the gang was looking for the applicant's mother's partner, and they threatened to kidnap him because of this. A family PSG was considered, but there is insufficient evidence to establish any degree of social distinction of the applicant's family." In a checklist accompanying Plaintiff K.G.J.'s negative finding by USCIS, the asylum officer wrote "[t]he applicant testified that she was threatened because the gang wanted to know where her partner was[.]"

28.    Plaintiff M.A.C. and her minor child, Plaintiff I.G.C., are asylum seekers from Guatemala who participated in a reasonable fear interview at the South Texas Family Residential Center on October 9, 2019. At the interview, Plaintiff M.A.C. testified that gang members threatened M.A.C. and her son I.G.C. because of their familial relationship to her husband. Specifically, gang members threatened to kidnap or kill M.A.C. and her son I.G.C. if she did not tell the gang where her husband, who refused to work for the gang, was. On October 30, 2019, an asylum officer served Plaintiff M.A.C. and her child with a Form I-869A Record of Negative Credible/Reasonable Fear Finding and Request For Review by Immigration Judge for Aliens Barred From Asylum Pursuant to 8 CFR 208.13(c)(4) which stated USCIS's finding that "[t]here is no reasonable possibility that the harm you experienced and/or the harm you fear is on account of your race, religion, nationality, political opinion, or membership in a particular social group." In a checklist accompanying Plaintiff M.A.C.'s negative finding by USCIS, the asylum officer wrote "[t]he applicant testified that she was threatened by gangs in her area because the applicant and her husband refused to join them and work for them." In a checklist accompanying Plaintiff M.A.C.'s negative finding by USCIS, the asylum officer wrote "[t]he applicant testified that she was threatened by the gangs in her area because the applicant and her husband refused to join

and work for them."

29.     Plaintiff L.R.Q. and her minor child, Plaintiff E.M.M.R., are asylum seekers from Guatemala who participated in a reasonable fear interview at the South Texas Family Residential Center on October 9, 2019. At the interview, L.R.Q. testified that gang members had threatened to murder E.M.M.R. because of his relationship to his older brother (L.R.Q.'s eldest son), who had refused to join the gang. Specifically, L.R.Q. testified that "I was told by them that because my other son had left Guatemala that my son was going to pay the consequences" and L.R.Q. understood this to mean that her son E.M.M.R. was going to be killed. On October 16, 2019, an asylum officer served Plaintiff L.R.Q. and her child with Forms I-869A Record of Negative Credible/Reasonable Fear Finding and Request For Review by Immigration Judge for Aliens Barred From Asylum Pursuant to 8 CFR 208.13(c)(4) which stated USCIS's finding that "[t]here is no reasonable possibility that the harm you experienced and/or the harm you fear is on account of your race, religion, nationality, political opinion, or membership in a particular social group." In a checklist accompanying Plaintiff L.R.Q.'s negative finding by USCIS, the asylum officer wrote "The applicant did not establish that the harm she fears and has experienced would be on account of any protected grounds. The applicant stated the gang's motive to harm her was because her son refused to join the gang and left to go to the United States. The gang's desire for retribution is not on account of any protected ground, but rather a private criminal act of vengeance against the applicant."

30.     Plaintiff Y.C.D., a minor child, is an asylum seeker from Honduras who participated in a reasonable fear interview at the South Texas Family Residential Center on October 18, 2019. At the interview, Y.C.D.'s mother testified that gang members threatened Y.C.D. because of his familial relationship to his mother. Specifically, a gang member told

Y.C.D.'s mother that he would kill her and Y.C.D. unless she "became his." On November 6, 2019, an asylum officer served Plaintiff Y.C.D. with a Form I-869A Record of Negative Credible/Reasonable Fear Finding and Request For Review by Immigration Judge for Aliens Barred From Asylum Pursuant to 8 CFR 208.13(c)(4). In a checklist accompanying Plaintiff Y.C.D.'s negative finding by USCIS, the asylum officer wrote "[t]his gang member's statements indicate that [Y.C.D.] was threatened because the gang member wanted to make the applicant's mother live with him. The threats [Y.C.D.] faced were not on account of a protected ground."

31.     Plaintiff J.S.R. and her minor child, Plaintiff J.N.R.S., are asylum seekers from Honduras who participated in a reasonable fear interview at the South Texas Family Residential Center on October 28, 2019. At the interview, J.S.R. testified that men threatened her and her child because of her relationship to her brother. Specifically, J.S.R.'s brother, who is a police officer in Honduras, advised her to leave the country because gang members had told him that they will find out where his family lives and go after his family. On November 4, 2019, an asylum officer served Plaintiff J.S.R. and her child with a Form I-869A Record of Negative Credible/Reasonable Fear Finding and Request For Review by Immigration Judge for Aliens Barred From Asylum Pursuant to 8 CFR 208.13(c)(4) which stated USCIS's finding that "[t]here is no reasonable possibility that the harm you experienced and/or the harm you fear is on account of your race, religion, nationality, political opinion, or membership in a particular social group." In a checklist accompanying Plaintiff J.S.R.'s negative finding by USCIS, the asylum officer wrote "[t]he applicant's testimony reflects that she was not targeted on account of a protected ground," even though her brother was told "[the gang] will find out where his family lives and go after his family."

32.     Plaintiff S.G.F., and her minor children Plaintiffs L.O.G., T.O.G. and W.E.O.G.

are asylum seekers from Honduras who participated in a reasonable fear interview at the South Texas Family Residential Center on October 7, 2019. At the interview, Plaintiff S.G.F. testified that gang members threatened to kill S.G.F., L.O.G., T.O.G. and W.E.O.G. because of their familial relationship to her husband. Specifically, gang members threatened to kill S.G.F. and her children if she did not tell the gang members where S.G.F.'s husband was. S.G.F.'s husband fled after he reported the gang members to the police for robbing his brother. On October 10, 2019, an asylum officer served Plaintiff S.G.F. and her children with a Form I-869A Record of Negative Credible/Reasonable Fear Finding and Request For Review by Immigration Judge for Aliens Barred From Asylum Pursuant to 8 CFR 208.13(c)(4) which stated USCIS's finding that "[t]here is no reasonable possibility that the harm you experienced and/or the harm you fear is on account of your race, religion, nationality, political opinion, or membership in a particular social group." In a checklist accompanying Plaintiff S.G.F.'s negative finding by USCIS, the asylum officer wrote "[t]here is no social distinction to the family."

