### THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| S.A.P., *et al.*, | |
| Plaintiffs, | Case: 1:19-cv-3549-RC |
| v. | |
| WILLIAM P. BARR, *et al.*, | MOTION FOR SUMMARY JUDGMENT AND MEMORANDUM OF LAW |
| Defendants. | |

### PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT
### AND SUPPORTING MEMORANDUM

## <u>MOTION FOR SUMMARY JUDGMENT</u>

Plaintiffs S.A.P., *et al.*, who are children and adults fleeing violence directed against them because of their family membership, move for summary judgment under Fed. R. Civ. P. 56. They seek an order: (1) declaring that the challenged guidance documents are arbitrary, capricious, and unlawful; (2) vacating the guidance documents; and (3) enjoining the government from applying that written guidance or its substance to Plaintiffs or any other persons in the credible fear interview context.

Summary judgment is warranted for the reasons in the accompanying memorandum of law, including that the challenged agency guidance documents—which direct asylum officers conducting expedited removal proceedings to deny persons who fled violence directed at them because of their family membership the opportunity to pursue asylum claims—are arbitrary, capricious, and contrary to the Immigration and Nationality Act ("INA"). Those guidance documents should be declared unlawful and vacated under the Administrative Procedure Act ("APA") (5 U.S.C. § 706), along with Plaintiffs' negative credible fear determinations and removal orders. Furthermore, because Defendants have asserted that, even if the challenged guidance were vacated, asylum officers conducting credible fear interviews would be required to continue to deny family-based asylum claims under *Matter of L-E-A-*, 27 I. & N. Dec. 581 (A.G. 2019), which contains *dicta* on which the challenged guidance documents were based, the Court should also permanently enjoin the government from doing so.

Plaintiffs moved for preliminary relief last fall and this Court held a hearing on March 2, 2020. The Court indicated that it was inclined to wait for the D.C. Circuit's decision on appeal of *Grace v. Barr*, 344 F. Supp. 3d 96, 137-38 (D.D.C. 2018) ("*Grace I*"), before deciding that motion, and Plaintiffs agreed to that course so long as the stipulated stay of removal remained in place. *See* ECF No. 45. On July 17, 2020, the D.C. Circuit issued its decision in *Grace*,

confirming that the district court had jurisdiction to review the credible fear guidance challenged in that case, and partially affirming the lower court's grant of summary judgment for the plaintiffs and issuance of an injunction in regard to several aspects of that challenged guidance. *Grace v. Barr*, 965 F.3d 883 (D.C. Cir. 2020) ("*Grace II*"). The parties in this case then stipulated to forego a decision on Plaintiffs' pending preliminary injunction motion and proceed to summary judgment briefing. *See* ECF Nos. 46-47.

As discussed in the accompanying memorandum of law, the D.C. Circuit's recent decision in *Grace II* confirms that this Court has jurisdiction to hear this case and adjudicate Plaintiffs' challenges to the credible fear guidance at issue, as well as authority to vacate and enjoin its application. The D.C. Circuit's decision in *Grace II*, as well as parts of *Grace I* affirmed by the D.C. Circuit, also support Plaintiffs' arguments that the substance of the challenged guidance is arbitrary, capricious, and unlawful in violation of the APA and the INA.

Dated: September 4, 2020

Respectfully submitted,

s/ Amanda Shafer Berman
Tracy A. Roman (#443718)
Amanda Shafer Berman (#497860)
Jared A. Levine*
Mara Lieber*
CROWELL & MORING LLP
1001 Pennsylvania Ave., N.W.
Washington, D.C. 20004
(202) 624-2500
aberman@crowell.com

Bradley Jenkins (MD0110)
Michelle Mendez*
Victoria Neilson*
Rebecca Scholtz*
CATHOLIC LEGAL IMMIGRATION
NETWORK, INC.
8757 Georgia Ave., Suite 850
Silver Spring, MD 20910
(301)565-4820

bjenkins@cliniclegal.org

*Admitted pro hac vice*

## **TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ............................................................................................ vi

MEMORANDUM OF LAW IN SUPPORT OF SUMMARY JUDGMENT .............................. 1

BACKGROUND ........................................................................................................ 4

I.      Asylum and Withholding of Removal Protections in the United States............................ 4

II.     The Creation of the Expedited Removal System............................................................. 5

III.    The Attorney General's Decision in *L-E-A- II* .............................................................. 7

IV.   The New PSG Guidance ................................................................................................ 8

V.    Plaintiffs...................................................................................................................... 11

LEGAL STANDARD................................................................................................... 12

ARGUMENT ............................................................................................................. 14

I.      Plaintiffs Have Standing and the Court Has Jurisdiction............................................... 14

      A.     Plaintiffs Have Standing. ................................................................................ 14

      B.     The Court Has Statutory Jurisdiction.............................................................. 16

II.     The New PSG Guidance Is Unlawful ............................................................................ 16

      A.     The New PSG Guidance Is Contrary to the "Significant Possibility"
             Standard for Credible Fear Interviews. ........................................................... 18

      B.     The New PSG Guidance Violates the INA's Individualized Decision-
             Making Requirement ....................................................................................... 22

      C.     The New PSG Guidance Is Arbitrary and Capricious. ..................................... 26

             1.     The Guidance Departs from BIA Precedent Without Explanation.......... 26

             2.     The Guidance Is Not the Product of Reasoned Decision-Making........... 30

             3.     USCIS Failed to Consider Whether Its View of *L-E-A- II* Should
                    Control in Credible Fear Proceedings................................................. 32

      D.     The New PSG Guidance Unlawfully Interprets the Statutory Term
             "Particular Social Group." ............................................................................... 34

1.    The Guidance Does Not Merit Chevron Deference.................................. 34

2.    The Guidance Is an Incorrect and Unreasonable Interpretation of the INA........................................................................................................ 35

III.    The Court Should Vacate the New PSG Guidance, Declare Its Substance Unlawful, and Enjoin the Government from Applying *L-E-A- II* in Credible Fear Interviews......................................................................................................... 40

A.    The Court Should Vacate Plaintiffs' Negative Credible Fear Determinations and the New PSG Guidance. ....................................................... 40

B.    The Court Should Issue a Declaratory Judgment. ................................................ 41

C.    The Court Should Enjoin the Government from Applying *L-E-A- II* in the Credible Fear Interview Setting. .......................................................................... 41

D.    The Relief Granted by this Court Should Apply Nationwide……..……43

CONCLUSION............................................................................................................................ 44

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Matter of A-B-*,
27 I. & N. Dec. 316 (A.G. 2018) ......................................................................................1, 31

*A.B-B et. al v. Morgan et. al*,
20-cv-846 (D.D.C.), ECF No. 110 (Aug. 29, 2020) ...................................................19

*Al–Ghorbani v. Holder*,
585 F.3d 980 (6th Cir. 2009) ...........................................................................................36

*Ayele v. Holder*,
564 F.3d 862 (7th Cir. 2009) ...........................................................................................36

*Bennett v. Spear*,
520 U.S. 154 (1997)..........................................................................................................14

*Bernal-Rendon v. Gonzales*,
419 F.3d 877 (8th Cir. 2005) ...........................................................................................36

*Matter of C-A-*,
23 I. & N. Dec. 951 (BIA 2006) .............................................................................2, 27, 40

*Capital Area Immigrants' Rights Coalition v. Trump*,
No. 19-2117 (TJK), 2020 WL 3542481 (D.D.C. June 30, 2020) ...........................11

*Carpenters Indus. Council v. Zinke*,
854 F.3d 1 (D.C. Cir. 2017) ............................................................................................15

*Castillo-Arias v. Att'y Gen.*,
446 F.3d 1190 (11th Cir. 2006) .......................................................................................37

*Chevron USA, Inc. v. Natural Resources Defense Council, Inc.*,
467 U.S. 837 (1984)............................................................................................... *passim*

*Christensen v. Harris Cnty.*,
529 U.S. 576 (2000)....................................................................................................14, 35

*City of Waukesha v. EPA*,
320 F.3d 228 (D.C. Cir. 2003) .........................................................................................14

*Crespin-Valladares v. Holder*,
632 F.3d 117 (4th Cir. 2011) ...................................................................................2, 36, 37

*DeBurgh v. DeBurgh,*
    250 P.2d 598 (Cal. 1952) ...................................................................................39

*Dept. of Homeland Security v. Regents of the Univ. of Cal.,*
    140 S. Ct. 1891 (2020) .......................................................................17, 32, 34

*E. Bay Sanctuary Covenant v. Trump,*
    932 F.3d 742 (9th Cir. 2018) ............................................................................43

*Matter of E-R-A-L-,*
    27 I. & N. Dec. 767 (BIA 2020) .......................................................................25

*FCC v. Fox Television Stations, Inc.,*
    556 U.S. 502 (2009) ..........................................................................................12

*Fox v. Clinton,*
    684 F.3d 67 (D.C. Cir. 2012) ............................................................................12

*Gebremichael v. I.N.S.,*
    10 F.3d 28 (1st Cir. 1993) .................................................................................37

*\*Grace v. Whitaker,*
    344 F. Supp. 3d 96, 137-38 (D.D.C. 2018), *aff'd in part and rev'd in part*
    *sub nom. Grace v. Barr*, 965 F.3d 883 (D.C. Cir. 2020)   ............................ *passim*

*Matter of H-,*
    21 I. & N. Dec. 337 (BIA 1996) .......................................................................27

*Hall St. Assocs., L.L.C. v. Mattel, Inc.,*
    552 U.S. 576 (2008) ..........................................................................................30

*INS v. Cardoza-Fonseca,*
    480 U.S. 421 (1987) ........................................................................................4, 6

*Judulang v. Holder,*
    565 U.S. 42 (2011) ..............................................................................13, 30, 32

*Matter of Kasinga,*
    21 I. & N. Dec. 357 (BIA 1996) (en banc) ......................................................27

*Matter of L-E-A-,*
    27 I. & N. Dec. 581 (A.G. 2019)  ................................................................ *passim*

*\*L.M.-M. v. Cuccinelli,*
    442 F. Supp. 3d 1 (D.D.C. 2020) ................................................................ *passim*

*Lone Mountain Processing, Inc. v. Sec'y of Labor,*
    709 F.3d 1161 (D.C. Cir. 2013) ........................................................................29

*Lujan v. Defs. of Wildlife*,
    504 U.S. 555 (1992)..................................................................................14

*\*Matter of M-E-V-G-*,
    26 I. & N. Dec. 227 (BIA 2014) ....................................................... *passim*

*McLouth Steel Products Corp. v. Thomas*,
    838 F.2d 1317 (D.C. Cir. 1988)................................................................24

*Montclair v. Ramsdell*,
    107 U.S. 147 (1883)..................................................................................31

*Moore v. City of East Cleveland*,
    431 U.S. 494 (1977)..................................................................................39

*Morgan Drexen, Inc. v. Consumer Fin. Prot. Bureau*,
    785 F.3d 684 (D.C. Cir. 2015)..................................................................42

*Motor Vehicle Mfrs. Assn. of United States, Inc. v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983)..............................................................................12, 32

*Nat'l Ass'n of Regulatory Util. Comm'rs v. ICC*,
    41 F.3d 721 (D.C. Cir. 1994)...................................................................13

*Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*,
    545 U.S. 967 (2005)..................................................................................37

*Nat'l Min. Ass'n v. U.S. Army Corps of Engineers*,
    145 F.3d 1399 (D.C. Cir. 1998)...............................................................40

*Natural Res. Def. Council, Inc. v. Daley*,
    209 F.3d 747 (2000)..................................................................................13

*Negusie v. Holder*,
    555 U.S. 511 (2009)..................................................................................34

*Nken v. Holder*,
    556 U.S. 418 (2009)..................................................................................42

*Pena Oseguera v. Barr*,
    936 F.3d 249 (5th Cir. 2019) ...................................................................21

*Pirir-Boc v. Holder*,
    750 F.3d 1077 (9th Cir. 2014) .................................................................22

*Rios v. Lynch*,
    807 F.3d 1123 (9th Cir. 2015) ...........................................................36, 37

*Rivera-Barrientos v. Holder,*
    666 F.3d 641 (10th Cir. 2012) ........................................................36

*In Re S-P-,*
    21 I. & N. Dec. 486 (BIA 1998) ....................................................38

*S.E.R.L. v. Att'y Gen.,*
    894 F.3d 535 (3d Cir. 2018) ..........................................................36