33. Plaintiff J.I.H.R., a minor child, is an asylum seeker from Mexico who participated in a credible fear interview at the South Texas Family Residential Center on October 30, 2019. At the interview, Plaintiff's mother testified that Zetas threatened J.I.H.R. because of his familial relationship to her. Specifically, Zetas threatened Plaintiff's mother and her son to extort money from Plaintiff's mother. After Plaintiff's mother gave them money, the Zetas came back a second time and told Plaintiff's mother that if she did not continue to give them money, they would make her and her son, Plaintiff J.I.H.R., disappear. On November 1, 2019, an asylum officer served Plaintiff J.I.H.R. with a Form I-869 Record of Negative Credible Fear Finding and Request for Review by Immigration Judge which stated USCIS's finding that "[t]here is no significant possibility that you could establish in a full hearing that the harm you experienced

and/or the harm you fear is on account of your race, religion, nationality, political opinion, or membership in a particular social group." In a checklist accompanying Plaintiff J.I.H.R.'s negative finding by USCIS, the asylum officer wrote "[t]he applicant seeks protection on a basis of membership in a particular group, immediate family members of his mother, [M.O.R.S.]. However, the applicant has failed to establish that this proposed group is a cognizable social group. This particular social group is not cognizable because it lacks social distinction. The applicant's family is not 'set apart, or distinct, from other persons within the society in some significant way.' Matter of L-E-A-, 27 I&N Dec. 581, 594 (A.G. 2019). The applicant's testimony did not establish that the immediate family members of his mother [M.O.R.S.], are significant within society in some way."

34.     Plaintiff D.A.M. and her minor child, Plaintiff A.I.A., are asylum seekers from Mexico who participated in a credible fear interview at the South Texas Family Residential Center on October 11, 2019. At the interview, Plaintiff D.A.M. testified that a cartel has followed and threatened her. Specifically, D.A.M.'s husband disappeared two years ago. Since then she has been followed by members of a powerful cartel. In March 2019, a man with a gun came to her house, asking if she was the wife of her husband and if A.I.A. was her daughter. She responded yes, and the armed man went to speak with other armed men. D.A.M. was terrified because she believed they were the men responsible for her husband disappearing. D.A.M. had heard from other family members that the cartel wanted to kill her and she feared seeking protection from the police because she believed the police worked together with the cartel. On October 23, 2019, an asylum officer served Plaintiff D.A.M. and her child with a Form I-869 Record of Negative Credible Fear Finding and Request for Review by Immigration Judge which stated USCIS's finding that "Though, the applicant's testimony indicates that she is a member of

the particular social group 'Family members of 'JI' the evidence does not [sic] that indicate that her family is socially distinct in Mexican society. Therefore, the evidence does not indicate that the applicant would be harmed on account of a protected ground."

35.     Plaintiff D.A.L. is an asylum seeker from El Salvador who participated in a reasonable fear interview in June 7, 2017. On May 29, 2019, Plaintiff D.A.L. attended a negative credible fear review hearing before the Los Angeles Immigration Court, during which D.A.L. provided evidence regarding her persecutors' family-based motivations that was not available to the USCIS asylum officer. The Immigration Judge affirmed the USCIS's negative determination. On May 31, 2019, Plaintiff DAL submitted a request to USCIS to reconsider its negative determination. In response to Plaintiff D.A.L.'s request, USCIS scheduled an interview on September 24, 2019, to receive additional evidence regarding Plaintiff D.A.L.'s asylum claim. At that interview, the asylum officer asked several questions regarding the fame or notoriety of Plaintiff D.A.L.'s family within El Salvador. On October 2, 2019, USCIS found that no change was warranted in the disposition of Plaintiff D.A.L.'s credible fear interview.

36.     Plaintiff I.G.V. and her minor child, Plaintiff M.S.G., are asylum seekers from Mexico who participated in a credible fear interview at the South Texas Family Residential Center on October 9, 2019. At the interview, Plaintiff I.G.V. testified that a cartel threatened her and her family because of her familial relationship with Plaintiff M.S.G.'s father. Specifically, M.S.G.'s father was a member of a rival group, and the cartel came to I.G.V.'s house and told her that she could no longer communicate with M.S.G.'s father. The cartel later returned and told I.G.V. she had to become the girlfriend of one of the cartel members for "protection." The cartel also warned her to find a way they did not know about if she wanted to leave the country because they would not allow her to get out, and that if she left she would never be allowed to return. On

October 31, 2019, an asylum officer served Plaintiff I.G.V. and her child with a Form I-869A

Record of Negative Credible/Reasonable Fear Finding and Request For Review by Immigration

Judge for Aliens Barred From Asylum Pursuant to 8 CFR 208.13(c)(4), which stated USCIS's

finding that "[t]here is no reasonable possibility that the harm you experienced and/or the harm

you fear is on account of your race, religion, nationality, political opinion, or membership in a

particular social group." In a checklist accompanying Plaintiff I.G.V.'s adverse finding by

USCIS, the asylum officer wrote "[e]ven considering the applicant's inclusion in a family based

group, the evidence does not indicate that the family based particular social group is socially

distinct per Matter of L-E-A."

37.     Defendant William Barr is sued in his official capacity as the Attorney General of

the United States. In this capacity, he is responsible for the administration of the immigration

laws pursuant to 8 U.S.C. § 1103, oversees the Executive Office for Immigration Review

("EOIR") (the administrative immigration court system), and is empowered to grant asylum or

other immigration relief.

38.     Defendant Chad Wolf is sued in his official capacity as the Acting Secretary of

DHS. In this capacity, he directs each of the component agencies within DHS, including USCIS,

United States Immigration and Customs Enforcement ("ICE"), and United States Customs and

Border Protection ("CBP"). In his official capacity, Defendant Wolf is responsible for the

administration of the immigration laws pursuant to 8 U.S.C. § 1103, and is empowered to grant

asylum or other immigration relief.

39.     Defendant Ken Cuccinelli is sued in his official capacity as the Acting Director of

USCIS, which is the agency that, through its asylum officers, conducts interviews of certain

individuals placed in expedited removal to determine whether they have a credible and/or

reasonable fear of persecution and should be permitted to apply for asylum or withholding of removal before an immigration judge.

40. Defendant James McHenry is sued in his official capacity as the Director of EOIR, the agency within the Department of Justice that, through its immigration judges, conducts limited review of negative credible and reasonable fear determinations.