*Torres v. Mukasey,*
    551 F.3d 616 (7th Cir. 2008) .........................................................36

*Troy Corp. v. Browder,*
    120 F.3d 277 (D.C. Cir. 1997) .......................................................13

*Matter of V-T-S-,*
    21 I. & N. Dec. 792 (BIA 1997) ....................................................27

*Vanegas-Ramirez v. Holder,*
    768 F.3d 226 (2d Cir. 2014) ..........................................................36

*Villalta-Martinez v. Sessions,*
    882 F.3d 20 (1st Cir. 2018) .......................................................36, 39

*Vumi v. Gonzales,*
    502 F.3d 150 (2d Cir. 2007) ..........................................................36

*Matter of W-G-R-,*
    26 I. & N. Dec. 208 (BIA 2014) ....................................................27

**Statutes and Regulations**

*5 U.S.C. § 706 ...................................................................... passim

5 U.S.C. § 706(2)(a) ......................................................................12

8 U.S.C. § 1101(a)(42)(A) ..........................................................4, 30

8 U.S.C. § 1158(b)(1)(B)(i) ..............................................................4

8 U.S.C. § 1158(b)(l)(A) ..................................................................4

8 U.S.C. § 1182(a)(9)(A)(i) ...............................................................6

*8 U.S.C. § 1225(b) ................................................................ passim

8 U.S.C. § 1229a ......................................................................6, 44

8 U.S.C. § 1231(b)(3) ......................................................................5

ix

8 U.S.C. § 1252(e)(3) ...............................................................................14, 16, 41, 43

Immigration and Nationality Act ............................................................................ *passim*

Refugee Act of 1980, Pub. 96-212, 94 Stat. 102 ....................................................4, 38

8 C.F.R. § 208.30 .................................................................................................... *passim*

8 C.F.R. § 1208.16(b)(2) ...............................................................................................5

**Other Authorities**

142 CONG. REC. S11491-02 ......................................................................................2, 19

*Guidance for Processing Reasonable Fear, Credible Fear, Asylum, and Refugee
Claims in Accordance with Matter of L-E-A-* ("USCIS Guidance") ............................. *passim*

Human Rights Watch, *You Don't Have Rights Here: US Border Screening and
Returns of Central Americans to Risk of Serious Harm* (Oct. 16, 2014)...................................5

*RAIO Nexus – Particular Social Group Lesson Plan* ("2015 Guidance") ....................................3

*Refugees and Stateless Persons*., U.N. Doc. A/CONF.2/108/Rev.1, https://
www.refworld.org/docid/40a8a7394.html (July 25, 1951) ...............................................38, 39

## MEMORANDUM OF LAW IN SUPPORT OF SUMMARY JUDGMENT

Defendants have enacted unlawful new policies designed to dismantle longstanding protections for asylum seekers who, like Plaintiffs, were targeted for persecution in their home countries because they are members of a particular family. Unless this Court vacates and enjoins these policies, Defendants will deport Plaintiffs and countless other noncitizens with meritorious asylum claims to their countries of origin, where they face violence and possible death.

In September 2019, Defendant United States Citizenship and Immigration Services ("USCIS") issued two written guidance documents (USCIS000013-19 & USCIS000020-57, together, the "New PSG Guidance" or "Guidance") to asylum officers conducting expedited removal proceedings, which are commonly known as credible fear interviews. In essence, the relevant parts of the New PSG Guidance instruct asylum officers to stop recognizing ordinary families as sufficiently distinct to qualify as a "particular social group" ("PSG") for the purpose of establishing potential asylum eligibility in credible fear interviews, thereby preventing persons fleeing violence directed against them because of their family membership from even pursuing asylum claims in immigration court—unless their families happen to be "well-known in the relevant society." USCIS000014, USCIS000019.

The New PSG Guidance purports to implement *Matter of L-E-A-*, 27 I. & N. Dec. 581 (A.G. 2019) ("*L-E-A- II*"), an Attorney General opinion regarding family-based PSGs. *See* USCIS000011 & USCIS000012 (emails conveying Guidance to asylum officers). While the holding of *L-E-A- II* was simply that family-based claims must be assessed on a case-by-case basis, the Attorney General suggested in *dicta* that families cannot meet the social distinction requirement for PSGs unless they "carr[y] greater societal import" than "ordinary" families and are "recognizable by society at large." 27 I. & N. Dec. at 595. Unlike in *Matter of A-B-*, 27 I. & N. Dec. 316, 338 (A.G. 2018), the Attorney General did not state in *L-E-A- II* whether the

1

holding of his opinion—much less this *dicta*—would apply in the unique context of expedited removal proceedings.

In creating expedited removal proceedings, Congress expressly articulated a standard— an applicant only need show "significant possibility" of establishing eligibility for asylum, 8 U.S.C. § 1225(b)(1)(B)(v)— that "is intended to be a low screening standard for admission into the usual full asylum process." *See* 142 CONG. REC. S11491-02. As Judge Sullivan explained in *Grace v. Whitaker*, "to prevail at a credible fear interview, the alien need only show a 'significant possibility' of a one in ten chance of persecution, i.e., a fraction of ten percent." 344 F. Supp. 3d 96, 137-38 ("*Grace I*") (D.D.C. 2018) (citing 8 U.S.C. § 1225(b)(l)(B)(v)), *aff'd in part and rev'd in part sub nom. Grace v. Barr*, 965 F.3d 883 (D.C. Cir. 2020) ("*Grace II*"). *L-E-A II* does not discuss, much less require, any changes to how asylum officers conduct credible fear interviews. It was not until Defendants issued the New PSG Guidance that Defendants instructed asylum officers—for the first time— to apply *L-E-A- II* in credible fear interviews to reject claims involving "ordinary" families.

The New PSG Guidance is irreconcilable with decades of precedent under which the federal circuit courts and the Board of Immigration Appeals ("BIA" or "Board") have *uniformly* held that ordinary nuclear families easily qualify as PSGs. *E.g*., *Crespin-Valladares v. Holder*, 632 F.3d 117, 125 (4th Cir. 2011) ("the family provides a prototypical example of a particular social group"); *Matter of C-A*-, 23 I. & N. Dec. 951, 955 (BIA 2006) ("[s]ocial groups based on . . . family relationship are generally easily recognizable and understood by others to constitute social groups"). The New PSG Guidance is also at odds with BIA precedent requiring case-by-case PSG analysis and construing the "social distinction" prong of that analysis to allow ordinary nuclear families to qualify.

The New PSG Guidance is also a stark departure from Defendants' own past practices. In a July 27, 2015 Guidance entitled *RAIO Nexus – Particular Social Group Lesson Plan* ("2015 Guidance"), USCIS instructed asylum officers conducting credible fear interviews that, "[i]n most societies . . . the nuclear family would qualify as a particular social group." *See* USCIS000079. The 2015 Guidance emphasized that the pivotal question in analyzing a claim based on membership in a nuclear family *was not* "whether a specific family is well-known in the society" but instead whether "the society distinguishes groups of people based on that type of [familial] relationship." *See id.* The New PSG Guidance turns the 2015 Guidance on its head, instructing asylum officers for the first time that: "[T]he average or ordinary family typically will not meet the standard" for social distinction, and that an applicant must establish that his or her specific nuclear family is "well-known in the relevant society." USCIS000014, USCIS000019. The Guidance thereby also contradicts the common sense proposition—recognized for decades by both the government and the courts—that the nuclear family is a distinct social unit.

For all these reasons, the New PSG Guidance fails the reasoned decision-making requirement of the Administrative Procedure Act ("APA"), 5 U.S.C. § 706, and is an unlawful and unreasonable interpretation of the Immigration and Nationality Act ("INA") that warrants no deference—particularly when applied in the expedited removal setting, where applicants with even a small chance of showing that they are entitled to protection must be permitted to pursue their asylum claim. The D.C. Circuit's decision in *Grace II,* 965 F.3d at 883, affirming in part the vacatur of another USCIS guidance addressing credible fear interview policies, not only confirms that this Court has jurisdiction to entertain Plaintiffs' challenges to the New PSG Guidance, but supports Plaintiffs' arguments that the Guidance is unlawful, arbitrary, and capricious.

This Court therefore should vacate the unlawful New PSG Guidance under the APA, declare that it is unlawful, and enjoin the government from applying the New PSG Guidance or otherwise instructing asylum officers to apply *L-E-A- II* so as to bar asylum claims predicated on family-based PSGs at the credible fear interview stage.

## BACKGROUND

I.    **Asylum and Withholding of Removal Protections in the United States**

Congress enacted the current asylum system in 1980 in order to bring U.S. law into conformity with our obligations under the United Nations Convention Relating to the Status of Refugees and 1967 United Nations Protocol Relating to the Status of Refugees. *See* Refugee Act of 1980, Pub. 96-212, 94 Stat. 102. To be eligible for asylum, a noncitizen must establish that she is "a refugee within the meaning of [8 U.S.C.] section 1101(a)(42)(A)[.]" 8 U.S.C. § 1158(b)(l)(A); *see also* 8 U.S.C. § 1158(b)(1)(B)(i). A refugee is defined as:

> any person who is outside any country of such person's nationality or, in the case of a person having no nationality, is outside any country in which such person last habitually resided, and who is unable or unwilling to return to, and is unable or unwilling to avail himself or herself of the protection of, that country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, *membership in a particular social group*, or political opinion[.]

8 U.S.C. § 1101(a)(42)(A) (emphasis added).

Consistent with international law, the definition of "refugee" does not require a showing of certain harm. Instead, individuals can establish eligibility for asylum based on a "well-founded fear of persecution," which the Supreme Court has defined as at least a one in ten chance of persecution. *See INS v. Cardoza-Fonseca*, 480 U.S. 421, 430, 440 (1987). A noncitizen who is ineligible for asylum may apply for other forms of relief, including withholding of removal, in cases in which the applicant can show "that it is more likely than not

that he or she would be persecuted on account of" a protected ground if removed from the United States. 8 C.F.R. § 1208.16(b)(2); *see also* 8 U.S.C. § 1231(b)(3).

## II.     The Creation of the Expedited Removal System

Prior to 1996, noncitizens seeking protection from deportation or exclusion from the United States were entitled to a full hearing in immigration court, appellate review before the BIA, and judicial review in federal court, even if they were outside the United States seeking entry. But in 1996, Congress created a new mechanism called "expedited removal" for certain noncitizens seeking admission to the United States. *See* 8 U.S.C. § 1225(b)(1).

Through expedited removal, the government can summarily remove noncitizens after a preliminary inspection by an immigration officer, so long as the noncitizens do not express a credible fear of persecution in their country of origin. If noncitizens indicate fear of returning to their home country, they are entitled to receive a "credible fear interview" with an asylum officer, a non-adversarial process intended "to elicit all relevant and useful information bearing on whether the applicant has a credible fear of persecution or torture." 8 C.F.R. § 208.30(d). Credible fear proceedings usually occur within days of arrival, with little to no preparation or assistance by counsel, little to no knowledge of asylum law by the applicant, no opportunity to examine witnesses or gather evidence, and while the individual is detained. Applicants are thus not in a position to present a fully developed asylum claim.[1]

When conducting a credible fear interview, the asylum officer must "consider whether the [applicant's] case presents novel or unique issues that merit consideration in a full hearing before an immigration judge." 8 C.F.R. § 208.30(e)(4). If the asylum officer makes a negative

---

[1] *See generally* Human Rights Watch, *You Don't Have Rights Here: US Border Screening and Returns of Central Americans to Risk of Serious Harm*, at § 3 (Oct. 16, 2014), https://www.hrw.org/report/2014/10/16/you-dont-have-rights-here/us-border-screening-and-returns-central-americans-risk.

credible fear determination, he or she must issue a written decision documenting "the officer's analysis of why, in light of [the] facts, the [applicant] has not established a credible fear of persecution." *Id*. at § 1225(b)(l)(B)(iii)(II).

A noncitizen who receives a negative credible fear determination is entitled to request a review of that determination by an immigration judge. 8 U.S.C. § 1225(b)(l)(B)(iii)(III); *see also* 8 C.F.R. § 208.30(g)(1). However, review of a negative credible fear decision is limited; it does not entitle a noncitizen to many rights available in full removal proceedings under 8 U.S.C. § 1229a. Once an immigration judge upholds a negative credible fear review decision, the decision is administratively final. Noncitizens who receive a negative credible fear determination are immediately removed to their home countries and, upon removal, are subject to a five-year bar on admission to the United States. 8 U.S.C. § 1182(a)(9)(A)(i).