## BACKGROUND

### A. Asylum and Withholding of Removal Protections in the United States

41. Pursuant to 8 U.S.C. § 1158(a)(1), any noncitizen "who is physically present in the United States or who arrives in the United States. . . irrespective of such alien's status, may apply for asylum[.]" To be eligible for asylum, a noncitizen must establish that she is "a refugee within the meaning of [8 U.S.C.] section 1101(a)(42)(A)[.]" 8 U.S.C. § 1158(b)(l)(A); *see also* 8 U.S.C. § 1158(b)(1)(B)(i). A refugee is defined as:

> any person who is outside any country of such person's nationality or, in the case of a person having no nationality, is outside any country in which such person last habitually resided, and who is unable or unwilling to return to, and is unable or unwilling to avail himself or herself of the protection of, that country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, **membership in a particular social group**, or political opinion[.]

8 U.S.C. § 1101(a)(42)(A) (emphasis added).

42. Congress enacted the current asylum system in 1980 in order to bring U.S. law into conformity with our obligations under the United Nations Convention Relating to the Status of Refugees and 1967 United Nations Protocol Relating to the Status of Refugees. *See* Refugee Act of 1980, Pub. 96-212, 94 Stat. 102.

43. Consistent with international law, the definition of "refugee" does not require a showing of certain harm. Instead, individuals can establish eligibility for asylum based on a "well-founded fear of persecution," which the Supreme Court has defined as at least a 1 in 10

chance of persecution. *See INS v. Cardoza-Fonseca*, 480 U.S. 421, 430, 440-41 (1987).

44.     A noncitizen who is ineligible for asylum may apply for other forms of relief, including withholding of removal in cases in which the applicant can show "that it is more likely than not that he or she would be persecuted on account of" a protected ground if removed from the United States. 8 C.F.R. § 1208.16(b)(2); *see also* 8 U.S.C. § 1231(b)(3).

**B.     The Expedited Removal System**

45.     Prior to 1996, noncitizens seeking protection from deportation or exclusion from the United States were generally entitled to a full hearing in immigration court, appellate review before the BIA, and judicial review in federal court even if they were outside the United States seeking entry.

46.     In 1996, Congress created a new removal mechanism called "expedited removal" that could be used for certain noncitizens seeking admission to the United States. *See* 8 U.S.C. § 1225(b)(1).

47.     Through expedited removal, the government can summarily remove noncitizens after a preliminary inspection by an immigration officer, so long as the noncitizens do not express a fear of persecution in their country of origin.

48.     If noncitizens indicate any fear of returning to their home country, they are entitled to receive a "credible fear interview" with an asylum officer, a non-adversarial process intended "to elicit all relevant and useful information bearing on whether the applicant has a credible fear of persecution or torture." 8 C.F.R. § 208.30(d).

49.     The asylum officer must "consider whether the [applicant's] case presents novel or unique issues that merit consideration in a full hearing before an immigration judge." 8 C.F.R. § 208.30(e)(4).

50.     If the asylum officer makes a negative credible fear determination, the officer

must issue a written decision documenting "the officer's analysis of why, in light of [the] facts, the alien has not established a credible fear of persecution." 8 U.S.C. § 1225(b)(l)(B)(iii)(II).

51.     In the expedited removal system, abbreviated credible fear proceedings often occur within days of arrival, with little to no preparation or assistance by counsel, little to no knowledge of asylum law by the applicant, no opportunity to examine witnesses or gather evidence, and while the individual is detained. It is thus unrealistic for applicants in the expedited removal system to present a fully developed asylum claim.

52.     A noncitizen who receives a negative credible fear determination is entitled to request a prompt review of that determination by an immigration judge. 8 U.S.C. § 1225(b)(l)(B)(iii)(III); *see also* 8 C.F.R. § 208.30(g)(1).

53.     However, immigration judge review of a negative credible fear decision does not entitle a noncitizen to many rights available in full removal proceedings under section 240 of the INA. And once an immigration judge makes a negative credible fear review decision, it is administratively final. Noncitizens who receive a negative credible fear determination by an asylum officer or immigration judge receive expedited removal orders and, upon removal, are subject to a five-year bar on admission to the United States. 8 U.S.C. § 1182(a)(9)(A)(i).

54.     Given the truncated removal process and serious consequence of expedited removal, Congress was careful to include crucial protections to avoid sending asylum seekers back to harm. One such protection was to establish a low threshold at the credible fear stage to ensure that asylum seekers could develop valid asylum claims properly in a full trial-type hearing before an immigration judge. Congress thus viewed the credible fear process as an essential safeguard to prevent summary removals of bona fide asylum seekers.

55.     To obtain asylum in full immigration removal proceedings, a noncitizen need only establish that there is a 1 in 10 chance that he or she will be persecuted on account of one of the five protected grounds for asylum.

56.     By contrast, "[t]o prevail at a credible fear interview, the alien need only show a 'significant possibility' of a one in ten chance of persecution, *i.e.*, a fraction of ten percent." *Grace,* 344 F. Supp. 3d at 127 (D.D.C. 2018) (citing 8 U.S.C. § 1225(b)(l)(B)(v)). The reason for the low threshold at the credible fear stage is straightforward. An asylum claim is highly fact-specific and often will take significant time, resources, and expertise to develop, including expert testimony and extensive evidence about country conditions. It may also involve complex legal questions.

57.     If an asylum officer finds that a noncitizen has a "credible fear," the individual is no longer subject to expedited removal proceedings and is entitled to a full removal hearing under 8 USC § 1229 before an immigration judge. At that hearing, the asylum seeker has the opportunity to develop a full record before the immigration judge, and the asylum seeker may appeal an adverse decision to the BIA and federal court of appeals. 8 C.F.R. § 208.30 (f); *see also* 8 U.S.C. § 1225(b)(l)(B)(ii).

## C.     Changes to the Expedited Removal System for Certain Noncitizens

58.     Notwithstanding Congress' stated intent to protect bona fide asylum seekers from summary removal, on July 16, 2019, the Department of Justice ("DOJ") and the DHS published a joint interim final rule, entitled "Asylum Eligibility and Procedural Modifications." 84 Fed. Reg. 33,829 (July 16, 2019) (codified at 8 C.F.R. pts. 208, 1003, 1208).[2] The Rule imposes "a new mandatory bar for asylum eligibility for [noncitizens] who enter or attempt to enter the

---

[2] *See East Bay Sanctuary Covenant v. Barr*, 385 F. Supp. 3d 922, 935 (N.D. Cal. 2019) injunction stayed *sub. nom Barr v. East Bay Sanctuary Covenant*, ___ S. Ct. ____, 2019 WL 4292781 (Sept. 11, 2019).

United States across the southern border after failing to apply for protection from persecution or torture in at least one third country through which they transited en route to the United States." *Id*. at 33,830.