Given the truncated process and serious consequences of expedited removal, Congress included crucial protections to avoid sending asylum seekers back to harm. One protection was to establish a low threshold at the credible fear stage to ensure that asylum seekers could develop valid asylum claims in a full hearing before an immigration judge. Echoing the "well-founded fear of persecution" definition that the Supreme Court affirmed in *Cardoza-Fonseca*, 480 U.S. at 440, Judge Sullivan in *Grace I* explained that, "[t]o prevail at a credible fear interview, the [applicant] need only show a 'significant possibility' of a one in ten chance of persecution, *i.e.*, a fraction of ten percent." 344 F. Supp. 3d at 127 (citing 8 U.S.C. § 1225(b)(l)(B)(v)).

If an asylum officer finds that a noncitizen has a "credible fear," the individual is taken out of expedited removal proceedings and is entitled to full removal proceedings under 8 U.S.C. § 1229a. Prior to and at their hearing before an immigration judge, the asylum seeker has the

opportunity to develop a full evidentiary record, and may appeal an adverse decision to the BIA and federal courts of appeals. 8 C.F.R. § 208.30(f); 8 U.S.C. § 1225(b)(l)(B)(ii).

## III.    The Attorney General's Decision in *L-E-A- II*

On July 29, 2019, Defendant Barr issued *Matter of L-E-A- II*, 27 I. & N. Dec. 581 (A.G. 2019), which reversed part of a precedential 2017 BIA decision discussing whether a Mexican man who fled extreme violence at the hands of a drug cartel had established a cognizable family-based PSG. In the earlier decision, the BIA held that members of an immediate family may constitute a particular social group—a determination that was conceded by DHS in that case— but proceeded to deny Mr. L-E-A-'s claims, finding that his feared persecution from the cartel had an insufficient nexus to his family membership.

Although the BIA had already denied Mr. L-E-A-'s claims on nexus grounds, Defendant Barr's predecessor, Acting Attorney General Whitaker, employed a procedural mechanism to "certify" the BIA's prior decision to the Attorney General for review. Despite affirming the BIA's denial based on lack of nexus in the prior decision, Defendant Barr used this procedure as a vehicle to criticize the BIA and immigration judge below for accepting DHS's concession that Mr. L-E-A-'s family qualified as a PSG without undertaking a complete independent analysis.[2] In addressing that issue, he relied on a narrow and uncontroversial legal principle: to determine whether an applicant for asylum or withholding is a member of a family-based "particular social group," for purposes of the INA, courts must assess all three PSG criteria identified in prior cases. 27 I. & N. Dec. at 582, 584. Defendant Barr reconfirmed BIA case law holding that an

---

[2] At the time Acting Attorney General Whitaker certified the case to himself, Mr. L-E-A- had already lost his asylum claim and the case had been remanded to the immigration judge solely to consider relief under the Convention Against Torture. Acting Attorney General Whitaker and Defendant Barr thus took extraordinary steps to issue a decision on a claim which was no longer pending before the BIA or even the immigration judge.

asylum applicant raising a family-based PSG claim must establish that her proposed PSG is "(1) composed of members who share a common immutable characteristic; (2) defined with particularity; and (3) socially distinct within the society in question." *Id*. at 588 (citing *Matter of M-E-V-G-*, 26 I. & N. Dec. 227, 237 (BIA 2014)). *L-E-A- II* broke no new ground in this respect; it simply reaffirmed settled law requiring adjudicators assessing proposed PSGs to conduct "a fact-specific inquiry based on the evidence in a particular case." 27 I. & N. Dec. at 584.

Despite the Attorney General's stated adherence to the principle of fact-based, case-by-case adjudication, he nonetheless made several statements in *dicta* suggesting that most family-based groups will not meet the social distinction requirement for PSGs. For example, he stated that "unless an immediate family carries greater societal import, it is unlikely that a proposed family-based group will be 'distinct' in the way required by the INA for purposes of asylum." *Id.* at 595. He also stated: "In the ordinary case, a family group will not meet [the PSG] standard, because it will not have the kind of identifying characteristics that render the family socially distinct within the society in question." *Id.* at 586; *see also id.* at 589 ("[I]n the ordinary case, a nuclear family will not, without more, constitute a 'particular social group' because most nuclear families are not inherently socially distinct.").

These statements radically depart from past precedent by imposing new criteria to meet the social distinction requirement under which an applicant's family must "carr[y] greater societal import" than other families in their home country. *Id*. at 595. This new standard precludes members of "ordinary" nuclear families from seeking protection from persecution, and would arbitrarily limit the availability of asylum protections to a very small subset of families.

## IV.   The New PSG Guidance

On September 24, 2019, USCIS issued a written Refugee, Asylum, and International Operations Directorate Officer Training Asylum Division Officer Training Course ("Credible

Fear Lesson Plan"), entitled *Credible Fear of Persecution and Torture Determinations. See*

USCIS000020-57. The Credible Fear Lesson Plan instructs asylum officers to implement the

*dicta* of *L-E-A- II* as follows:

> The relevant question in this analysis is *not* whether the degree and type of relationship that defines a potential family-based particular social group is immutable, particular and socially distinct. Rather, "[i]f an applicant claims persecution based on membership in his father's immediate family, then the adjudicator must ask whether that specific family is 'set apart, or distinct, from other persons within the society in some significant way.' It is not sufficient to observe that the applicant's society (or societies in general) place great significance on the concept of the family." *Matter of L-E-A-*, 27 I&N Dec. at 594 (citing *M-E-V-G-*, 26 I&N Dec. at 238). *Matter of L-E-A-* instructs that "[t]he fact that 'nuclear families' or some other widely recognized family unit generally carry societal importance says nothing about whether a specific nuclear family would be 'recognizable by society at large'" *Id.* Therefore, officers must analyze the specific group of people identified as a family group in making this assessment. *Previous guidance that instructed officers to assess whether the society in question recognizes the type of relationship shared by the group as significant or distinct is no longer valid* under *Matter of L-E-A-*.

*See* USCIS000042 (emphasis added).

On September 30, 2019, USCIS published on its website an unsigned, undated Policy

Memorandum that addresses the issue even more bluntly. *See* USCIS000013-19, *Guidance for*

*Processing Reasonable Fear, Credible Fear, Asylum, and Refugee Claims in Accordance with*

*Matter of L-E-A-* ("USCIS Guidance"). The USCIS Guidance instructs asylum officers to apply

the *dicta* of *L-E-A- II* when conducting credible and reasonable fear interviews*,* stating:

> [I]n the ordinary case, a nuclear family will not, without more, constitute a 'particular social group' because most nuclear families are not inherently socially distinct.

USCIS000015-16. The USCIS Guidance then goes beyond *L-E-A- II* by further advising

asylum officers that prior guidance on this issue is "no longer valid" because it incorrectly

permitted the recognition of nuclear families as PSGs where the families themselves "were

not *well-known in the relevant society*." *Id*. (emphasis added). The USCIS Guidance also goes

beyond *L-E-A- II* by mandating that asylum officers ignore court of appeals cases recognizing

that "ordinary" families qualify as PSGs:

> [T]he Attorney General's decision in *Matter of L-E-A- [II]* is controlling law in every
> circuit, and must be applied going forward in every circuit, unless and until a circuit
> court holds to the contrary. The Attorney General in L-E-A- held that previous courts
> of appeals decisions that held that nuclear families categorically constituted particular
> social groups were interpretations of "particular social group," an ambiguous statutory
> term that the Attorney General has discretion to reasonably interpret. The Attorney
> General has reasonably interpreted that term to require social distinction and
> particularity, and has predicted that many family-based groups may not meet those
> requirements.

USCIS Guidance at 2, n.1 (USCIS000014).

The New PSG Guidance is a radical departure from USCIS's prior guidance addressing

the assessment of family-based PSGs in the credible fear interview context. That 2015 Guidance

noted that "[i]n most societies . . . *the nuclear family would qualify as a particular social group*."

USCIS000079 (emphasis added); *see also id.* ("[I]n many cases a family may constitute a

particular social group. This approach is consistent with existing case law recognizing family as

a "particular social group."). The 2015 Guidance further explained that "[t]he question here is

not generally whether a specific family is well-known in the society," but whether "the society

distinguishes groups of people based on that type of relationship." *Id.* There was thus a clear

reversal of course by the agency between these instructions and those in the New PSG Guidance.

Throughout the country, denials of family-based claims in credible and reasonable fear

proceedings increased dramatically after the New PSG Guidance, with asylum officers informing

applicants that family-based claims are "not a thing anymore" and "they cannot rely on family

anymore to find a nexus to a protected ground." Ex. 2 ¶ 13; *see also* Ex. 3 ¶ 5 ("a significantly

higher number of individuals. . . have received a negative credible or reasonable fear decision

despite presenting facts that would have previously formed the basis of a cognizable family-

based claim. Those who have been most significantly affected have been minor children");

Ex. 4 ¶ 7 ("Previously, 1-2% of our clients were issued negative credible fear findings. Currently, approximately 25-30 families represented by our project are served with a negative credible fear finding each day. The overwhelming majority of these families have family-based claims, that would have been granted prior to the implementation of *Matter of L-E-A-*.").

## V.    Plaintiffs

Plaintiffs are predominantly women and children seeking safety from violence and threats of violence directed against them because of their family relationships and who received negative credible fear determinations because of the New PSG Guidance.[3]

For example, Plaintiffs R.C.E.A. and her children fled Honduras after gang members beat her husband and killed the family dog in front of her and two of her children after her husband refused to pay a war tax. Ex. 1, Declaration of R.C.E.A. ¶¶ 1-3. Plaintiff Y.C.D. fled Honduras after a gang member raped his mother and told her that if she was not going to be his, he would kill her and Y.C.D. Ex. 1, Declaration of E.D.A. ¶ 2. Plaintiffs L.R.Q. and her son E.M.M.R. fled Guatemala after gang members began threatening E.M.M.R. because his older brother refused to join the gang. Ex. 1, Declaration of L.R.Q. ¶ 2. *See also* Ex. 1, Declaration of S.G.F. (fled Honduras with her children after they began receiving death threats from a gang after her husband fled the country out of fear of retaliation for filing a police report against the gang for robbing his brother); Ex. 1, Declaration of K.G.J. (fled Guatemala with her son after gang members told her she had three days to tell them where her partner was or they would kidnap her son); Ex. 1, Declaration of M.A.C. (fled Honduras with her son after gang members threatened to kill her and kidnap her sons if she did not work for them after her husband was violently beaten

---

[3] While many of Plaintiffs' claims were denied under the credible fear standard, some were adjudicated under a "reasonable fear" standard, which has since been vacated and enjoined by another judge of this Court. *See Capital Area Immigrants' Rights Coalition v. Trump*, No. 19-2117 (TJK), 2020 WL 3542481 (D.D.C. June 30, 2020).

for refusing to pay money to or join the gang); Ex. 1, Declaration of M.O.R.S. (minor child fled

Mexico after gang members threatened to "disappear him" after his mother stopped paying

money to a gang that had extorted her for years); Ex. 1, Declaration of J.S.R. (fled Honduras

with her child after gang members discovered her brother was a police officer and told him they

were going to go after his family; those gang members subsequently identified her as a family

member of her brother); Ex. 1, Declaration of A.G.T. (fled Brazil with her son after being shot at

multiple times by gang members who killed her brother); Ex. 1, Declaration of D.A.M. (fled

Mexico with her daughter after being followed by cartel members threatening to kill her because

of her relationship with her husband, who disappeared two years ago); Ex. 1, Declaration of

D.A.L. (fled El Salvador after gang members threatened to murder her and her family and

subsequently murdered her half-brother); Ex. 1, Declaration of P.A.O. (fled Guatemala after a

political party threatened to kill him because his father supported a different political party).

## <u>LEGAL STANDARD</u>

Under 5 U.S.C. § 706(2)(a), agency action that is "arbitrary, capricious, an abuse of

discretion, or otherwise not in accordance with law" must be "set aside." "To survive an arbitrary

and capricious challenge, an agency action must be 'the product of reasoned decision making.'"

*Grace I*, 344 F. Supp. 3d at 120 (quoting *Fox v. Clinton*, 684 F.3d 67, 74–75 (D.C. Cir. 2012)).