59.     These noncitizens are still subject to expedited removal proceedings and, while they are presumed to be ineligible to seek asylum, the government must still screen them for potential eligibility for withholding of removal and protection under the Convention against Torture (CAT). Noncitizens subject to this recently promulgated regulation are evaluated by the asylum officer under a higher "reasonable fear" standard described in 8 C.F.R. § 208.30(e)(5)(iii), rather than the intentionally low "credible fear" standard discussed above.

60.     Regardless of which standard is applied, Defendants' newly enacted policies have the same effect: they unlawfully deny relief to noncitizens by imposing new legal standards for family-based PSG claims that are inconsistent with U.S. law and treaty obligations.

**D.     The Decision and *Dicta* in L-E-A- II**

61.     On July 29, 2019, Attorney General Barr issued Matter of L-E-A, 27 I. & N. Dec. 581 (A.G. 2019), which reversed part of a 2017 BIA decision discussing whether a Mexican man who fled extreme violence at the hands of a drug cartel had established a cognizable family-based PSG. The earlier decision acknowledged that "members of an immediate family may constitute a particular social group"—a determination that was conceded by the Government in that case—but proceeded to deny Mr. L-E-A's claims, finding that his feared persecution from the cartel had an insufficient nexus to his family membership.

62.     Although the BIA had already denied Mr. L-E-A's claims on nexus grounds, Defendant Barr's predecessor, Acting Attorney General Whitaker, employed a procedural mechanism to "certify" the BIA's prior decision to the Attorney General for review.

63.     Despite affirming the BIA's denial based on lack of nexus in the prior decision, Defendant Barr used this procedure as a vehicle to criticize the BIA and IJ below for accepting the Government's stipulation that Mr. L-E-A's family qualified as a PSG without undertaking an independent factual analysis.

64.     In addressing this issue, Defendant Barr relied on a narrow and uncontroversial legal principle: to determine whether an applicant for asylum or withholding is a member of a family-based "particular social group," for purposes of the INA, courts must assess all three PSG criteria identified in prior cases—immutability, particularity, and social distinction—on a case-by-case basis. *See* 27 I. & N. Dec. at 582, 584.

65.     In this respect, *L-E-A- II* broke no new ground; it simply reaffirmed settled law requiring adjudicators analyzing proposed particular social groups to conduct "a fact-specific inquiry based on the evidence in a particular case." *See* 27 I. & N. Dec. at 584.

66.     Despite the Attorney General's stated adherence to the principle of case-by-case adjudication, he nonetheless made several statements in *dicta* suggesting that family-based groups *usually* will not meet the social distinction requirement for PSGs.

67.     For example, he stated that "unless an immediate family carries greater societal import, it is unlikely that a proposed family-based group will be 'distinct' in the way required by the INA for purposes of asylum." *Id.* at 595.

68.     The Attorney General further surmised that "[t]he fact that 'nuclear families' or some other widely recognized family unit generally carry societal importance says nothing about whether a *specific* nuclear family would be 'recognizable by society at large.'" *Id.* at 594 (citation omitted).

69.     The Attorney General's statements represent a radical departure from past

precedent by imposing new criteria to meet the social distinction requirement under which an applicant's family must "carr[y] greater societal import" than ordinary families and be "recognizable by society at large."

70.     This new legal standard precludes members of "ordinary" nuclear families from seeking protection from persecution based on their family membership and would arbitrarily limit asylum protections to members of well-known or famous families.

**E.      The New PSG Guidance**

71.     On September 24, 2019, USCIS issued a written Refugee, Asylum, and International Operations Directorate Officer Training Asylum Division Officer Training Course ("Credible Fear Lesson Plan"), entitled *Credible Fear of Persecution and Torture Determinations* (attached hereto as Exhibit A).

72.     The Credible Fear Lesson plan instructs asylum officers to implement the *dicta* of *L-E-A- II* as follows:

> The relevant question in this analysis is not whether the degree and type of relationship that defines a potential family-based particular social group is immutable, particular and socially distinct. Rather, "[i]f an applicant claims persecution based on membership in his father's immediate family, then the adjudicator must ask whether that specific family is 'set apart, or distinct, from other persons within the society in some significant way.' It is not sufficient to observe that the applicant's society (or societies in general) place great significance on the concept of the family." Matter of L-E-A-, 27 I&N Dec. at 594 (citing M-E-V-G-, 26 I&N Dec. at 238). Matter of L-E-A- instructs that "[t]he fact that 'nuclear families' or some other widely recognized family unit generally carry societal importance says nothing about whether a specific nuclear family would be 'recognizable by society at large'" *Id.* Therefore, officers must analyze the specific group of people identified as a family group in making this assessment. Previous guidance that instructed officers to assess whether the society in question recognizes the type of relationship shared by the group as significant or distinct is no longer valid under Matter of L-E-A-.

*See* Credible Fear Lesson Plan at 23.

73.     On or around September 30, 2019,[3] USCIS issued an unsigned, undated Policy Memorandum titled Guidance for Processing Reasonable Fear, Credible Fear, Asylum, and Refugee Claims in Accordance with Matter of L-E-A- ("USCIS Guidance") (attached hereto as Exhibit B).

74.     The USCIS Guidance likewise instructs asylum officers to apply the *dicta* of *L-E-A- II* when conducting credible and reasonable fear interviews. It specifically directs that "in the ordinary case, a nuclear family will not, without more, constitute a 'particular social group' because most nuclear families are not inherently socially distinct." USCIS Guidance, at 3-4; *see also id.* at 1 (indicating that the "Authority" for the USCIS Guidance includes the expedited removal statute, 8 U.S.C. § 1225, and it's implementing regulations at 8 C.F.R. §§ 235 and 208).

75.     The USCIS Guidance also announces a new policy not mentioned in *L-E-A- II* by mandating that, in making credible and reasonable fear determinations, USCIS asylum officers must ignore all federal court of appeals cases recognizing that ordinary families unambiguously qualify as PSGs under the INA:

> While a court order in *Grace v. Whitaker*, 344 F. Supp. 3d 96 (D.D.C. 2018), currently requires officers to apply the law of the circuit most favorable to an alien undergoing credible fear screening, the Attorney General's decision in *Matter of L-E-A- [II]* is controlling law in every circuit, and must be applied going forward in every circuit, unless and until a circuit court holds to the contrary. The Attorney General in L-E-A- held that previous courts of appeals decisions that held that nuclear families categorically constituted particular social groups were interpretations of "particular social group," an ambiguous statutory term that the Attorney General has discretion to reasonably interpret. The Attorney General has reasonably interpreted that term to require social distinction and particularity, and has predicted that many family-based groups may not meet those requirements.