"No deference is owed to an agency action . . . where the agency's explanation for its action

lacks any coherence." *Fox*, 684 F.3d at 75. "Unexplained inconsistency" is another "reason for

holding an interpretation to be an arbitrary and capricious change from agency practice under the

[APA]." *Motor Vehicle Mfrs. Assn. of United States, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463

U.S. 29, 46–57 (1983) ("*State Farm*"). If an agency "chang[es] position," it must "display

awareness that it is" doing so. *Fox Television Stations, Inc.*, 556 U.S. at 514, 515 (2009).

In reviewing an agency's interpretation of a statute it is charged with administering, courts apply the framework set forth in *Chevron USA, Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984). Under that two-part test, the court must first ask "whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Chevron*, 467 U.S. at 842–43. When determining whether Congress had a clear intent, the court must employ all the traditional tools of statutory construction, including "examination of the statute's text, legislative history, and structure . . . as well as its purpose." *Natural Res. Def. Council, Inc. v. Daley*, 209 F.3d 747, 572 (2000) (citation omitted). If, after applying those interpretative tools, a court concludes that the statute is ambiguous with respect to the question before the court, then the court must determine if the agency's approach is "reasonable and consistent with the statutory purpose." *Troy Corp. v. Browder*, 120 F.3d 277, 285 (D.C. Cir. 1997). To make that determination, a court employs the "traditional tools of statutory interpretation, including reviewing the text, structure, and purpose of the statute." *Daley*, 209 F.3d at 572 (citation omitted).

The court is not to defer reflexively to the agency; rather, as the Supreme Court has noted, "courts retain a role, and an important one, in ensuring that agencies have engaged in reasoned decision making." *Judulang v. Holder*, 565 U.S. 42, 53 (2011). Indeed, the second step of the *Chevron* analysis "overlaps analytically" with the APA reasoned decision-making standard for determining whether an action is arbitrary and capricious. *See Nat'l Ass'n of Regulatory Util. Comm'rs v. ICC*, 41 F.3d 721, 726 (D.C. Cir. 1994) ("[T]he inquiry at the second step of Chevron overlaps analytically with a court's task under the [APA].").

Furthermore, agency "[i]nterpretations such as those in opinion letters—like interpretations contained in policy statements, agency manuals, and enforcement guidelines, all of which lack the force of law—do not warrant Chevron-style deference." *Christensen v. Harris Cnty.*, 529 U.S. 576, 587 (2000). Rather, such interpretations "are entitled to respect ... only to the extent that those interpretations have the power to persuade." *Id*. (citations omitted).

## ARGUMENT

### I.      Plaintiffs Have Standing and the Court Has Jurisdiction.

Plaintiffs have standing to bring their challenge to the New PSG Guidance, and this Court has jurisdiction to hear that challenge under 8 U.S.C. § 1252(e)(3)(A), which specifically authorizes review of written agency policies addressing expedited removal.

### A.      Plaintiffs Have Standing.

To show that they have standing, a plaintiff "must, generally speaking, demonstrate that he has suffered 'injury in fact,' that the injury is 'fairly traceable' to the actions of the defendant, and that the injury will likely be redressed by a favorable decision." *Bennett v. Spear*, 520 U.S. 154, 162 (1997); *see also Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992) (identifying a concrete and particularized injury, causation, and redressability as the three core elements of standing). When resolving a standing challenge, the court must "assume that on the merits the plaintiffs would be successful in their claims," *City of Waukesha v. EPA*, 320 F.3d 228, 235 (D.C. Cir. 2003) (citations omitted), and "that the requested relief would be granted." *L.M.-M. v. Cuccinelli*, 442 F. Supp. 3d 1, 22 (D.D.C. 2020) (quoting *Cutler v. U.S. Dep't of Health & Human Servs.*, 797 F.3d 1173, 1179–80 (D.C. Cir. 2015) (also noting that a court "must assume that the party asserting federal jurisdiction is correct on the legal merits of his claim").

As in *Grace I*, "[t]here is no question that the challenged policies impacted plaintiffs" and thereby satisfy the injury-in-fact and causation requirements of the standing analysis. 344

F. Supp. 3d at 120. Plaintiffs attempted to assert asylum claims predicated on violence directed against them because of their family membership, but received negative credible fear determinations. Counsel representing Plaintiffs and others attempting to pursue family-based asylum claims were told explicitly that family-based PSG claims were simply no longer a ground for a positive credible fear determination because of the implementation of *L-E-A- II* in that specific context. *See* Ex. 2 ¶ 13; Ex. 3 ¶ 5; Ex. 4 ¶¶ 8-9. Thus, the New PSG Guidance caused an injury to these Plaintiffs.

"There is also no question that an order from this Court declaring the policies unlawful and enjoining their use would redress those injuries." *Grace I*, 344 F. Supp. 3d at 120. If the Court provided the relief requested—vacatur of the New PSG Guidance and Plaintiffs' negative credible fear determinations, and an injunction preventing Defendants from again barring PSG claims based on membership in an ordinary family in the credible fear interview context specifically—Plaintiffs would have a strong chance of prevailing at the credible fear interview stage. *See Carpenters Indus. Council v. Zinke*, 854 F.3d 1, 6 n.1 (D.C. Cir. 2017) (stating that when government actions cause an injury, enjoining that action will usually redress the injury).

The Government has argued that Plaintiffs lack standing because, even absent the New PSG Guidance, the "INA and its implementing regulations require USCIS officers to apply *L-E-A- II* to Plaintiffs" in their credible fear interviews. Opp'n to Pls.' Mot. for Prelim. Inj., ECF No. 22, at 19. That argument flatly contradicts the Government's own assertion, in the same document, that "there is no basis to conclude that the Attorney General made 'legal policy' for credible fear proceedings through *L-E-A- II*" because "*L-E-A- II* nowhere mentions credible fear or 8 U.S.C. § 1225(b)(1)[.]" *Id.* at 15 n.4. It is precisely because the Attorney General was *not* addressing credible fear interviews in *L-E-A- II* that the subsequent Guidance implementing *dicta*

from *L-E-A- II* in that unique setting causes Plaintiffs' injuries. And in *Grace II*, the D.C. Circuit explicitly authorized suits challenging credible fear guidance that "incorporates" an Attorney General decision. 965 F.3d at 896.

**B.      The Court Has Statutory Jurisdiction.**

The INA provides for judicial review, in this court only, of written agency policies addressing credible fear interviews, which are authorized and governed by 8 U.S.C. § 1225(b). Specifically, section 1252(e)(3)(A) states:

> Judicial review of determinations under [8 U.S.C. §] 1225(b) … and its implementation is available … but shall be limited to determinations of … (ii) whether … a written policy directive, written policy guideline, or written procedure issued by or under the authority of the Attorney General to implement such section, is not consistent with applicable provisions of this subchapter or is otherwise in violation of law.

Plaintiffs are challenging the New PSG Guidance, which plainly constitutes "a written policy directive, written policy guideline, or written procedure issued by or under the authority of the Attorney General to implement" the credible fear interview provisions of the INA contained in 8 U.S.C. § 1225(b)(1)(A)(ii), (B). Defendants have previously objected to the Court's exercise of jurisdiction, arguing that section 1252(e)(3)(A) does not grant jurisdiction when the "agency issues guidance or training materials informing its officers of . . . new [Board or Attorney General] precedent." Opp'n to Pls.' Mot. for Prelim. Inj., ECF No. 22, at 17. The D.C. Circuit has since squarely rejected this argument, holding that jurisdiction extends to credible fear policy guidance documents and that "such jurisdiction extends to [a Board or Attorney General decision] to the extent the Guidance incorporates [that decision]." *Grace II*, 965 F.3d at 896.

**II.      The New PSG Guidance Is Unlawful.**

The New PSG Guidance effects an irrational, arbitrary, unreasonable, and unlawful change in our asylum laws, which is at odds with decades of circuit court and BIA authority

interpreting the phrase "particular social group" as encompassing ordinary families.

First, directing asylum officers to apply *L-E-A II* to determine whether an applicant's family is "well-known" and of "greater social import" than other families in a credible fear interview violates the INA's "significant possibility" standard.

Second, the New PSG Guidance's directive to reject asylum claims based on membership in a PSG consisting of a nuclear family that is "ordinary," as opposed to "well-known," USCIS000015-16, violates the strict requirement under both the INA and BIA precedent that the government make an individualized asylum decision based on the facts of each case. The imposition of this bar in the credible fear interview setting means that asylum seekers never even have the opportunity to prove the cognizability of their proposed family PSG in a hearing before an immigration court.

Third, the New PSG Guidance's directives regarding the application of the "social distinction" prong of the PSG analysis to families are contrary to Board precedent, including the seminal decision in *Matter of M-E-V-G,* 26 I. & N. Dec. 227 (BIA 2014). Neither the New PSG Guidance nor *L-E-A- II* acknowledges this departure from precedent, much less justifies it, rendering the Guidance arbitrary and unlawful. The New PSG Guidance is also arbitrary and capricious because it erroneously presumes that USCIS is *compelled* to apply the dicta from *L-E-A- II* regarding "ordinary" families under the more relaxed credible fear standard. An agency acts arbitrarily and capriciously, when it does not "appreciate the full scope of [its] discretion." *Dept. of Homeland Security v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1911 (2020).

Finally, the government's new interpretation of the INA term "particular social group" to exclude ordinary families is arbitrary, capricious, unlawful, and unreasonable. In addition to being at odds with BIA precedent and in conflict with other INA requirements, the reasons

17

the government has offered to justify its novel re-interpretation of "particular social group" as excluding most families are illogical and unsound. Furthermore, allowing only members of extraordinary families to pursue asylum claims is contrary to the textual breadth of the phrase "particular social group," its context, and its history—and the precedent of every Court of Appeals to construe that term. Whether viewed as arbitrary and capricious under the APA, or as an incorrect—or at least unreasonable—interpretation of the INA under the *Chevron* framework, the presumption against family-based PSGs set forth in the Guidance is unlawful.

### A.    The New PSG Guidance Is Contrary to the "Significant Possibility" Standard for Credible Fear Interviews.

The New PSG Guidance instructs asylum officers to deny claims based on membership in PSGs comprised of "ordinary" families, defined as those that are not "well-known" in the relevant society. This directive is unlawful for the numerous independent reasons set forth in Sections II.B to II.D below. But the Court can grant summary judgment to Plaintiffs simply because the New PSG Guidance imposes *L-E-A II*'s "greater social import" requirement to family-based PSGs in the unique context of credible fear interviews, where the statute prescribes the application of a low "significant possibility" standard. 8 U.S.C. § 1225(b)(l)(B)(v).

The stark contrast between full removal proceedings and expedited removal proceedings is critical to this analysis. In full removal proceedings, applicants have months or even years to develop a complete factual record, obtain the advice of counsel, gather supporting documents from abroad, and present witnesses and expert testimony in support of their claims in a hearing before an immigration judge. In that context, applicants must meet heavy burdens of proof and persuasion to establish *entitlement to asylum on the merits*. The individuals responsible for making that merits determination are immigration judges with the expertise to apply notoriously complex legal analyses to a fully developed factual record.

In contrast, and true to their name, expedited removal proceedings were neither intended nor designed to resolve the *merits* of an applicant's asylum claim. Instead, Congress created the credible fear interview process solely as a screening interview to determine whether, if given the opportunity to develop a full factual record, an asylum seeker had any *meaningful chance* of obtaining asylum. For this reason, Congress directed asylum officers to apply the "significant possibility" standard which "is intended to be a low screening standard for admission into the usual full asylum process." *See* 142 CONG. REC. S11491-02. As Judge Sullivan explained in *Grace I*, "to prevail at a credible fear interview, the alien need only show a 'significant possibility' of a one in ten chance of persecution, i.e., a fraction of ten percent." 344 F. Supp. 3d at 137-38. And as the Court of Appeals subsequently held in *Grace II*, "[u]nder this system, there should be no danger that an alien with a genuine asylum claim will be returned to persecution." 965 F.3d at 902 (*quoting* H.R. Rep. No. 104-469, pt. 1, at 158 (1995)).