---

[3] While this document is undated, the publically available USCIS Memoranda website lists its publication date as September 30, 2019. *See* https://www.uscis.gov/legal-resources/policy-memoranda.

USCIS Guidance at 2, n.1.

76.     This Court recently issued a preliminary injunction against Defendants, prohibiting them from applying a very similar guidance memorandum in *Grace*, and holding that directing asylum officers to ignore controlling court of appeals precedent is "clearly unlawful." 344 F. Supp. 3d at 137-38.

77.     *L-E-A- II* and the subsequently issued guidance documents establish written policies concerning credible and reasonable fear interviews and implementing the expedited removal provisions at 8 U.S.C. § 1225(b)(I).

78.     The Credible Fear Lesson Plan and USCIS Guidance (collectively, "New PSG Guidance") were first implemented during the last 60 days.

**F.     The Instruction to Reject PSGs Based on "Ordinary" Families Is Unlawful**

79.     The New PSG Guidance effects an irrational and unlawful change in our asylum laws that would reverse decades of federal courts of appeals and BIA authority interpreting the phrase "particular social group" as encompassing ordinary families. This New PSG Guidance (i) violates the APA because it is arbitrary, capricious, and contrary to law; and (ii) violates the INA and Refugee Act by imposing an unlawful presumption against family-based PSGs.

**1.     The Effort to Deny Protection to "Ordinary" Families Is Based on an Unreasonable Interpretation of the INA That Arbitrarily Departs from Past BIA and Federal Courts of Appeals Precedent**

80.     *Dicta* in *L-E-A- II* weights the PSG analysis heavily against family-based claims by adding an additional criterion, requiring applicants to show not just that their family is "distinct," but that it "carries greater societal import" than most families. 27 I. & N. Dec. at 595.

81.     Based on the *dicta* in *L-E-A- II*, the New PSG Guidance instruct asylum

officers to reject claims based on membership in family-based PSGs in all but the most extraordinary cases. *See* USCIS Guidance, at 3-4 (directing that "in the ordinary case, a nuclear family will not, without more, constitute a 'particular social group' because most nuclear families are not inherently socially distinct.").

82.   The New PSG Guidance violates the APA because its instruction to asylum officers represents a radical change in law that is arbitrary, capricious, is not the product of reasoned decision making, and "was neither adequately explained [] nor supported by agency precedent." *Grace*, 344 F. Supp. at 120 (internal citation omitted).

83.   Relying on the *dicta* of *L-E-A- II*, the New PSG Guidance seeks to reverse decades of uniform federal courts of appeals and BIA precedent holding that ordinary families qualify as PSGs under the plain language of the INA.

84.   The USCIS Guidance asserts that the Attorney General is free to reverse decades of court and BIA precedent, and is entitled to *Chevron* deference in doing so, because the term particular social group is ambiguous. USCIS Guidance at 2, n.1. But while courts have recognized that the outer contours of this term may be ambiguous, they have uniformly held that the particular social group unambiguously encompasses ordinary nuclear families.

85.   The *dicta* in *L-E-A II* is at odds with the conclusion of *every* federal court of appeals that has ever interpreted this language. *See Villalta-Martinez v. Sessions*, 882 F.3d 20, 26 (1st Cir. 2018) ("[I]t is well established that the nuclear family constitutes a recognizable social group . . . ."); *Vanegas-Ramirez v. Holder*, 768 F.3d 226, 237 (2d Cir. 2014) (petitioner's "membership in his family may, in fact, constitute a 'social-group basis of persecution' against him"); *Vumi v. Gonzales*, 502 F.3d 150, 155 (2d Cir. 2007) (remanding a family-based claim because "[t]he BIA has long recognized that 'kinship ties' may form a cognizable shared

characteristic for a particular social group"); *S.E.R.L. v. Att'y Gen.*, 894 F.3d 535, 556 (3d Cir. 2018) ("Kinship, marital status, and domestic relationships can each be a defining characteristic of a particular social group . . . ."); *Crespin-Valladares v. Holder*, 632 F.3d 117, 125 (4th Cir. 2011) ("the family provides a prototypical example of a particular social group") (internal quotations omitted); *Al–Ghorbani v. Holder*, 585 F.3d 980, 995 (6th Cir. 2009) ("[A] family is a 'particular social group' if it is recognizable as a distinctive subgroup of society."); *Torres v. Mukasey*, 551 F.3d 616, 629 (7th Cir. 2008) ("Our prior opinions make it clear that we consider family to be a cognizable social group . . . ."); *Ayele v. Holder*, 564 F.3d 862, 869 (7th Cir. 2009) ("Our circuit recognizes a family as a cognizable social group under the INA."); *Bernal-Rendon v. Gonzales*, 419 F.3d 877, 881 (8th Cir. 2005) ("[P]etitioners correctly contend that a nuclear family can constitute a social group."); *Rios v. Lynch*, 807 F.3d 1123, 1128 (9th Cir. 2015) (families are "quintessential" particular social groups); *Rivera-Barrientos v. Holder*, 666 F.3d 641, 648 (10th Cir. 2012) (approvingly citing the Board's prior characterization of particular social groups as including those bound by kinship ties formulation); *Castillo-Arias v. Att'y Gen.*, 446 F.3d 1190, 1193 (11th Cir. 2006) (same).

86. Independent of overwhelming past precedent, the New PSG Guidance's directive that an "ordinary" family cannot be a "particular social group" within the meaning of the INA is not a reasonable interpretation of that broad statutory term.

87. Congress adopted the facially broad term "particular social group" into the INA through the Refugee Act of 1980.

88. The "motivation for the enactment of the Refugee Act" was the "United Nations Protocol Relating to the Status of Refugees ["Protocol"]," *INS v. Cardoza-Fonseca*, 480 U.S. 421, 424, "to which the United States had been bound since 1968," *id.* at 432–33.

89.     Thus, "[i]n interpreting the Refugee Act in accordance with the meaning intended by the Protocol, the language in the Act should be read consistently with the United Nations' interpretation of the refugee standards." *Grace*, 344 F. Supp. 3d at 124.