This deliberately generous standard is consistent with the circumstances of a credible fear interview, in which asylum seekers (many, like Plaintiffs, mothers and their young children) are interviewed within days of arriving in the United States. These asylum seekers have endured the compounded traumas of violence in their home country and the hunger, exhaustion, and dangers of their travel to the United States. They have no understanding of immigration law, no opportunity to obtain supporting documents or witnesses, and, in nearly all cases, no legal representation. The individuals responsible for conducting their credible interviews are not immigration judges but asylum officers, or sometime even Customs and Border Protection ("CBP") officers.[4]

The significant possibility standard cannot be reconciled with a system in which

---

[4] *See A.B-B et. al v. Morgan et. al*, 20-cv-846, (D.D.C.), ECF No. 110 (Aug. 29, 2020) (enjoining unlawful government practice of permitting CBP Officers to conduct credible fear interviews).

asylum or CBP officers are directed to deny credible fear interviews, without any meaningful factual development, on the grounds that newly arrived asylum seekers have failed to establish that their individual nuclear family is of "greater social import" than other families in their society. Asylum officers are explicitly required to "consider whether the [applicant's] case presents novel or unique issues that merit consideration in a full hearing before an immigration judge." 8 C.F.R. § 208.30(e)(4). Whether an applicant's family can meet the newly articulated "greater societal import" standard is, on its face, such an issue.

Requiring asylum officers to impose this standard in the credible fear context is especially improper given that neither the New PSG Guidance nor Defendants have provided a single example of how an ordinary or typical family could be deemed sufficiently distinct to qualify as a PSG. And it is further improper given that, even prior to the implementation of this nebulous new standard, the evidence required to establish membership in a PSG usually consisted of "country conditions reports [and] expert witness testimony," *M-E-V-G-*, 26 I. & N. at 244, evidence that is not available in expedited removal proceedings.

Even accepting Defendants' facially unreasonable proposition that "most nuclear families are not inherently socially distinct," USCIS000015-16, an asylum seeker who presents an *otherwise cognizable* family-based PSG claim in a credible fear interview has at least a "significant possibility" of prevailing in full removal proceedings. The Attorney General himself stated that not all ordinary family-based asylum claims would be barred under *L-E-A-II*, and that such claims must be assessed on a case-by-case basis. Thus, even if the *dicta* from *L-E-A- II* were applied in full removal proceeding by immigration courts to bar *most* family-based claims, some meaningful percentage would still establish the requisite social distinction to prevail on their claims. The fact that ordinary families can prevail in full removal

proceedings means that any given applicant asserting an otherwise cognizable claim based on ordinary-family-based PSG has at least a "a fraction of ten percent" chance of meeting the "greater social import" requirement in a full removal proceeding. By requiring the asylum seeker to introduce evidence proving that their family is "well-known" or has some other special societal significance in this initial screening, the New PSG Guidance impermissibly elevates the screening standard well beyond "a fraction of ten percent."

Finally, there is a separate, independent reason that the "significant possibility" requires this Court to grant summary judgment to Plaintiffs. Even if *this* Court does not find in favor of Plaintiffs on the legal arguments articulated in Section II.B to II.D below, there can be no dispute that they raise serious questions about the meaning, lawfulness, and viability of *L-E-A-II* that will ultimately be addressed in appeals to federal circuit courts. That alone warrants granting summary judgment to Plaintiffs and barring application of *dicta* from *L-E-A- II* in the unique credible fear context, where an applicant need only show a fraction of a ten percent chance of experiencing persecution based on a protected ground.

The possibility of a successful appellate challenge to the application of *L-E-A- II* by immigration courts is not remote. The Fifth Circuit has already recognized that *L-E-A- II* is "at odds with the precedent of several circuits." *Pena Oseguera v. Barr*, 936 F.3d 249, 251 (5th Cir. 2019). Permitting asylum officers to reject family-based PSGs in expedited removal proceedings ignores the fact that, if such claims were permitted to proceed to immigration court, asylum applicants could appeal any denial of their claims based on *L-E-A- II's* re-interpretation of "particular social group" in the federal courts—where every circuit to address the issue has concluded that ordinary nuclear families qualify as PSGs. *See* pp. 36-37 below.

In other words, when considering how the New PSG Guidance's directives interact

with the "significant possibility" standard, the Court must consider that asylum applicants have at least a reasonable chance that application of *L-E-A- II* by the immigration court to bar their claims would be set aside on appeal. This, too, elevates Plaintiffs' ultimate chances of success on their asylum claims well above the "fraction of ten percent" chance of success inherent to the "significant possibility" standard. *See Grace I*, 344 F. Supp. 3d at 137-38. In sum, even if the language of the New PSG Guidance could otherwise withstand scrutiny, it cannot be squared with the statutory standard for expedited removal proceedings.

**B.      The New PSG Guidance Violates the INA's Individualized Decision-Making Requirement.**

The New PSG Guidance instructs asylum officers to categorically deny claims based on membership in PSGs comprised of "ordinary" nuclear families, defined as those that are not well-known in the relevant society. This categorical bar violates the INA requirement that each case be decided based on its unique facts. As the district court stated in *Grace I*:

> Credible fear determinations, like requests for asylum in general, must be resolved based on the particular facts and circumstances of each case . . . . A general rule that effectively bars the claims based on certain categories of persecutors . . . or claims related to certain kinds of violence is inconsistent with Congress' intent . . . .

344 F. Supp. 3d at 126; *see also Pirir-Boc v. Holder*, 750 F.3d 1077, 1084 (9th Cir. 2014) ("[T]he BIA may not reject a group solely because it had previously found a similar group" did not meet the standard). BIA precedent also mandates that "social group determination[s] must be made on a case-by-case basis." *Matter of M-E-V-G-*, 26 I. & N. Dec. at 242.

In *Grace II*, the D.C. Circuit affirmed this settled principle of law, but held that the guidance at issue there did not actually prevent asylum officers from assessing claims on an individualized basis. 965 F.3d at 890. That guidance instructed asylum officers that "generally, claims by aliens pertaining to domestic violence or gang violence perpetrated by non-governmental actors will not qualify for asylum." *Id*. While the court recognized that the

language was problematic, it held that the challenged guidance did not prevent individualized analysis of these claims because: (i) the phrase "in general" still allows for the possibility "that asylum claims based on domestic and/or gang violence might, depending on the circumstances of the case, qualify for asylum," and (ii) the record was devoid of "later conduct" demonstrating that, in practice, this instruction was treated as a bar against these categories of asylum claims. *Id*. (citations omitted).

The New PSG Guidance goes well beyond the language at issue in *Grace*. It instructs asylum officers both that (i) "the average or ordinary family typically will not meet the standard" for a PSG, *and* (ii) such claims may only proceed where the specific nuclear family holds "some greater meaning or significance" because it is "well-known in the relevant society." USCIS000014-15 & 17. The New PSG Guidance thus does not instruct asylum officers to simply evaluate family-based claims on a case-by-case basis; it instructs them to deny cases that might otherwise succeed in full removal proceedings.

To the extent there was any doubt as to the meaning of the New PSG Guidance, it is clarified by the express revocation of Defendants' 2015 Guidance, which instructed Asylum Officers that "[i]n most societies . . . the nuclear family *would* qualify as a particular social group," and that "[t]he question here is *not* generally whether a specific family is well-known in the society." USCIS000014-15 (emphasis added). The New PSG Guidance declares:

> Previous USCIS guidance, *no longer valid in light of the Attorney General's decision in Matter of L-E-A-*, instructed officers to recognize particular social groups based on familial relationships so long as the pertinent society perceived the degree of relationship among the family members as so significant that the society distinguished groups based on that type of relationship. This held true under past USCIS guidance, even for families that were not well-known in the relevant society. For example, the RAIO Nexus – Particular Social Group Lesson Plan, July 27, 2015, stated: […]
>
> "The question here is not generally whether a specific family is well-known in the society. Rather, the question is whether the society perceives the degree of

> relationship shared by group members as so significant that the society
> distinguishes groups of people based on that type of relationship.
>
> In most societies, for example, the nuclear family would qualify as a particular
> social group, while those in more distant relationships, such as second or third
> cousins, may not . . . ."
>
> This language and all other guidance and training materials that conflicts with the
> holding in Matter of L-E-A- *are no longer valid* and do not reflect the current
> state of the law.

*Id*. (emphasis in original). Defendants cannot reasonably dispute that, by declaring prior

guidance invalid, the New PSG Guidance directs asylum officers to deny claims asserting PSGs

comprised of typical nuclear families who are not well-known.

Moreover, Defendants' "later conduct . . . confirms [the] binding character" of the

Guidance's bar to asylum claims based on membership in typical families. *McLouth Steel*

*Products Corp. v. Thomas*, 838 F.2d 1317, 1321 (D.C. Cir. 1988); *see also Grace II*, 965 F.3d at

906. Legal services providers throughout the country have confirmed that asylum officers

understand and apply the New PSG Guidance as a categorical bar. *E.g.*, Ex. 3 ¶ 5. Indeed,

asylum officers have directly informed counsel that "they cannot rely on family anymore to find

a nexus to a protected ground." Ex. 2 ¶¶ 13, 2. Several of the Plaintiffs' negative credible fear

determinations contain notations indicating that the asylum officer treated *L-E-A- II* as

categorically foreclosing their claims.[5] And while the government has claimed that neither

*L-E-A-II* nor the New PSG Guidance function as a bar to recognizing typical families as PSGs,

the BIA has since affirmed the denial of asylum to an applicant precisely because he failed to

---

[5]*E.g.*, Ex. 5 (negative credible fear determination for Plaintiff R.C.E.A., noting: "The evidence
gleaned from the applicant's testimony regarding social distinction discusses facts that, while
supporting the notion that the applicant's family *was perceived as a family unit*, do not support
the conclusion that the applicant's family was perceived by her society *as distinct from other
family units* in a significant way . . . . [T]his is simply a family and the characteristics described
are the functions of the *average family in this society*. Therefore the past [sic] and the harms she
fears is not on account of a protected ground.") (emphasis added).

establish that "his family is socially distinct or was viewed as anything besides a *typical nuclear family* in Guatemala," citing *L-E-A- II. Matter of E-R-A-L-*, 27 I. & N. Dec. 767, 774 & n.9 (BIA 2020) (emphasis added). This "later conduct" confirms that—unlike in *Grace*—both *L-E-A- II* and the New PSG Guidance are being applied to "conclusively dispos[e] of" asylum claims predicated on familial PSGs. *See Grace II*, 965 F.3d at 906 (quoting *McLouth Steel Products Corp. v. Thomas*, 838 F.2d 1317 (D.C. Cir. 1988)) (explaining that the "record in this case" did not show that the challenged guidance language regarding domestic and gang violence "erected a rule against [such] asylum claims").

When asked by this Court at the preliminary injunction hearing, Defendants could not provide an example of an ordinary or typical family sufficiently distinct to qualify as a PSG:

> THE COURT: So give me some examples of what types of families would qualify under the new policy.
>
> MS. GREER: For example, Matter of H- and then Al-Ghorbani at least based on the facts provided it would. A family that is socially distinct for some reason. So that could be that --
>
> THE COURT: I understand the clans. But give me an example of a nuclear family that would qualify under the new policy.
>
> MS. GREER: It's somewhat difficult because it very much depends on the societal context. So I would need to know the facts of a specific case.

To date, Defendants have not articulated any example of how—other than being "well-known"—a nuclear family could demonstrate "greater meaning or significance" to meet the Guidance's new requirement for establishing a PSG. Defendants cannot do so because the Guidance was intended to function, and does function, as a bar against claims involving ordinary nuclear families. This bar violates both the INA and BIA precedent requiring that "social group determination[s] must be made on a case-by-case basis[.]"*M-E-V-G-*, 26 I. & N. Dec. at 242.

### C.      The New PSG Guidance Is Arbitrary and Capricious.

Even if the New PSG Guidance did not conflict with the statutory standard for credible

fear interviews or foreclose individualized analysis of ordinary nuclear-family-based PSGs, it is

still arbitrary and capricious in violation of the APA, 5 U.S.C. § 706. While a court is not to

"substitute its own judgment for that of the agency," it must assess "whether there has been a

clear error of judgment." *Grace II*, 965 F.3d at 897 (quoting *Regents,* 140 S. Ct. at 1905). That,

in turn, requires the court to "examin[e] the reasons for [the] agency decision[]—or, as the case

may be, the absence of such reasons." *Id*. (citation omitted).

The New PSG Guidance's instruction to asylum officers—that "in the ordinary case, a

nuclear family will not, without more, constitute a 'particular social group' because most nuclear

families are not inherently socially distinct" (USCIS000015-16)—fails to meet the APA's

reasoned decision-making standard for at least three reasons. First, it departs from prior

precedent, and Defendants' interpretation of prior precedent, without explanation or even

recognition of that departure. Second, the policy set forth in the New PSG Guidance is

irrational and unsupported. And third, USCIS failed to consider whether it should decline to

apply *L-E-A- II* in the credible fear context, incorrectly presuming that it had to do so.