90.     The term "particular social group" is a term of art first used in the 1951 Refugee Convention.[4] Since that time, the family unit has been closely associated with the idea of a social group as those terms were used in post-war international human rights law instruments. Both the conference that unanimously adopted the 1951 Refugee Convention[5] and the Universal Declaration of Human Rights,[6] which was passed just two years earlier, explicitly recognize the principle that "the family" is "the natural and fundamental group unit of society."[7]

91.     The BIA has long recognized that Congress' intent in enacting the Refugee Act was to align domestic refugee law with the United States' obligations under the Protocol, to give statutory meaning to "our national commitment to human rights and humanitarian concerns," and "to afford a generous standard for protection in cases of doubt." *In Re S-P-*, 21 I. & N. Dec. 486, 492 (B.I.A. 1998) (quoting S. REP. NO. 256, 96th Cong., 2d Sess. 1, 4, reprinted in 1980 U.S.C.C.A.N. 141, 144).

92.     For decades, BIA precedent has uniformly recognized that families are paradigmatic particular social groups for the purposes of the INA. *See Matter of C-A-*, 23 I. & N. Dec. 951, 955 (BIA 2006) ("[s]ocial groups based on . . . family relationship are generally easily

---

[4] *See* Art. 1(A)(2), July 28, 1951, 19 U.S.T. 6259, 189 U.N.T.S. 137 (Refugee Convention).

[5] United Nations Conference of Plenipotentiaries on the Status of Refugees and Stateless Persons, *Final Act of the United Nations Conference of Plenipotentiaries on the Status of Refugees and Stateless Persons*., U.N. Doc. A/CONF.2/108/Rev.1, https:// www.refworld.org/docid/40a8a7394.html (July 25, 1951).

[6] G.A. Res. 217A, U.N. GOAR, 3d Sess., 1st plen. Mtg., U.N. Doc. A/810 (Dec. 12, 1948).

[7] *See also Final Act of the United Nations Conference of Plenipotentiaries on the Status of Refugees and Stateless Persons*, U.N. Doc. A/CONF.2/108/Rev.1 (articulating principle that "the family" is "the natural and fundamental group unit of society"). This language was adopted concurrently with the 1951 Refugee Convention, where the term "particular social group" was first used. Thus, the intent behind the original use of that term, later imported into the INA, was in fact to encompass and protect families.

recognizable and understood by others to constitute social groups"); *Matter of V-T-S-*, 21 I. & N. Dec. 792, 798 (BIA 1997) (en banc) (analogizing the group "Filipino[s] of mixed Filipino-Chinese ancestry" to "kinship ties" when concluding it constituted a particular social group); *Matter of Kasinga*, 21 I. & N. Dec. 357, 365-66 (BIA 1996) (en banc) ("identifiable shared ties of kinship warrant characterization as a social group"); *Matter of H-*, 21 I. & N. Dec. 337, 342 (BIA 1996) (en banc) (noting that "clan membership . . . is inextricably linked to family ties" and therefore grounds for finding a particular social group); *see also Matter of M-E-V-G-*, 26 I. & N. Dec. 227, 240 (BIA 2014) (noting that the particular social group found in a prior case was "inextricably linked to family ties"); *Matter of W-G-R-*, 26 I. & N. Dec. 208, 216 (BIA 2014) (same).

93.     The Board has also previously interpreted the "social distinction" component of the "particular social group" analysis to be focused "on the extent to which the group is understood to exist as a recognized component of the society in question." *Matter of M-E-V-G-*, 26 I. & N. Dec. 227 (BIA 2014). The Board explained in *M-E-V-G-* that a "successful case"—*i.e.*, one in which the proposed group meets the standard—is one in which a group "is set apart within society in some significant way." *Id.* at 244.

94.     The Attorney General's *dicta* in *L-E-A- II* is an abrupt departure from this well-settled law. It imposes a new requirement that PSGs not only be socially distinct but also be of "greater societal import" than "ordinary" groups. And it produces an irrational result that arbitrarily denies protections to member of "ordinary" nuclear families, while providing the same protections to members of well-known or famous families.

95.     Moreover, while the Attorney General recognized that he was departing from federal courts of appeals precedent addressing family-based PSGs generally, he did not

acknowledge or explain his departure from precedent specifically addressing the "social distinction" component of the "particular social group" analysis, including *Matter of M-E-V-G-*. The absence of this recognition and a reasoned explanation further renders that departure unreasonable. *See Encino Motorcars, LLC v. Navarro,* 136 S. Ct. 2117, 2126 (2016) (an agency changing its interpretation of a statute must "at least 'display awareness that it is changing position' and 'show that there are good reasons for the new policy'") (quoting *FCC v. Fox Television Stations, Inc*., 556 U.S. 502, 515 (2009*).

96. The *dicta* of *L-E-A- II*, which the government has now attempted to make the law of the land by instructing asylum officers to follow it in the New PSG Guidance, is also poorly reasoned and illogical.

97. The Attorney General attempted to justify his reinterpretation of the INA by misapplying the *ejusdem generis* canon of construction, claiming that that canon requires the term "particular social group" be read "in conjunction with the terms preceding it, which cabins its reach." *Matter of L-E-A-*, 27 I. & N. Dec. at 592. But the terms surrounding "particular social group"—"political opinion," "religion," "race," and "nationality" (8 U.S.C. § 1101(a)(42)(A))—are all extremely broad.

98. Few persons exist who do not belong to a race, practice a religion, have a nationality, or hold a political opinion. Correctly applied, then, the *ejusdem generis* canon indicates that the term "particular social group" casts a very wide net. *See Hall St. Assocs., L.L.C. v. Mattel, Inc.*, 552 U.S. 576, 587 (2008).

99. The Attorney General also suggested that a broad interpretation of "particular social group" would "render virtually every [applicant] a member of a [particular social group]" and thus eligible for relief. 27 I. & N. Dec. at 593.

100.    But that conflates the particular social group analysis with the *separate* requirement that an applicant show that he was persecuted *because of* membership in a particular social group (the "nexus" requirement). Thus, the Attorney General's suggestion that interpreting "particular social group" to include ordinary families would unreasonably extend asylum eligibility is logically flawed.

101.    The Attorney General further argued that "particular social group" should not be interpreted to encompass ordinary families because "family" is not one of the grounds for protection explicitly listed in the INA. *See Matter of L-E-A,* 27 I. & N. Dec. at 583. The INA term "particular social group," however, is intentionally broad, and does not explicitly list any recognized groups. Congress' decision to use the broad international law term "particular social group," long understood to encompass families, rendered it unnecessary for Congress to also specifically list "family" as a protected group.