1.      The Guidance Departs from BIA Precedent Without Explanation.

"[R]easoned decision-making requires that when departing from precedents or practices,

an agency must 'offer a reason to distinguish them or explain its apparent rejection of their

approach . . . . [H]owever the agency justifies its new position, what it may not do is gloss over

or swerve from prior precedents without discussion." *Grace II*, 965 F.3d at 900 (internal

quotations and citations omitted); *see also Encino Motorcars,* 136 S. Ct. 2117, 2126 (2016) (an

agency changing its interpretation of a statute must "at least 'display awareness that it is

changing position' and 'show that there are good reasons for the new policy'") (quoting *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009)).

For decades, BIA precedent has uniformly recognized that families are paradigmatic particular social groups under the INA. *See, e.g.*, *Matter of C-A-*, 23 I. & N. Dec. 951, 955 (BIA 2006) ("[s]ocial groups based on . . . family relationship are generally easily recognizable and understood by others to constitute social groups"); *Matter of V-T-S-*, 21 I. & N. Dec. 792, 798 (BIA 1997) (en banc) (analogizing the group "Filipino[s] of mixed Filipino-Chinese ancestry" to "kinship ties" when concluding it constituted a particular social group); *Matter of Kasinga*, 21 I. & N. Dec. 357, 365-66 (BIA 1996) (en banc) ("identifiable shared ties of kinship warrant characterization as a social group"); *Matter of H-*, 21 I. & N. Dec. 337, 342 (BIA 1996) (en banc) (noting that "clan membership . . . is inextricably linked to family ties" and therefore grounds for finding a particular social group); *see also Matter of M-E-V-G-*, 26 I. & N. Dec. 227, 240 (BIA 2014) (noting that the particular social group found in a prior case was "inextricably linked to family ties"); *Matter of W-G-R-*, 26 I. & N. Dec. 208, 216 (BIA 2014) (same). The New PSG Guidance's "greater social import" requirement departs from that long line of precedent, and radically changes the standard by requiring *something more* than the family or kinship ties long found to constitute viable particular social groups under the INA.

As the D.C. Circuit reminded the government when affirming the vacatur of several new credible fear policies in *Grace II*, the Attorney General and USCIS may not "adopt[ ] [a] new, more demanding standard 'without acknowledging and explaining the change[,]" and by doing so "violat[es] the rule that '[an] agenc[y] may not depart from a prior policy *sub silentio*." 965 F.3d 898 (quoting *American Wild Horse Preservation Campaign v. Perdue*, 873 F.3d 914, 923 (D.C. Cir. 2017)). That is exactly what the government has done here.

The BIA has previously interpreted the "social distinction" component of the "particular social group" analysis to be focused "on the extent to which the group is understood to exist as a recognized component of the society in question." *Matter of M-E-V-G-*, 26 I. & N. Dec. 227 (BIA 2014). Under that standard, a nuclear family may easily qualify as a particular social group, given that most societies view families as a "recognized component" (*id.*) of their societies. For decades, ordinary families were accordingly found by the BIA to qualify as PSGs, without any showing of "greater social import" as the New PSG Guidance requires. In *M-E-V-G-*, the Board reaffirmed its prior pronouncement that "'[s]ocial groups based on innate characteristics such as sex *or family relationship* are generally easily recognizable and understood by others to constitute social groups.'" 26 I. & N. Dec. at 246 (quoting *Matter of C-A-*, 23 I.& N. Dec. at 957, 959-60) (emphasis added). And following *M-E-V-G*, Defendants issued their 2015 guidance, explicitly instructing that "[i]n most societies, for example, the nuclear family would qualify as a particular social group." USCIS000078.

Yet now, under the pretense of reconciling the law with *M-E-V-G*, Defendants instruct asylum officers that most families will not qualify as particular social groups, without any attempt to explain—or even acknowledge—its own about-face on this issue. While the Attorney General recognized in *L-E-A- II* that he was departing from *circuit court* precedent addressing family-based PSGs, neither the Attorney General nor USCIS acknowledged that they were reversing their own prior interpretation and implementation of *M-E-V-G-*.

Defendants do not dispute that in most (if not all) societies, (i) members of a nuclear family "will generally understand their own affiliation with the grouping, as will other people in the particular society;" and (ii) if their family relationship "were known, those with the characteristic [*i.e.*, members of the family] in the society in question would be meaningfully

distinguished from those who do not have it." *M-E-V-G*, 26 I. & N. Dec. at 238. But Defendants

now seek to graft on the additional requirement that ordinary families cannot meet the social

distinction requirement for PSGs unless they "carr[y] greater societal import" than "ordinary"

families. 27 I. & N. Dec. at 595. There is no basis in *M-E-V-G-* for these additional requirements,

nor any reason for applying a higher standard to family-based PSGs than other PSGs.

Indeed, after *M-E-V-G-* was decided, USCIS issued its 2015 Guidance instructing asylum

officers to analyze nuclear-family based PSGs as follows:

> Often, the determinative question is whether the familial relationship also reflects
> social distinctions. . . *The question here is not generally whether a specific family
> is well-known in the society*. Rather, the question is whether the society perceives
> the degree of relationship shared by group members as so significant that the
> society distinguishes groups of people based on that type of relationship.
>
> *In most societies, for example, the nuclear family would qualify as a particular
> social group*, while those in more distant relationships . . . may not.

USCIS000079 (emphasis added). Thus, the New PSG Guidance is a clear departure from both

*M-E-V-G-* and the agency's implementation of that decision.

The agency's failure to recognize its departure from BIA precedent, and the lack of a

reasoned explanation for that departure, renders the New PSG Guidance arbitrary, capricious,

and unreasonable. *Encino Motorcars*, 136 S. Ct. at 2126 (agency must "at least display

awareness that it is changing position and show that there are good reasons for the new policy")

(quotation omitted); *Lone Mountain Processing, Inc. v. Sec'y of Labor*, 709 F.3d 1161, 1164

(D.C. Cir. 2013) ("an agency changing its course must supply a reasoned analysis indicating that

prior policies and standards are being deliberately changed, not casually ignored")*.*

Finally, the New PSG Guidance even deviates without explanation from *L-E-A- II* by

explicitly imposing a "well-known" requirement for nuclear family-based PSGs, a phrase that

appears nowhere in the text of *L-E-A- II*. The failure of the New PSG Guidance to acknowledge

or explain its decision to go beyond the requirements of *L-E-A- II* further render the Guidance arbitrary, capricious, and unreasonable.

## 2.    The Guidance Is Not the Product of Reasoned Decision-Making.

The New PSG Guidance is also arbitrary and capricious because it is irrational and unsupported. Neither *L-E-A- II* nor the New PSG Guidance provides any framework for determining when an applicant's family "carries greater societal import" than "ordinary" families and is "recognizable by society at large." 27 I. & N. Dec. at 595. This language suggests that the New PSG Guidance would extend asylum to only members of "well-known" families—a fundamentally irrational result that "bears no relation" to "the purposes of the immigration laws or the appropriate operation of the immigration system." *Judulang*, 565 U.S. at 55. The New PSG Guidance itself identifies no reasoned basis for this requirement or any workable framework for its application. Rather, the Guidance simply points back to *L-E-A- II*.

First, the Attorney General attempted to justify his reinterpretation of the INA to bar members of "ordinary" families facing persecution because of their family connection from obtaining asylum by misapplying the *ejusdem generis* canon of construction, claiming that this canon requires the term "particular social group" be read "in conjunction with the terms preceding it, which cabins its reach." *L-E-A- II*, 27 I. & N. Dec. at 592. But the terms surrounding "particular social group"—"political opinion," "religion," "race," and "nationality" (8 U.S.C. § 1101(a)(42)(A))—are all extremely broad. Few persons exist who do not belong to a race, practice a religion, have a nationality, or hold a political opinion. Correctly applied, then, the *ejusdem generis* canon indicates that the term "particular social group" casts a very wide net. *See Hall St. Assocs., L.L.C. v. Mattel, Inc.*, 552 U.S. 576, 587 (2008). Certainly, there is no indication in the surrounding terms that individuals who possess the other protected characteristics, or that the characteristics themselves, must be something other than "ordinary."

The Attorney General also suggested that a broad interpretation of "particular social group" would "render virtually every [applicant] a member of a [particular social group]" and thus eligible for relief. *L-E-A- II*, 27 I. & N. Dec. at 593. But that conflates the particular social group analysis with the *separate* requirement that an applicant show that they were persecuted *because of* membership in a particular social group (the "nexus" requirement). Just as not everyone affiliated with a religion qualifies for asylum, not everyone who belongs to a particular social group qualifies for asylum. As the Attorney General noted in *Matter of A-B-*, 27 I. & N. Dec. 316, 338 (A.G. 2018), nexus is "'where the rubber meets the road.'" *L-E-A- II* ignores that important additional requirement, falsely suggesting that the term "particular social group" must be interpreted to limit the pool of asylum applicants to a more manageable subset.

The Attorney General further opined that "particular social group" should not be interpreted to encompass ordinary families because "family" is not one of the grounds for protection explicitly listed in the INA. *See L-E-A- II*, 27 I. & N. Dec. at 583. The INA term "particular social group," however, is facially broad. Indeed, Congress's choice to enact the broad term "particular social group," which had been recognized under international law and long understood to encompass families (*see* pages 2-4 above and 38-39 below), rendered it unnecessary for Congress to specifically list "family" as a protected group. The BIA recognized that family readily qualifies as "particular social group" when it interpreted that term for the first time in *Matter of Acosta*, identifying "kinship ties" as a "characteristic that defines a particular social group," 19 I. & N. Dec. 211, 233 (BIA 1985).

In any event, the government's claim that specific groups must be named in the INA to qualify for protection under the statute would render the "particular social group" language meaningless, contrary to longstanding principles of statutory interpretation. *See*

*Ramsdell,* 107 U.S. 147, 152 (1883) (interpreter must "give effect, if possible, to every clause and word of a statute"). And this reading arbitrarily denies asylum protections to "ordinary" families, while providing them to "well-known" families. *Cf. Judulang*, 565 U.S. at 55 (a rule disfavoring certain noncitizens that "bears no relation" to "the purposes of the immigration laws or the appropriate operation of the immigration system" is arbitrary and capricious).

The Attorney General's *dicta,* suggesting that "ordinary" families are not particular social groups, is thus unsupported and poorly reasoned. The adoption and implementation of that *dicta* in the credible fear interview process via the New PSG Guidance—with no better explanation or support—is therefore arbitrary and capricious.

3. <u>USCIS Failed to Consider Whether Its View of *L-E-A- II* Should Control in Credible Fear Proceedings**,** as Opposed to in Immigration Courts</u>.

The New PSG Guidance also should be set aside as arbitrary and capricious because it erroneously proceeds on the premise that USCIS is bound to apply a rule barring asylum claims based on membership in ordinary families under the more relaxed credible fear standard. An agency can "fail[ ] to consider an important aspect of the problem," *State Farm*, 463 U.S. at 43, and thus act arbitrarily and capriciously, when it does not "appreciate the full scope of [its] discretion." *Regents*, 140 S. Ct. at 1911. Here, as in *Regents*, the Department of Homeland Security defends its policy by pointing to a decision of the Attorney General and asserting that the Attorney General's legal determination is "controlling law." USCIS000015 n.1. And here, as in *Regents*, the agency's policy should be vacated because it mistakenly assumed the decision of the Attorney General "compelled DHS to abandon [its prior] policy." 140 S. Ct. at 1912.

As noted above in Section II.A, credible fear interviews are governed by a "significant possibility" standard that is designed to ensure there is "no danger that an alien with a genuine asylum claim will be returned to persecution." *Grace II*, 965 F.3d at 902 (quoting H.R. Rep.