102.    And, in *Matter of Acosta,* the seminal Board decision interpreting that term for the first time, the Board specified that "kinship ties" are a "characteristic that defines a particular social group," *see Matter of Acosta,* 19 I. & N. Dec. at 233, further indicating that the term was originally intended by Congress to encompass families. In any event, the Attorney General's argument that specific types of PSGs must be named in the INA to qualify for protection thereunder would render the "particular social group" language meaningless contrary to longstanding principles of statutory interpretation. *See Montclair v. Ramsdell,* 107 U.S. 147, 152 (1883) (interpreter must "give effect, if possible, to every clause and word of a statute"); *U.S. v. Perchman*, 42 U.S. 51, 69-70 (1833) ("It is one of the admitted rules of construction, that interpretation which . . . render an act null, are to be avoided").

103.    Because the Attorney General's *dicta* suggesting that "ordinary" families

generally are not particular social groups is an unreasonable reading of the INA—as evidenced by the dozens of federal courts of appeals and Board decisions to the contrary—poorly reasoned, and inadequately explained, the implementation of this *dicta* in the New PSG Guidance is arbitrary, deprives asylum seekers of an impartial adjudication of their claims based on the specific facts of their cases, represents an improper departure from prior policy and reflects Defendants' unlawful presumption against entire categories of claims at the credible and reasonable fear stage.

### 2. The INA and Refugee Act Prohibit a Presumption Against Family-Based PSGs

104.    The New PSG Guidance also violates the INA and Refugee Act because it instructs asylum officers to apply a presumption against claims premised on family-based PSGs. The USCIS Guidance explicitly informs asylum officers that "in the ordinary case, a nuclear family will not, without more, constitute a 'particular social group' because most nuclear families are not inherently socially distinct." USCIS Guidance, at 3-4.

105.    The INA and Refugee Act, however, require an individualized approach to asylum adjudication.

106.    In *Grace*, this Court struck down a similar directive creating a presumption against asylum claims premised on social groups related to victims of gang and domestic violence. As the Court held, such a "general rule is arbitrary and capricious because there is no legal basis for an effective categorical ban on" certain categories of PSGs and "runs contrary to the individualized analysis required by the INA." 344 F. Supp. 3d at 126. As the Court further explained:

> A general rule that effectively bars. . . claims related to certain kinds of violence is inconsistent with Congress' intent to bring "United States refugee law into conformance with the [Protocol]." *Cardoza-Fonseca*, 480 U.S. at 436-37, 107 S.Ct. 1207. The new general rule is thus contrary to the Refugee Act and the

INA. In interpreting "particular social group" in a way that results in a general rule, in violation of the requirements of the statute, the Attorney General has failed to "stay[ ] within the bounds" of his statutory authority. *District of Columbia v. Dep't of Labor*, 819 F.3d at 449.

*Id*.

## G.     The Instruction to Disregard Contrary Court of Appeals Precedent Violates the APA

107.    The New PSG Guidance is also unlawful because it instructs asylum officers to disregard any court of appeals precedent that contradicts the *dicta* of *L-E-A- II*. That wholesale rejection of federal court precedent contradicts basic separation-of-powers principles, and represents an irrational and radical departure from longstanding agency practice in violation of the APA.

108.    The USCIS Guidance informs asylum officers that "the Attorney General's decision in Matter of L-E-A- [II] is controlling law in every circuit, and must be applied going forward in every circuit, unless and until a circuit court holds to the contrary." USCIS Guidance at 2, n.1.

109.    But it is essential to our constitutional system that Executive Branch officials are bound by the decisions of Article III courts. *See Marbury v. Madison*, 5 U.S. 137, 177 (1803); *see also Cooper v. Aaron*, 358 U.S. 1, 17-19 (1958).

110.    This Court recently issued a preliminary injunction against Defendants prohibiting them from applying a similar directive in *Grace*, holding that directing asylum officers to ignore controlling court of appeals precedent is "clearly unlawful." 344 F. Supp. 3d at 137-38.

111.    As this Court explained, "an agency's interpretation of a provision may override a prior court's interpretation if the agency is entitled to Chevron deference and the agency's interpretation is reasonable. If the agency is not entitled to deference or if the

agency's interpretation is unreasonable, a court's prior decision interpreting the same statutory provision controls." *Id*. at 137.

112.    First, the simple fact that the Attorney General's discussion of family-based PSGs is *dicta* precludes Chevron deference with respect to those statements as a matter of law. *See Grace*, 344 F. Supp. 3d at 138 ("the only legal effect of [the Attorney General decision] is to overrule [a particular BIA decision]. Any other [] dicta would not be entitled to deference.").

113.    Second, the BIA and federal courts of appeals have uniformly held that, while the outer contours of the term may be ambiguous, the term "particular social group" unambiguously encompasses the ordinary nuclear family. *See, e.g.*, *Crespin-Valladares v. Holder*, 632 F.3d 117, 125 (4th Cir. 2011) ("the family provides a prototypical example of a particular social group") (internal quotations omitted); *Rios v. Lynch*, 807 F.3d 1123, 1128 (9th Cir. 2015) (families are "quintessential" particular social groups); *Rivera-Barrientos v. Holder*, 666 F.3d 641, 648 (10th Cir. 2012) (approvingly citing the Board's prior characterization of particular social groups as including those bound by kinship ties formulation); *Castillo-Arias v. Att'y Gen.*, 446 F.3d 1190, 1193 (11th Cir. 2006) (same).

114.    Third, the Attorney General's newly proposed interpretation of the phrase "particular social group" is unreasonable in light of the legislative history and text of the INA and violates the INA's prohibition against establishing general presumptions against certain categories of asylum seekers.

115.    Fourth, while the Attorney General recognized that he was departing from federal courts of appeals precedent addressing family-based PSGs generally, he did not acknowledge his departure from precedent specifically addressing the "social distinction"

component of the "particular social group" analysis, including *Matter of M-E-V-G-.* The failure to explain this departure from past Board precedent further renders that departure unreasonable. *See Encino Motorcars, LLC,* 136 S. Ct. at 2126 (an agency changing its interpretation of a statute must "at least 'display awareness that it is changing position' and 'show that there are good reasons for the new policy'") (quoting *FCC v. Fox Television Stations, Inc.,* 556 U.S. 502, 515 (2009)).

116.    The directive of the New PSG Guidance represents an irrational and radical departure from longstanding agency practice, based on unreasonable interpretation of the INA and without any well-reasoned explanation. The New PSG Guidance is not entitled to *Chevron* deference, and this Court should enjoin its directive that asylum officers disregard controlling court of appeals precedent.

**H.    The New PSG Guidance Places Plaintiffs in Grave Danger**

117.    Under the correct legal standards, each of the Plaintiffs would have passed their credible or reasonable fear interview and would have been referred for full removal proceedings to seek asylum or withholding of removal. Instead, because of the New PSG Guidance, asylum officers summarily denied their claims.