No. 104-469, pt. 1, at 158 (1995)). Because of the screening function of credible fear interviews, USCIS has frequently adopted policies to allow asylum claims that raise unresolved legal issues or are otherwise doubtful, uncertain, novel, or likely to require substantial factual development to receive a positive determination. *See*, *e.g.*, 8 C.F.R. § 208.30(e)(4) ("In determining whether the alien has a credible fear of persecution . . . the asylum officer shall consider whether the alien's case presents novel or unique issues that merit consideration in a full hearing before an immigration judge."); 8 C.F.R. § 208.30(e)(5)(i) ("[I[f an alien is able to establish a credible fear of persecution but appears to be subject to one or more of the mandatory bars to applying for, or being granted, asylum . . . or to withholding of removal . . . the Department of Homeland Security shall nonetheless place the alien in [asylum] proceedings . . . for full consideration of the alien's claim."); *see also Grace II*, 965 F.3d at 901 (noting USCIS credible fear policy instructing officers to adopt the interpretation most favorable to the applicant where the claim "raises an unresolved issue of law" and "there is no DHS or Asylum Division policy or guidance on the issue").

Consistent with this longstanding practice of permitting more complicated or novel issues to be decided in a full hearing before an immigration judge, even if USCIS thought (incorrectly) that, under *L-E-A- II*, asylum claims based on membership in ordinary families will no longer succeed, USCIS was not compelled to implement that view in the credible fear interview context—particularly given that, unlike the Attorney General decision at issue in *Grace*, *L-E-A- II* does not itself state that it applies to credible fear interviews. Instead, USCIS could have proceeded based on its prior guidance allowed asylum seekers, who otherwise pass the "significant possibility" threshold by asserting that they face a significant possibility of persecution based on their membership in a particular family, to have an immigration judge

determine the legally complicated and evidence-intensive issue of whether that family

qualifies as a PSG, including in light of *L-E-A- II*. In other words, whatever *L-E-A- II* means

or does not mean for asylum cases proceeding in immigration courts, it does not *compel*

USCIS to change its policies regarding the circumstances under which families may be

considered as potential particular social groups *at the credible fear interview process stage*,

where an asylum seeker need only show a significant possibility of ultimately prevailing.

USCIS, however, proceeded on the erroneous assumption that the opposite was true.

*See* USCIS000015 n.1

When an agency mistakenly believes that it is legally compelled to take a particular

action, but it in fact retains discretion to choose a different course—and failed to consider

whether it should instead choose that course—the Supreme Court has not hesitated to vacate

the agency action and remand for further consideration. *See Regents*, 140 S. Ct. at 1901; *see

also Negusie v. Holder*, 555 U.S. 511, 516 (2009) ("We conclude that the BIA misapplied our

precedent . . . as mandating [a particular result]. The agency must confront the same question

free of this mistaken legal premise."). The Court should do the same here.

**D.**   **The New PSG Guidance Unlawfully Interprets the Statutory Term "Particular Social Group."**

Finally, in addition to being arbitrary and capricious, the New PSG Guidance is also an

unlawful interpretation of the INA term "particular social group." That broad phrase cannot be

interpreted to exclude "the average or ordinary family." USCIS000017, USCIS000019.

1.   The Guidance Does Not Merit Chevron Deference.

The government has claimed—including in the New PSG Guidance (USCIS000014)—

that its new interpretation of the statutory phrase "particular social group" as excluding ordinary

families is entitled to deference. It is not.

To begin, the Guidance's instructions are based on the Attorney General's *dicta* in *L-E-A-II*, and such *dicta* is not entitled to *Chevron* deference. *See Grace I*, 344 F. Supp. 3d at 138 ("[T]he only legal effect of [the Attorney General decision] is to overrule [a particular BIA decision]. Any other [] *dicta* would not be entitled to deference.").[6] As previously discussed (*see* pp. 7-8 above), the actual holding of *L-E-A- II* was that immigration courts must apply the three-pronged PSG analysis to each proposed PSG that comes before them. The Attorney General's gratuitous prediction that most "ordinary" families would not qualify as PSGs was not essential to that holding or the disposition of the case, and thus is classic *dicta*. While *Chevron* deference may apply to an agency's interpretation of ambiguous statutory text, it does not apply to *dicta* predicting how statutory text may apply to unspecified facts.

Moreover, the Supreme Court has warned that agency interpretations "contained in policy statements, agency manuals, and enforcement guidelines, all of which lack the force of law[,] do not warrant *Chevron*-style deference." *Christensen v. Harris Cnty.*, 529 U.S. 576, 587 (2000). For this reason as well, the New PSG Guidance, which consists of an agency "guidance" document and a lesson plan (akin to a manual), is not entitled to *Chevron* deference.

    2.    <u>The Guidance Is an Incorrect and Unreasonable Interpretation of the INA</u>.

Even if assessed within the *Chevron* framework, the New PSG Guidance sets forth an incorrect—or at least unreasonable—interpretation of the INA term "particular social group."

To begin, all of the reasons identified above as to why the Guidance is arbitrary, capricious, and unlawful also support the conclusion that it is not a permissible interpretation of

---

[6] The D.C. Circuit did not disturb this conclusion in *Grace II*; rather, it concluded that the relevant parts of the challenged guidance did not in fact impermissibly treat the Attorney General's *dicta* as binding. *See* 965 F.3d at 906. As explained above, the New PSG Guidance, in contrast, is both phrased in writing and treated in practice as a rule that categorically bars from proceeding asylum claims predicated on membership in non-famous families. *See* p. 22 above.

the statutory term "particular social group," which must be read in the broader context of the

INA's other provisions and requirements, and also in a logically sound and reasonable manner.

The New PSG Guidance also fails the *Chevron* test given that it conflicts with the

conclusion of *every* circuit that has ever interpreted this language. *See, e.g., Villalta-Martinez v.*

*Sessions*, 882 F.3d 20, 26 (1st Cir. 2018) ("[I]t is well established that the nuclear family

constitutes a recognizable social group . . . ."); *Vanegas-Ramirez v. Holder*, 768 F.3d 226, 237

(2d Cir. 2014) (petitioner's "membership in his family may, in fact, constitute a 'social-group

basis of persecution' against him"); *Vumi v. Gonzales*, 502 F.3d 150, 155 (2d Cir. 2007)

(remanding a family-based claim because "[t]he BIA has long recognized that 'kinship ties' may

form a cognizable shared characteristic for a particular social group"); *S.E.R.L. v. Att'y Gen.*, 894

F.3d 535, 556 (3d Cir. 2018) ("Kinship, marital status, and domestic relationships can each be a

defining characteristic of a particular social group. . . ."); *Crespin-Valladares v. Holder*, 632 F.3d

117, 125 (4th Cir. 2011) ("the family provides a prototypical example of a particular social

group") (internal quotations omitted); *Al–Ghorbani v. Holder*, 585 F.3d 980, 995 (6th Cir. 2009)

("[A] family is a 'particular social group' if it is recognizable as a distinctive subgroup of

society."); *Torres v. Mukasey*, 551 F.3d 616, 629 (7th Cir. 2008) ("Our prior opinions make it

clear that we consider family to be a cognizable social group . . . ."); *Ayele v. Holder*, 564 F.3d

862, 869 (7th Cir. 2009) ("Our circuit recognizes a family as a cognizable social group under the

INA."); *Bernal-Rendon v. Gonzales*, 419 F.3d 877, 881 (8th Cir. 2005) ("[P]etitioners correctly

contend that a nuclear family can constitute a social group."); *Rios v. Lynch*, 807 F.3d 1123,

1128 (9th Cir. 2015) (families are "quintessential" particular social groups); *Rivera-Barrientos v.*

*Holder*, 666 F.3d 641, 648 (10th Cir. 2012) (approvingly citing the Board's prior

characterization of particular social groups as including those bound by kinship ties); *Castillo-Arias v. Att'y Gen.*, 446 F.3d 1190, 1193 (11th Cir. 2006) (same).

Notably, several circuits have expressed the view that ordinary nuclear families are *unambiguously* "particular social groups." *See, e.g.*, *Rios v. Lynch*, 807 F.3d 1123, 1128 (9th Cir. 2015) (families are "quintessential" particular social groups); *Crespin-Valladares v. Holder*, 632 F.3d 117, 125 (4th Cir. 2011) ("the family provides a *prototypical* example of a particular social group") (internal quotations omitted and emphasis added); *Gebremichael v. I.N.S.*, 10 F.3d 28, 36 (1st Cir. 1993) ("There can, in fact, be no plainer example of a social group . . . than that of the nuclear family."). Thus, despite the fact that the term "particular social group" may lend itself to some ambiguity in the abstract, these prior circuit court decisions foreclose the new interpretation of that phrase offered in *L-E-A- II* as a matter of law. *See Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 983 (2005) ("[A] judicial precedent holding that the statute unambiguously forecloses the agency's interpretation, and therefore contains no gap for the agency to fill, displaces a conflicting agency construction."). In other words, if *Chevron* applies at all here, then the agency's re-interpretation of the term "particular social group" to exclude ordinary families fails at *Chevron* Step One. But at the very least, the uniform conclusion of the circuit courts that ordinary nuclear families readily may qualify as PSGs is strong evidence that the government's new interpretation of "particular social group" as *excluding* ordinary nuclear families, and instead covering only families who are "well known," is not a reasonable interpretation of that statutory phrase.

The New PSG Guidance's directive that an ordinary family will not qualify as a "particular social group" is also at odds with the legislative history of that term. When Congress adopted the facially broad term "particular social group" into the INA through the Refugee Act

of 1980, it already had a well-established scope under international law that *included* families.

The term "particular social group" was first used in the 1951 Refugee Convention,[7] and the U.N. Conference that unanimously adopted that treaty[8] explicitly recognized that "the family" is "the natural and fundamental group unit of society."[9] This historical context confirms that the term "particular social group"—imported by Congress into the Refugee Act—was intended and understood by Congress to encompass families.[10] As the D.C. Circuit noted in *Grace II*, where "the intent of Congress is clear, that is the end of the matter;" any contrary interpretation fails under *Chevron* Step One. 965 F.3d at 896 (quoting *Chevron*, 467 U.S. at 842). But even if Congress's intent in regard to the question of whether "particular social group" includes ordinary nuclear families were not viewed as clear, an interpretation of that term that instead *excludes* ordinary families is not a reasonable interpretation of that statutory term.

Furthermore, the BIA has long recognized that Congress's intent in enacting the Refugee Act was to align domestic refugee law with the United States' obligations under the Protocol, including "to afford a generous standard for [refugee] protection in cases of doubt." *In Re S-P-*, 21 I. & N. Dec. 486, 492 (BIA 1998) (quoting S. REP. NO. 256, 96th Cong., 2d Sess. 1, 4,

---

[7] *See* Art. 1(A)(2), July 28, 1951, 19 U.S.T. 6259, 189 U.N.T.S. 137 (Refugee Convention).

[8] United Nations Conference of Plenipotentiaries on the Status of Refugees and Stateless Persons, *Final Act of the United Nations Conference of Plenipotentiaries on the Status of Refugees and Stateless Persons*., U.N. Doc. A/CONF.2/108/Rev.1, https://www.refworld.org/docid/40a8a7394.html (July 25, 1951).

[9] *See also Final Act of the United Nations Conference of Plenipotentiaries on the Status of Refugees and Stateless Persons*, U.N. Doc. A/CONF.2/108/Rev.1 (articulating principle that "the family" is "the natural and fundamental group unit of society").

[10] This is consistent with the distinction drawn by the D.C. Circuit in *Grace II* between relying on international law sources to confirm Congress's clear intent based on the text of the statute, which the court thought appropriate, and using such sources to "divine clarity from an ambiguous statutory language," which the court did not think appropriate. 965 F.3d at 898. While the term "particular social group" may be ambiguous in some regards (e.g., as to whether women unable to leave their husbands so qualify), it is unambiguous in that its textual breadth plainly encompasses ordinary nuclear families—the social building blocks of any society.

reprinted in 1980 U.S.C.C.A.N. 141, 144). An interpretation of "particular social group" that presumptively *excludes* most families—the very group initially identified by the international community as the "natural and fundamental" social group[11]—at the credible fear interview stage would obviate that intent to align U.S. asylum law with international refugee law, and afford a generous standard for protection.

The New PSG Guidance also cannot be squared with a plain text, common-sense reading of the broad phrase "particular social group." In nearly every culture on earth, the nuclear family relationship is recognized by society and controls fundamental legal and economic rights. Using American society as a familiar example, the nuclear family relationship plays a central role in determining access to healthcare, hospital visitation rights, burial rights, inheritance and other property rights, as well as spousal and parental responsibilities. Whether one is filing taxes, enrolling a child in school, or leasing a home, society recognizes the nuclear family and grants or denies rights to individuals on the basis of that family relationship.