118.    Like the Plaintiff, thousands of similarly situated noncitizens have received or will receive negative determinations based on the new policies.

119.    Defendants' New PSG Guidance is depriving Plaintiffs and other noncitizens of their right to pursue potentially meritorious claims for protection in full removal proceedings. As a result of the New PSG Guidance, there has been a dramatic increase in the number of negative determinations issued to non-citizens presenting claims based on family-based PSGs. *See* https://www.theguardian.com/us-news/2019/nov/13/asylum-credible-fear-interview-immigration-women-children-lawsuit.

120.     As a result of the New PSG Guidance, the Plaintiffs and other noncitizens with meritorious claims for protection will be deported to their country of origin, where they will suffer violent persecution on account of their family membership.

### FIRST CLAIM FOR RELIEF
(Violation of Immigration and Nationality Act, Refugees Act, and Administrative Procedure Act)

121.     All of the foregoing allegations are repeated and realleged as if fully set forth herein.

122.     Pursuant to 8 U.S.C. § 1252(e)(3), judicial review is available before the Court regarding whether "a written policy directive, written policy guideline, or written procedure issued by or under the authority of the Attorney General to implement [8 U.S.C. § 1252(b)] is not consistent with applicable provisions of [Subchapter II of the INA] or is otherwise in violation of law."

123.     The APA, 5 U.S.C. § 706, provides that a Court "shall hold unlawful and set aside agency action, findings, and conclusions found to be-(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (B) contrary to constitutional right, power, privilege, or immunity; [or] (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right."

124.     The New PSG Guidance violates the INA and Refugee Act by imposing an unlawful presumption against family-based PSGs, arbitrarily departing from decades of agency guidance requiring an individualized, fact-based, case-by-case social group analysis.

125.     The New PSG Guidance also unreasonably and unlawfully interprets the INA term "particular social group" to exclude most families, which is at odds with the statutory text, context, and legislative history, and contrary to a substantial body of federal courts of

appeals and BIA precedent.

126.    And the New PSG Guidance fails to adequately acknowledge, much less reasonably explain, its departure from settled law.

127.    Because it is arbitrary, capricious, and contrary to law, the New PSG Guidance must be vacated under the Administrative Procedure Act.

## SECOND CLAIM FOR RELIEF
(Administrative Procedure Act)

128.    All of the foregoing allegations are repeated and realleged as if fully set forth herein.

129.    The New PSG Guidance violates the APA by explicitly prohibiting asylum officers from applying decades of controlling precedent from the courts of appeals and the BIA recognizing that ordinary families constitute quintessential PSGs.

130.    The New PSG Guidance fails to adequately acknowledge, much less reasonably explain, its departure from settled law.

131.    Because it is arbitrary, capricious, and contrary to law, the New PSG Guidance must be vacated under the Administrative Procedure Act.

## THIRD CLAIM FOR RELIEF
(Due Process Clause of the Fifth Amendment to the United States Constitution)

132.    All of the foregoing allegations are repeated and realleged as if fully set forth herein.

133.    Plaintiffs have protected interests in applying for asylum and withholding of removal upon a showing that meets the applicable standards, and in not being removed to a country where they face serious danger and potential loss of life.

134.    Plaintiffs are entitled under the Due Process Clause to a fair hearing of their claims, and a meaningful opportunity to  establish their potential eligibility for asylum and withholding of

removal.

135.    The New PSG Interview Policy has violated Plaintiffs' right to due process in numerous respects, including by foreclosing their claims regardless of their individual facts or merits; by applying an unlawful, more burdensome legal standard to Plaintiffs' claims; and by depriving them of a meaningful opportunity to establish their potential eligibility for asylum and withholding of removal.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs respectfully pray this Court to:

a.    Declare the New PSG Guidance (including but not limited to *L-E-A- II,* the Credible Fear Lesson Plan, USCIS Guidance, and all written guidance issued by DHS and DOJ relating to *L-E-A- II*) contrary to law;

b.    Enter an order vacating the New PSG Guidance (including but not limited to the Credible Fear Lesson Plan, USCIS Guidance, and all written credible fear guidance issued by DHS and DOJ relating to *L-E-A- II*);

c.    Enter an order enjoining Defendants from continuing to apply the New PSG Guidance (including but not limited to the Credible Fear Lesson Plan, USCIS Guidance and all written guidance issued by DHS and DOJ relating to *L-E-A- II*) to credible or reasonable fear determinations, interviews, or hearings issued or conducted by asylum officers or immigration judges;

d.    Enter an order staying the expedited removal of each of the Plaintiffs and vacating the expedited removal orders issued to each of the Plaintiffs;

e.    Enter an order enjoining Defendants from removing the Plaintiffs without first providing each of them with a new credible or reasonable fear process under correct legal standards

37

or, in the alternative, full immigration court removal proceedings pursuant to 8 U.S.C. § 1229a; and, for any Plaintiffs who have been removed pursuant to an expedited removal order prior to the Court's order, to parole those Plaintiffs into the United States for the duration of those credible fear and/or removal proceedings;

      f.   Award Plaintiffs' counsel reasonable attorneys' fees under the Equal Access to Justice Act, and any other applicable statute or regulation; and

      g.   Grant such further relief as the Court deems just, equitable, and appropriate.

Dated: December 9, 2019          Respectfully submitted,

          s/ Amanda Shafer Berman
          Tracy A. Roman (#443718)
          Amanda Shafer Berman (#497860)
          Jared A. Levine*
          Mara R. Lieber*
          CROWELL & MORING LLP
          1001 Pennsylvania Ave., N.W.
          Washington, D.C. 20004
          (202) 624-2500
          troman@crowell.com

          Victoria Neilson*
          Bradley Jenkins**
          Michelle Mendez*
          Rebecca Scholtz*
          CATHOLIC LEGAL IMMIGRATION
          NETWORK, INC.
          8757 Georgia Ave., Suite 850
          Silver Spring, MD 20910
          (301)565-4820
          bjenkins@cliniclegal.org

          *Counsel for Plaintiffs*

          *Application for admission pro hac vice forthcoming*

          ** Application for admission to D.D.C. bar forthcoming*

**CERTIFICATE OF SERVICE**

I hereby certify that on December 9, 2019, I electronically caused the foregoing

document to be filed with the Clerk of the Court using the CM/ECF system, which will send

notification of such filing to the following counsel of record for the government in this matter:

Erez Reuveni
Assistant Director
U.S. Department of Justice
Office of Immigration Litigation, District Court Section
P.O. Box 868, Washington, DC 20044

s/ Amanda Shafer Berman
Amanda Shafer Berman