The courts have accordingly long recognized the family unit as a universal and fundamental building block upon which society rests. *See Moore v. City of East Cleveland*, 431 U.S. 494, 503-04 (1977) ("[T]he Constitution protects the sanctity of the family precisely because the institution of the family is deeply rooted in this Nation's history and tradition. It is through the family that we inculcate and pass down many of our most cherished values, moral and cultural."); *DeBurgh v. DeBurgh*, 250 P.2d 598, 601 (Cal. 1952) ("The family is the basic unit of our society, the center of the personal affections that ennoble and enrich human life."). This longstanding, common-sense recognition of the family as *the fundamental social group* on which most societies are founded is precisely why the circuit courts and the BIA have routinely held that "the nuclear family constitutes a recognizable social group." *Villalta-Martinez v.*

---

[11] *See id.*

*Sessions*, 882 F.3d 20, 26 (1st Cir. 2018); *see also Matter of C-A-*, 23 I. & N. Dec. 951, 955 (BIA 2006) ("[s]ocial groups based on . . . family relationship are generally easily recognizable and understood by others to constitute social groups").

While immigration courts must of course still assess whether the family relationship on which each asylum claim is based is sufficiently "particular" (*i.e.*, whether the bounds of the proposed family group are clearly defined), what cannot reasonably be debated is whether, as a general proposition, an ordinary family may qualify as a particular social group. And yet that is exactly what the government seeks to prohibit—and, importantly, to prohibit not only in proceedings before immigration courts, but in the unique context of credible fear interviews, where Congress has intentionally set a low standard that requires an asylum applicant to show only a significant possibility of persecution based on a protected ground.

The government's new interpretation of "particular social group" as excluding ordinary families is at odds with the facial breadth of that statutory phrase; its genesis and history; the view of every circuit to consider the question; and our shared cultural understanding that families are the most fundamental of social groups. This Court should accordingly hold that the New PSG Guidance sets forth an unlawful interpretation of the INA term "particular social group."

### III.   The Court Should Vacate the New PSG Guidance, Declare Its Substance Unlawful, and Enjoin the Government from Applying *L-E-A- II* in Credible Fear Interviews.

#### A.   The Court Should Vacate Plaintiffs' Negative Credible Fear Determinations and the New PSG Guidance.

Because the New PSG Guidance is unlawful, it must be "set aside" (5 U.S.C. § 706), along with Plaintiffs' negative credible fear determinations predicated on the Guidance.

As the D.C. Circuit has explained, "[w]hen a reviewing court determines that agency regulations are unlawful, the ordinary result is that the rules are vacated." *Nat'l Min. Ass'n v. U.S. Army Corps of Engineers*, 145 F.3d 1399, 1409 (D.C. Cir. 1998). This Court recently

applied that "ordinary" remedy in a challenge to asylum directives issued by then-Acting USCIS

Director Ken Cuccinelli regarding credible fear interviews, explaining: "[B]inding D.C. Circuit

precedent requires that, '[w]hen a reviewing court determines that agency regulations are

unlawful, the ordinary result is that the rules are vacated—not [just] that their application to the

individual [plaintiffs] is proscribed.'" *L.M.-M. v. Cuccinelli*, 442 F. Supp. 3d 1, 36 (D.D.C. Mar.

1, 2020) (quoting *Nat'l Mining*, 145 F.3d at 1409).

###### B.   The Court Should Issue a Declaratory Judgment.

Defendants have asserted in this litigation that even without the New PSG Guidance, *L-

E-A- II* would apply in the credible fear context—even though *L-E-A- II* itself (unlike the

Attorney General decision at issue in *Grace*) says nothing to that effect.[12] Given those

statements, this Court should also provide declaratory relief to clarify that any further application

of the relevant portions of *L-E-A- II* in expedited removal proceedings would be unlawful. As

explained in *L.M.-M-*, 442 F. Supp. 3d at 36, "the structure of 8 U.S.C. § 1252(e)(3) itself

contemplates that courts may issue declaratory judgments relating to the 'implementation of' the

expedited removal provisions of [the INA] that affect the interests of those not before the Court."

The *L.M.-M-* court therefore declared the challenged asylum directives to be unlawful, in

addition to vacating and setting them aside under the APA. This Court should do the same here.

###### C.   The Court Should Enjoin the Government from Applying *L-E-A- II* in the Credible Fear Interview Setting.

Given the government's assertion that *L-E-A- II*—including the *dicta* asserting "ordinary"

families lack the necessary social distinction to qualify as PSGs—would apply in the credible

fear interview context even absent the New PSG Guidance, the Court should also enjoin the

---

[12] For example, in a supplemental filing after the preliminary injunction hearing, the government asserted: [W]ith or without the Policy Memorandum and Lesson Plan, asylum officers . . . must follow *Matter of L-E-A- II* when screening for credible fear." ECF No. 44 at 2.

government from applying it in that context. While vacatur is the ordinary remedy in an APA

challenge to agency action, an injunction may also issue where it "would 'have [a] meaningful

practical effect independent of [the policy's] vacatur.'" *L.M.-M-*, 442 F. Supp. 3d at 36 (quoting

*Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165 (2010)). Injunctive relief is

appropriate where plaintiffs demonstrate that: (1) they have suffered an irreparable injury; (2)

traditional legal remedies, such as monetary relief, are inadequate; (3) the balance of hardships

warrants injunctive relief; and (4) an injunction is not contrary to the public interest. *See Morgan*

*Drexen, Inc. v. Consumer Fin. Prot. Bureau*, 785 F.3d 684, 695 (D.C. Cir. 2015).

As the district court found in *Grace I* (and the D.C. Circuit affirmed by upholding the

lower court's order of injunctive relief in regard to several credible fear policies), plaintiffs who

have been improperly denied the chance to pursue their asylum claims due to unlawful

government policies are entitled to injunctive relief. As in *Grace I*, "[n]o relief short of enjoining

the unlawful credible fear policies in this case could provide an adequate remedy . . . . The harm

[Plaintiffs] suffer will continue unless and until they receive a credible fear determination

pursuant to the existing immigration laws." 344 F. Supp. 3d at 146. And the district court's

assessment of the final two injunctive relief factors in *Grace I* holds true here as well:

> The balance of the hardships weighs in favor of plaintiffs since the [g]overnment 'cannot
> suffer harm from an injunction that merely ends an unlawful practice. . . . And the
> injunction is not contrary to the public interest because, of course, the public interest is
> served when administrative agencies comply with their obligations under the APA.
> Moreover, as the Supreme Court has stated, "there is a public interest in preventing aliens
> from being wrongfully removed, particularly to countries where they are likely to face
> substantial harm." *Nken v. Holder*, 556 U.S. 418, 436, (2009).

*Id.* (quotations omitted). Notably, in affirming this form of relief in *Grace II*, the D.C. Circuit

rejected the government's argument that the INA does not permit injunctive relief pursuant to a

determination that a credible fear policy is unlawful, holding: "Neither section 1252(f)(1) nor

section 1252(e)((1) prohibited the district court from entering an injunction." *Id*. at 908.

The injunctive relief ordered by the district court in *Grace I*, and then affirmed in regard to certain of the challenged policies by the D.C. Circuit in *Grace II*, required the government to "provide written guidance or instructions to all asylum officers and immigration judges . . . communicating that the [vacated policies] shall not be applied to any . . . credible fear proceedings," as well as to provide new credible fear interviews to the plaintiffs. *Id*. at 41. The same relief is appropriate here in order to make clear to asylum officers that the New PSG Guidance is unlawful and may no longer be applied in credible fear interviews—and to ensure that the Plaintiffs receive new credible fear interviews in which they are not barred from pursuing family-based PSG claims simply because their families are "ordinary."

### D.     The Relief Granted by this Court Should Apply Nationwide.

The relief granted by this Court should apply nationwide. Under the INA, any challenges to the New PSG Guidance had to be brought in this Court within 60 days of its implementation, thus preventing most asylum seekers from challenging the New PSG Guidance directly. 8 U.S.C. § 1252(e)(3). In other words, this is the *only* time and place where the New PSG Guidance can be challenged, and so the Court *must* determine whether it is lawful once and for all. As explained in *L.M.-M-*, "8 U.S.C. § 1252(e)(3) itself contemplates that courts may [issue relief] that affect the interests of those not before the Court." 442 F. Supp. 3d at 36,

Declining to vacate the New PSG Guidance and enjoin it nationwide would also frustrate the constitutional interest in a uniform federal immigration policy. "In immigration matters," courts "have consistently recognized the authority of district courts to enjoin unlawful policies on a universal basis." *E. Bay Sanctuary Covenant v. Trump*, 932 F.3d 742, 779 (9th Cir. 2018). "Such [universal] relief is commonplace in APA cases, promotes uniformity in immigration enforcement, and is necessary to provide the plaintiffs here with complete redress." *Id*. (citation omitted). Otherwise, the government would be free to continue to apply to other asylum seekers

across the country an expedited removal policy found unlawful by the court designated by statute to review that policy, rendering judicial review a formality with little practical impact. This Court has now rejected that untenable view of the government's power under the INA several times. *E.g.*, *L.M.-M. v. Cuccinelli*, 442 F. Supp. 3d at 36 (the "structure of" the INA "contemplates that courts may issue declaratory judgments relating to the 'implementation of' the expedited removal provisions . . . that affect the interests of those not before the Court"); *Grace I*, 344 F. Supp. 3d at 144 ("[A]ccording to the government, the Court may declare the new credible fear policies unlawful, but DHS may continue to enforce the policies in all other credible fear interviews. To state this proposition is to refute it.").

## CONCLUSION

For the foregoing reasons, the court should grant Plaintiffs' motion for summary judgment, and enter an Order providing that:

The negative credible fear determinations and expedited removal orders received by Plaintiffs are vacated, and Plaintiffs shall be afforded new credible fear interviews consistent with this Order or shall be placed in removal proceedings under 8 U.S.C. § 1229a;

The New PSG Guidance, consisting of (1) the parts of USCIS's September 24, 2019 *Credible Fear of Persecution and Torture Determinations* Lesson Plan instructing asylum officers to implement the Attorney General's decision in *Matter of L-E-A- II*, 27 I. & N. Dec. 581 (A.G. 2019), in credible or reasonable fear interviews of persons subject to expedited removal under 8 U.S.C. § 1225(b) and (2) the parts of the *Guidance for Processing Reasonable Fear, Credible Fear, Asylum, and Refugee Claims in Accordance with Matter of L-E-A-*, published on USCIS's website on September 30, 2019, addressing the conduct of credible or reasonable fear interviews of persons subject to expedited removal under 8 U.S.C. § 1225(b), is declared unlawful and vacated;

Defendants  are enjoined from applying the New PSG Guidance or *Matter of L-E-A-*, 27 I. & N. Dec. 581 (A.G. 2019), in credible or reasonable fear interviews of persons subject to expedited removal under 8 U.S.C. § 1225(b); and

Defendants must issue, within 30 days, written instructions to asylum officers conducting credible or reasonable fear interviews of persons subject to expedited removal under 8 U.S.C. § 1225(b) that direct them to cease applying the New PSG Guidance and instead apply USCIS's July 27, 2015, *RAIO Nexus – Particular Social Group Lesson Plan* in such proceedings, and to file a written report with this Court within 30 days detailing the steps Defendants have taken to comply with this Order.

Dated: September 4, 2020

Respectfully submitted,

s/ Amanda Shafer Berman
Tracy A. Roman (#443718)
Amanda Shafer Berman (#497860)
Jared A. Levine*
Mara Lieber*
CROWELL & MORING LLP
1001 Pennsylvania Ave., N.W.
Washington, D.C. 20004
(202) 624-2500
troman@crowell.com

Victoria Neilson*
Bradley Jenkins (MD0110)
Michelle Mendez*
Rebecca Scholtz*
CATHOLIC LEGAL IMMIGRATION
NETWORK, INC.
8757 Georgia Ave., Suite 850
Silver Spring, MD 20910
(301)565-4820
bjenkins@cliniclegal.org

*Counsel for Plaintiffs*

*Admitted pro hac vice*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on September 4, 2020, I will cause true and correct copies of

Plaintiffs' Motion for Summary Judgment to be served via the Court's CM-ECF system on all

counsel of record.

Dated: September 4, 2020                          Respectfully submitted,


                                                 <u>/s/ Amanda Shafer Berman</u>
                                                 Amanda Shafer Berman